# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: CALIFORNIA PIZZA KITCHEN DATA BREACH LITIGATION

AVIVA KIRSTEN AND JEREMY PITTMAN
*Movants-Appellants,*

v.

KANSAS GILLEO, SYDNEY RUSEN, ESTEBAN MORALES, DOUG WALLACE, ALONDRA MEZA, BRETT RIGAS, AND EVENCIO DIAZ
*Plaintiffs-Appellees,*

v.

CALIFORNIA PIZZA KITCHEN, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court for the
Central District of California, No. 8:21-cv-01928-DOC-KES
The Honorable David O. Carter, U.S. District Judge

## MOVANTS-APPELLANTS' OPENING BRIEF

Tina Wolfson
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
twolfson@ahdootwolfson.com

Todd. S. Garber
Andrew C. White
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
Facsimile: (914) 824-1561
tgarber@fbfglaw.com
awhite@fbfglaw.com

*Counsel for Movants-Appellants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

JURISDICTONAL STATEMENT ...........................................................3

STATEMENT OF ISSUES .......................................................................4

FACTUAL AND PROCEDURAL BACKGROUND ................................4

    A.  The Data Breach..............................................................................4

    B.  Original Complaints .......................................................................5

    C.  Appellants Tried to Have a Speedy Rule 23(g) Hearing While Settling Plaintiffs  Schemed to Delay 23(g) Proceedings and Excluded Appellants from Consolidated Proceedings So as to Conclude Their Secret and Collusive Settlement. ......................................................................5

    D.  CPK Realized That Appellants Would Not Sell Out the Class at an Early Mediation .....................................................................................6

    E.  Settling Plaintiffs and CPK Secretly Mediated While Deliberately Hiding That Mediation from Appellants and the Court. .............................7

    F.  Dispositive Motions in the *Kirsten* Matter Increased the Value of the Case ...............................................................................................8

    G.  Appellants' Motion to Appoint Interim Lead Counsel for the Plaintiffs and Opposition to the Motion to Stay Proceedings Presented Evidence of Collusion but the Court Held Both Motions in Abeyance and Proceeded with the Motion for Preliminary Approval..................9

    H.  The Settlement Terms .................................................................10

    I.  The Appellants Presented Valid Objections and Evidence of Collusion at Preliminary Approval; the Court Expressed Concerns but Granted Preliminary Approval...............................................................11

    J.  The Settling Plaintiffs Presented a False and Inflated Settlement Value to the Court at Final Approval ...................................................14

K. The Court Granted Final Approval and Awarded $800,000 in Attorneys' Fees and Expenses Without Applying Heightened Scrutiny or Addressing Any of Appellants' Objections or Its Own Concerns Expressed at Oral Argument. ...................................................18

SUMMARY OF ARGUMENT ..............................................................18

STANDARD OF REVIEW ...................................................................20

ARGUMENT ........................................................................................20

A. The District Court Failed to Apply Heightened Scrutiny to This Pre-Certification Class Settlement Marked by Glaring Indicia of Collusion ......22

B. The Settlement Is Not Fair, Reasonable, and Adequate ...............................24

1. The Relief Provided to the Class by the Settlement Is Inadequate..........27

2. Claims-Made Settlements Such as This One Embody the Concerns Present in Reversionary Settlements .......................................................27

3. The Settlement Agreement Contained a Collusive Clear-Sailing Provision ...................................................................................................29

4. The Court Abused Its Discretion By Ignoring Other Circumstances Indicating Collusion ................................................................................30

5. The Settlement Improperly Releases the CCPA Claim Advanced by Appellants for Inadequate Consideration .................................................30

6. Allowing the Lower Court's Approval of This Settlement to Stand Would Encourage Collusive Settlements That Reward Settling Plaintiffs' Counsel at the Expense of Class Members .............................32

C. The $800,000 Fee and Expense Award Should Be Reversed.......................34

1. Settling Plaintiffs' Claimed Lodestar Was Not Justified Given the Minimal Work Performed ........................................................................34

2. The Positive Multiplier the District Court Applied Was Not Merited by the Results Obtained ...........................................................................36

3.  The Court Abused Its Discretion by Failing to Apply Heightened Scrutiny to the Cross-Check Using the Percentage Method and Awarding Fees that Amounted to at Least 54% of Total Settlement Value ...................................................................................................38

4.  The Fee Award Is Excessive in Comparison to the Results Obtained for Class Members ....................................................................................40

CONCLUSION ...................................................................................................42

STATEMENT OF RELATED CASES ................................................................42

Form 8. Certificate of Compliance for Briefs .........................................................45

CERTIFICATE OF SERVICE................................................................................46

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Bedolla,*
    787 F.3d 1218 (9th Cir. 2015) ....................................................*passim*

*Briseño v. Henderson,*
    998 F.3d 1014 (9th Cir. 2021) ....................................................*passim*

*Chambers v. Whirlpool Corp.,*
    980 F.3d 645 (9th Cir. 2020) ...............................................................21

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy,*
    305 F.3d 943 (9th Cir. 2002) ...............................................................21

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) .........................................................21, 23

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir.1998) .......................................................25, 37

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983).............................................................................36

*Hesse v. Sprint Corp.,*
    598 F.3d 581 (9th Cir. 2010) ...............................................................32

*In re Apple Inc. Device Performance Litig.,*
    50 F.4th 769 (9th Cir. 2022) ................................................................20

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) .....................................................*passim*

*In re Easysaver Rewards Litig.,*
    906 F.3d 747 (9th Cir. 2018) ...............................................................27

*In re Magsafe Apple Power Adapter Litig.,*
    571 F. App'x 560 (9th Cir. 2014) ...........................................36, 37, 40

*K.C. v. Torlakson,*
    762 F.3d 963 (9th Cir. 2014) ...............................................................21

*Kim v. Allison*,
  8 F.4th 1170 (9th Cir. 2021) ...............................................23

*Lowery v. Rhapsody Int'l, Inc.*,
  75 F.4th 985 (9th Cir. 2023) ........................................27, 37, 38, 41

*Machowski v. 333 N. Placentia Prop.*,
  *LLC*, 38 F.4th 837 (9th Cir. 2022) ......................................21

*McKinney-Drobnis v. Oreshack*,
  16 F.4th 594 (9th Cir. 2021) ............................................21, 23, 30

*McKnight v. Hinojosa*,
  54 F.4th 1069 (9th Cir. 2022) ...........................................38

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) ..........................................20

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ...........................................29

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
  944 F.3d 1035 (9th Cir. 2019 .....................................*passim*

*Rosario v. PIH Health, Inc.*,
  No. 2:21-cv-07221-JAK (C.D. Cal.) ...................................33

*Saucillo v. Peck*,
  25 F.4th 1118 (9th Cir. 2022) ..........................................23

*Serrano v. Inmediata Corp.*,
  No. 3:19-cv-01811-JAG (D.P.R.) ......................................33

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ..........................................38

*Stanger v. China Elec. Motor, Inc.*,
  812 F.3d 734 (9th Cir. 2016) ...........................................36

*Stasi v. Inmediata Health Grp. Corp.*,
  No. 3:19-cv-02353-J (S.D. Cal.) ......................................33

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ........................................................29, 34

*Wininger v. SI Mgmt. L.P.*,
  301 F.3d 1115 (9th Cir. 2002) ................................................................38

*Young v. LG Chem Ltd.*,
  783 F. App'x 727 (9th Cir. 2019) ...........................................................20

**Statutes**

Cal. Civ. Code §§ 1798.100 *et seq* .............................................................5

Cal. Civ. Code § 1798.150(a)(1)(A) ...........................................................5

**Rules**

Fed. R. Civ. P. 16(f) ...................................................................................6

Fed. R. Civ. P. 23(c)(2) ............................................................................25

Fed. R. Civ. P. 23(e)(2) ......................................................................25, 41

Fed. R. Civ. P. 23(e)(2)(C) .......................................................................41

Fed. R. Civ. P. 23(g)........................................................................*passim*

Fed. R. Civ. P. 26(f) .............................................................................7, 8

# INTRODUCTION

Contrary to this Court's established precedent, the district court failed to apply heightened scrutiny and summarily approved the collusive and inadequate class action settlement, as well as the full amount of the settling plaintiffs' requested fees. The district court simply ignored the classic indicia of collusion outlined by this Court and by Appellants' well-reasoned and factually supported objections to the collusive pre-class-certification settlement and excessive fee award. Although it expressed concerns regarding the amount of fees at oral argument, the district court ultimately rubber-stamped both the settlement and the fee award. That approval should be reversed now.

This data breach case includes claims with statutory damages and is potentially worth $77 million to the class. The final approval, if allowed to stand, will give the class, at most, $497,974.50 in cash claims benefits and $800,000 to attorneys in fees and costs. The court abused its discretion in finding the settlement fair, reasonable, and adequate.

Putting their own interests before those of the class members they represented, the settling plaintiffs colluded with Defendant California Pizza Kitchen ("CPK") to secure a fee and expense award of $800,000—an amount that far exceeds the actual work performed and the value of valid cash claims made by class members, which at most is $497,974.50 prior to validation by the settlement administrator. By settling

cheap just before class counsel leadership applications were due, the settling plaintiffs avoided contested motion practice and a ruling under Rule 23(g), the outcome of which threatened the settling plaintiffs' ability to receive anything approaching $800,000. Instead of bearing that risk, the settling plaintiffs sold out the class with a paltry claims-made settlement that guaranteed no minimum payout by CPK other than the outsized attorney fees to settling plaintiffs' counsel.

CPK and the settling plaintiffs conspired to exclude Appellants from the settlement process because they knew that their counsel would not sell out the class. While settling plaintiffs colluded in secret, Appellants litigated and won a motion to dismiss the pleadings, raising the value of this case and demonstrating that the settlement challenged here is not fair, reasonable, or adequate.

Permitting defendants to collude with one group of plaintiffs' counsel at the outset of litigation to secure the cheapest route out of litigation before lead counsel have been appointed or class certification has been litigated creates perverse incentives for competing plaintiffs' counsel to settle early and cheap. District courts must apply heightened scrutiny to such settlements to safeguard against collusion between litigants and avoid settlements that prioritize benefit to counsel to the class's detriment. A district court's failure to meet its gatekeeping functions allows defendants to collude with their choice of plaintiff's counsel to settle class actions at

a deep discount while maximizing attorneys' fees for the settling plaintiff's counsel, who barely work for their ample reward. This is what happened here.

The district court's failure to apply the heightened scrutiny required in this Circuit to the challenged settlement; to the negotiation process that led to it, which was rife with indicia of collusion; and to the fees requested via the settlement's clear-sailing provision, amounted to an error of law that this Court should reverse on a *de novo* standard of review. However, the district court's approval of this inadequate settlement also amounted to an abuse of discretion that requires reversal, because *inter alia* the claims-made settlement fails to present a fair resolution of plaintiffs' claims when compared to the potential recovery at trial and the risks of continued litigation.

Accordingly, this Court should reverse the district court's approval of the settlement, along with the fee award to settling plaintiffs' counsel, with instructions that the district court consider applications for lead counsel under Rule 23(g) and require a settlement that is fair, reasonable, and adequate under Rule 23(e).

## JURISDICTONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291, as the district court's Final Judgment and Order approving the settlement on February 2, 2023, constituted a final order that disposed of all parties' claims and resolved the case. Appellants timely filed their notice of appeal on March 24, 2023. 5-ER-569.

## STATEMENT OF ISSUES

1.      Did the district court apply heightened scrutiny to the challenged pre-certification class action settlement, adequately examining it for indicia of collusion?

2. Did the district court commit reversible error when it approved the settlement as fair, where the case had a potential value of $77 million, the settlement contained inadequate terms including a claims-made structure with no fund, provided at most $497,974.50 in cash claims benefits, contained an overly broad release, and included a clear-sailing provision entitling the settling plaintiffs' counsel to excessive attorney fees and expenses of $800,000?

3. Did the district court commit reversible error by awarding $800,000 in attorney fees and expenses, where the case settled before any substantive motion practice and claims made by class members amounted to, at most, $497,974.50, prior to verification by the settlement administrator?

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Data Breach

CPK is an American casual dining restaurant chain that operates over 250 restaurants in 32 states and internationally, with approximately 14,000 employees. Because of its inadequate data security policies, CPK suffered a data breach (the "Data Breach"), which it discovered in or around September 2021, and which exposed over 100,000 employees' names, Social Security numbers, dates of birth,

financial information, and other private, personally identifying information (collectively, "PII") to nefarious actors. Plaintiffs and class members had no choice but to entrust their PII to CPK as a condition of their employment. Yet, despite CPK's assumption of legal and equitable duties to protect its employees' PII and its assertion that it understood the importance of those duties, it failed to adequately safeguard this private, sensitive data, leading to the Data Breach.

## B.    Original Complaints

In late 2021, five cases were filed within a span of 17 days, all of which were transferred to the United States District Court for the Central District of California.[1] The case filed by Appellant, *Kirsten*, was the only one of the five to allege a claim under the California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100 *et seq.* ("CCPA"), which gives rise to statutory damages between $100 and $750 per violation,[2] threatening significantly greater exposure for CPK and creating greater leverage for Appellants compared to the claims asserted by the settling plaintiffs.

## C.    Appellants Tried to Have a Speedy Rule 23(g) Hearing While Settling Plaintiffs Schemed to Delay 23(g) Proceedings and Excluded Appellants from Consolidated Proceedings So as to Conclude Their Secret and Collusive Settlement.

Soon after *Kirsten* was filed, Appellants' counsel reached out to all plaintiffs'

---

[1]  *Kirsten*, No. 8:21-cv-09578-DOC-KES; *Gilleo*, No. 8:21-cv-01928-DOC-KES; *Wallace*, No. 8:21-cv-01970-DOC-KES; *Morales*, No. 8:21-cv-01988-DOC-KES; *Rigas*, No. 8:21-cv-02004-DOC-KES.
[2] Cal. Civ. Code § 1798.150(a)(1)(A).

counsel to meet and confer about streamlining efforts and potentially coming to consensus on leadership. 3-ER-322, 2-ER-106. After it became clear that no consensus would be reached, Appellants advocated for a speedy and streamlined process to appoint plaintiffs' counsel leadership, while the settling plaintiffs schemed to delay and exclude Appellants' counsel from a secret mediation and the consolidated proceedings before the Court. 2-ER-106-107, 3-ER-322-323.

Appellants proposed an expedient appointment of interim lead counsel to promote efficiency, but failed to sway settling plaintiffs, who insisted on a protracted schedule that, in hindsight, allowed them the time needed to finalize their collusive settlement. 2-ER-107 ¶10. While Appellants' and the settling plaintiffs' counsel were exchanging drafts of consolidation stipulations, the settling plaintiffs' counsel filed a different version of the stipulation with the court, omitting Appellants' case, *Kirsten,* altogether. 2-ER-108, 3-ER-324. Although the order granting the stipulation, 3-ER-433, also drafted by settling plaintiffs' counsel, required that team to file it in any related matter, they failed to do so in *Kirsten* or to serve the stipulation on the Appellants' team.

### D. CPK Realized That Appellants Would Not Sell Out the Class at an Early Mediation

On February 9, 2022, CPK's and Appellants' counsel conferred about scheduling in *Kirsten* and discussed the possibility of early resolution pursuant to Fed. R. Civ. P. 16(f). Following that discussion, CPK's counsel sent a follow-up email

advocating his views of the case and asking, "*Would you consider for example a claims made style settlement*? Do you have a proposed term sheet?" 3-ER-324, 2-ER-108. Appellants' counsel responded that, to engage in settlement discussions, information should be exchanged, and a mediation should be set. CPK's counsel stated he would discuss that proposal with his client. *Id.*

In hindsight, this exchange provided CPK with the knowledge that Appellants, whose case uniquely alleged CCPA claims, were unlikely to agree to a low-ball, claims-made settlement that required no minimum payout by CPK other than attorneys' fees.

### E. Settling Plaintiffs and CPK Secretly Mediated While Deliberately Hiding That Mediation from Appellants and the Court.

Shortly thereafter, on March 10, 2022, CPK's counsel secretly mediated with the settling plaintiffs' counsel, who eagerly accepted CPK's terms in exchange for an $800,000 payout to themselves. Neither the settling plaintiffs' counsel nor CPK apprised Appellants' team of that mediation because they did not want to face opposition from counsel who would put the interests of the class first.

CPK's counsel again met and conferred with Appellants' counsel pursuant to Fed. R. Civ. P. 26(f) on March 14, 2022, a few days after their first mediation with settling plaintiffs and one day before a second, secret mediation was scheduled to occur on March 15 with settling plaintiffs and their counsel. During this Rule 26(f) meet and confer discussion, Appellants raised the possibility of mediation again,

specifically asked CPK's counsel whether CPK was negotiating with any other plaintiff's counsel and inquired about the status of any such discussions. *Id*. CPK's counsel purposefully misled the Appellants' team, stating that CPK wanted to wait until lead counsel is appointed before engaging in substantive settlement efforts and deliberately omitted that mediation had taken place. *Id*. CPK's counsel subsequently failed to tell the court in the joint Rule 26(f) report that was filed later that day that CPK already had engaged in mediation with the settling plaintiffs. *Id.*

Then, on March 16, 2022—when applications for lead counsel were due the very next day (3-ER-433)—and without meeting and conferring with or serving Appellants, the settling plaintiffs and CPK filed a stipulation to stay the litigation pending final approval of the present settlement. After discovering this development, Appellants opposed the stay. 3-ER-386.

### F.   Dispositive Motions in the *Kirsten* Matter Increased the Value of the Case

While negotiating a collusive settlement with settling plaintiffs, CPK actively and aggressively litigated against Appellants. In *Kirsten*, CPK brought two motions to dismiss the pleadings and a motion to reconsider the district court's decision denying in part the second motion to dismiss; met and conferred with Appellants' counsel pursuant to Rule 26(f) and filed a joint scheduling report; and served frivolous objections to Appellants' written discovery. 3-ER-437, 3-ER-420.

Appellants were largely able to defeat CPK's motions to dismiss, including as to the valuable CCPA claim. 2-ER-270. In contrast, there was no motion practice in any of the settling plaintiffs' related actions other than the motion to stay described below.

### G. Appellants' Motion to Appoint Interim Lead Counsel for the Plaintiffs and Opposition to the Motion to Stay Proceedings Presented Evidence of Collusion but the Court Held the Motion in Abeyance and Proceeded with the Motion for Preliminary Approval

On March 17, 2022, a day after the settling parties filed a stipulation to stay the litigation, Appellants moved the court to appoint Appellants' counsel as interim class counsel and opposed the settling plaintiffs' and CPK's requested stay. 3-ER-386. This motion expressly described how CPK and the settling plaintiffs excluded Appellants from consolidation and settlement negotiations. 3-ER-394-395.

At the hearing on April 22, 2022, the district court was surprised by the developments leading up to the consolidation of the four cases against CPK, to the exclusion of *Kirsten*: "I thought your case was separate." 4-ER-559:4. "Did I consolidate those cases?" *Id.* at 22. "Yeah, I'm wondering, frankly, I'm going to have to look back with some hope for memory of why I did that." 4-ER-560:15-17. "It seems just odd on my part that I wouldn't consolidate all five cases, frankly. It's to my benefit for efficiency." 4-ER-561:5-7. Settling plaintiffs' counsel had successfully pulled the wool over the district court's eyes.

In response, settling plaintiffs' counsel explained that the stipulation to consolidate included a footnote about the presence of another related case. 4-ER-563:21-24. The district court then admitted to an oversight: "And I wish I would have either been wise enough to recognize this and just consolidated all four (sic). Apparently, what I must have done is, I must have seen the stipulation, if the related case was out there, I either didn't see it or just wasn't wise enough and I will put that on the record to have consolidated it at the time." 4-ER-565:18-24. The district court decided to lay the motion in abeyance until receiving briefing and testimony on the motion for preliminary approval of class action settlement.

## H. The Settlement Terms

The settlement includes a claims-made structure without a floor to CPK's liability to class members, as well as a clear sailing agreement entitling settling plaintiffs' counsel to an excessive fee and expenses award of $800,000. 3-ER-373 SA ¶ 5(a).

The Settlement Class is defined as everyone to whom CPK sent notice of the Data Breach, and a California Settlement Subclass is defined as those members of the larger Settlement Class residing in California. 3-ER-369 SA ¶ 1. "The Settlement Class and California Settlement Subclass are estimated to include 103,767 and 30,781 individuals, respectively." 3-ER-370 SA ¶ 1.

The terms of the settlement provided for reimbursement of ordinary expenses and lost time up to $1,000 per claimant, extraordinary expenses up to $5,000 per claimant, and two-years of three-bureau credit monitoring. 3-ER-370 SA ¶ 3. Presumably to justify the overbroad release of the CCPA claims that Appellants pursued, the settlement included a $100 California Statutory Claim Benefit to California Subclass members. 3-ER-372 SA ¶ 3. The settlement also required CPK to take some measures for a three-year period to protect their database against future breaches. 3-ER-375 SA ¶ 6.

## I. The Appellants Presented Valid Objections and Evidence of Collusion at Preliminary Approval; the Court Expressed Concerns but Granted Preliminary Approval

On May 2, 2022, the settling plaintiffs filed a motion for preliminary approval of the settlement. 3-ER-327. Appellants objected on the grounds that the settlement is not fair, reasonable, or adequate, and is the product of collusion and a reverse auction. 3-ER-298. Appellants argued that given the potential exposure to CPK of $77 million, a no-floor claims-made settlement that hypothetically could result in CPK paying $0 in class benefits other than the hefty attorneys' fees, was not fair, adequate, or reasonable. 3-ER-306-308. Further, Appellants highlighted the classic *Bluetooth* indicia of collusion as well as the specific circumstances of this case that further indicated collusion. 3-ER-309-310. The hearing on the motion took place on

June 29, 2022, where the district court acknowledged numerous issues raised by Appellants.

In their memorandum in support of their motion for preliminary approval, settling plaintiffs represented to the court that "this settlement has a conservative value of over $3.7 million, and the $800,000 in combined fees and expenses is approximately 21% of the value of the settlement." 3-ER-346. Reading that representation into the record at the hearing, the district court stated:

> So on the face when you first read that it looks great. We're under 25 percent. ***The problem is it's reversionary.*** And the problem is that depending upon both of us guessing, you know, who's going to make these claims, what that number is, $800,000 for the amount of work that's done regardless is extraordinary. It's too much. And, therefore, if it was non-reversionary, I'd have less of a concern. But reversionary, I've got a tremendous concern about these fees.

4-ER-529:6-13 (emphasis added).

The district court observed that the "conservative" value assigned to the settlement was arbitrary and not reliable:

> Then we'll call it this, so we're not mincing words, $800,000 for a settlement where in effect I can't attach a value to it. Neither can the mediator. We're both guessing. Our best guess is maybe 3.2 million. Maybe 2.5. And by the way, that money is not being lost by the Defendant here. That's my problem. And so the argument could be made this is 40 percent. The argument could be made that this is 50 percent. Because we'll never know because we're shooting a golf ball in the fog.

4-ER-530:1-9.

The district court's remarks aptly highlight the reversionary nature of the claims-made only settlement here. There is no floor amount that CPK is liable for under this settlement. This is because the settlement agreement does not establish a non-reversionary fund. Nevertheless, settling plaintiffs' counsel proceeded with fee calculations as if there was one. Therefore, the assignment of a hypothetical value to a claims-made settlement means that any unclaimed amount from that estimated value reverts to the defendant. The district court emphasized this exact point when CPK's counsel argued that claims-made only settlements cannot revert since reversion requires a common fund: "I want to make certain that it isn't valued at 3.2 and then money goes back to you." 4-ER-532:24-25.

The court concluded:

> I'm not going to pay $800,000 right now. So whether you want to get into the game of reversionary or non-reversionary, I'm really uncomfortable not knowing the amount of the claims made within the 90-day period with a 60-day opt-out. And losing that jurisdiction would leave me in a position where there might be 800,000 claims made and I'm paying out 800,000.

4-ER-548:5-11. Nevertheless, the court eventually would do just that.

On June 30, 2022, the district court granted settling plaintiffs' motion for preliminary approval and found the settlement "to be fair, reasonable, and adequate, and the result of vigilant, informed, non-collusive arms'-length negotiations overseen by an experienced and neutral mediator." 3-ER-290:23-25. Despite contradicting its own expressions of concern with the settlement and the negotiation

process during the preliminary approval hearing, the district court's order contained no explanation or reference to that record and no analysis of any of the objections raised by Appellants.

**J.     The Settling Plaintiffs Presented a False and Inflated Settlement Value to the Court at Final Approval**

On September 14, 2022, settling plaintiffs filed their motion for attorneys' fees, expenses, and service awards to representative plaintiffs. 2-ER-111. On October 6, 2022, settling plaintiffs filed their motion for final approval of the settlement. 2-ER-42. Appellants filed timely oppositions to both motions. 2-ER-80, 2-ER-39. The district court held a final fairness hearing on November 7, 2022.

The settling plaintiffs never provided the district court with an accurate, total value of the settlement against which their requested fees could be judged. At the final approval hearing, settling plaintiffs reported a total of 1,828 unvalidated claims and an unvalidated value of $1,161,149.00.  2-ER-26 (ECF 81-1 at ¶ 2 & Ex. A at ¶¶ 6, 8). This figure included a value of $455,040 for credit monitoring valued at $15 per month (which is significantly greater than the actual cost of providing that service), and $706,109.27 in submitted claims. 2-ER-27 (ECF 81-1 at ¶ 2). Even accepting the inflated, unvalidated claims numbers presented to the district court at face value, settling plaintiffs' fees and costs of $800,000 exceeded the inflated cash value of $706,109.27 that possibly could be paid to Settlement Class assuming each

of the claims was determined to be valid and paid in full (despite the settlement's caps on claim values that necessarily would lower these figures).

There can be no doubt that the claims numbers presented to the district court were inflated. The administrator was careful to declare that these claims numbers had "not yet been audited, and the caps on reimbursement claims have not yet been applied. Therefore, these figures are subject to change." 2-ER-33 (ECF 81-1 at Ex. A ¶ 8). The validation process necessarily will reduce these claimed figures significantly, and as a result, the figures presented to the district court were misleading.

At the final approval hearing, settling plaintiffs' counsel provided the following details on the claims which prove the point that they are inflated:

- 176 claims for ordinary expenses, totaling $384,134.77;

- 979 claims for lost time, totaling $50,320.00;

- 45 claims for extraordinary expenses, totaling $191,354.50;

- 803 claims for the California Statutory Claim Benefit, $100 per claimant, totaling $80,300.00; and

- 1,264 claims for credit monitoring, multiplied by the $360 value per claimant that Settling Plaintiffs assigned to that service, totaling $455,040.00.

4-ER-485:19-486:6.[3]

These misleading representations further prove the point that the actual benefit to the class is necessarily hundreds of thousands of dollars less. For instance, 176 claims for ordinary expenses can, at most, amount to $176,000 due to the cap set by the settlement agreement of $1,000 per claimant. 3-ER-371 ¶ 3(b). Correcting those claim amounts alone reduces the settlement amount by over $200,000, and results in a total claim value of $497,974.50 ($176,000 + $50,320.00 + $191,354.50 + $80,300.00). Even that figure continues to be inflated given the validation by the settlement administrator will reduce it further.

At the hearing, Appellants reiterated their opposition to the motions seeking final approval of the settlement and attorneys' fees. Specifically, Appellants noted that the standard of review for pre-certification settlements in this Circuit calls for heightened scrutiny. Furthermore, Appellants specifically analyzed the heightened scrutiny factors and argued that the settlement and negotiations in this case exhibited indicia of collusion, a finding that would disfavor approval. 4-ER-491:22-492:13. Appellants also reminded the court that the "conservative" value settling plaintiffs assigned to the settlement at the preliminary approval stage had proven to be highly inflated, as the court feared. 4-ER-492:3-7. Acknowledging some of these concerns,

---

[3] Settling plaintiffs presented slightly different numbers to the district court in their supplemental briefing in support of fees, but the total dollar values remained the same. 2-ER-26 (ECF 81-1).

the district court stated: "When I approved this preliminarily, the figure I had in mind was about $3 million. And, once again, I'm trying to recall why, but I'm really concerned about the attorney's fees. I've gone through the collusion arguments of the past. In other words, when the preliminary approval took place, we had those arguments concerning collusion, and I rejected those."[4] 4-ER-495:12-19. "I have a tremendous concern over these attorney's fees." 4-ER-496:25-497:1. In the end, the court demanded additional briefing on the issue of attorneys' fees and stated the following: "And I would like to afford that to you. You know I am concerned." 4-ER-500:5-6.

Settling plaintiffs and Appellants filed supplemental briefs regarding the requested fees on November 14 and 21, respectively. 2-ER-19, 2-ER-12. Appellants highlighted the paltry result achieved by the settlement for the class; the inefficiencies and duplication of work in settling plaintiffs' management of the litigation, and the lack of extraordinary circumstances justifying a 36% fee to recovery ratio (the true figure is much higher than that given the claims validation issues described above) under the percentage of recovery cross-check. 2-ER-12.

---

[4] The district court is referring to the conclusory findings in its preliminary approval order that included no explanation of its decision.

**K.   The Court Granted Final Approval and Awarded $800,000 in Attorneys' Fees and Expenses Without Applying Heightened Scrutiny or Addressing Any of Appellants' Objections or Its Own Concerns Expressed at Oral Argument.**

On February 22, 2023, in stark contrast to its expressions of concern at the preliminary and final approval hearings, the district court granted final approval to the settlement in full and approved the requested attorneys' fees. 1-ER-3-7 (ECF 87 ¶ 3, ¶ 12). The Final Judgment and Order summarily concluded that the award of $800,000 to settling plaintiffs' counsel "would constitute 36.3% of the total class benefit, which is $2,133,719." 1-ER-7. This again relies on the inflated, unvalidated claims numbers described above and has no explanation as to why an upward adjustment of 11.3% from the 25% benchmark is justified. Neither does the judgment contain an analysis of the purported lodestar and its reasonableness.

The Final Judgment and Order did not provide any analysis of the *Bluetooth* factors or the issues raised by Appellants beyond conclusory statements. 1-ER-2.

## SUMMARY OF ARGUMENT

The district court erred in finally approving the settlement and the attorneys' fees without applying the requisite heightened scrutiny, where the resulting $497,974.50 (at most) in cash claims benefits paled by comparison to the potential $77 million liability exposure, Appellants presented significant evidence of collusion, and even the district court appeared to agree that the requested attorneys' fees were excessive.

First, the district court failed to apply the heightened scrutiny required for such class settlements in this Circuit. Instead, the court approved a settlement that gave less than $497,974.50 cash claims benefits to the class in a case worth potentially $77 million. And the settlement contained all three indicia of collusion recognized by this Circuit in addition to other compelling circumstances indicating collusion.

Second, the court's failure to analyze the highly suspect circumstances resulted in its approval of a settlement that fundamentally is not fair, reasonable, and adequate, as required by Rule 23. If allowed to stand, such a ruling creates corrupt incentive structures for litigants encouraging them to settle low and fast.

Third, the district court erred when it inexplicably changed course from its repeatedly voiced "concerns" regarding granting the requested $800,000 award. Despite observing that "$800,000 for the amount of work that's done regardless is extraordinary. It's too much" (4-ER-529), among many other concerns regarding the requested attorneys' fees, the court thereafter approved the same amount in a summarily worded Final Order and Judgment that was drafted by settling plaintiffs' counsel. The awarded fee is excessive because (1) the lodestar is not justified given the amount of work performed, (2) the multiplier of 1.2 is excessive given the paltry no-fund result for the class, (3) the fees comprise more than 36.3% of the total, inflated settlement value according to settling plaintiffs' inflated settlement value, but in reality they are at least 52.5% of the actual total class cash benefit of

$1,470,544 (4) even 36.3% is a substantial upward adjustment from the 25% benchmark that is not justified given the weak results for the class, and certainly not 52.5% (5) the $800,000 fee awarded is at least almost double the actual value of the yet-to-be-validated claims made by class members, which in any event cannot exceed $497,974.50.

## STANDARD OF REVIEW

Although the Court generally reviews the decision to approve a settlement under the deferential abuse of discretion standard, a "court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1043 (9th Cir. 2019) (quoting *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)); *see also Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (same).

Moreover, the Court reviews "legal questions de novo," including legal questions subsumed within the decision to approve or disapprove a class settlement, such as "the interpretation of the settlement agreement, . . . [and] 'whether notice of a proposed settlement satisfies due process.'" *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 779 (9th Cir. 2022) (citations omitted); *see also, e.g., Young v. LG Chem Ltd.*, 783 F. App'x 727, 736 (9th Cir. 2019) ("We review de novo whether notice of a settlement satisfies due process and the Federal Rules.").

Likewise, the Court "review[s] de novo the 'legal bases' of a fee award." *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 656 (9th Cir. 2020) (quoting *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 956 (9th Cir. 2002)); *see also Machowski v. 333 N. Placentia Prop., LLC*, 38 F.4th 837, 840 (9th Cir. 2022) ("'[W]e review de novo questions of law that underlie a court's fee award.'") (citation omitted); *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 603 (9th Cir. 2021) ("[W]hen, as here, 'elements of legal analysis and statutory interpretation' factor into the attorneys' fee award, those elements are properly reviewed de novo.") (quoting *K.C. v. Torlakson*, 762 F.3d 963, 966 (9th Cir. 2014)).

Finally, this Court "hold[s] district courts to a 'higher procedural standard when making that determination of substantive fairness'" concerning a class settlement, and "'[t]hat procedural burden is more strict when a settlement is negotiated absent class certification.'" *Roes, 1-2*, 944 F.3d at 1043 (quoting *Allen v. Bedolla*, 787 F.3d 1218, 1223-24 (9th Cir. 2015)). "'To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections.'" *Allen*, 787 F.3d at 1223-24 (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citations and internal quotation marks omitted)); *see also Roes, 1-2*, 944 F.3d at 1043 (same).

> Prior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of

interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair.

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). And since Rule 23(e) was amended to specify the factors that courts must consider in determining whether a settlement is "fair, reasonable, and adequate," courts must apply a similarly heightened degree of scrutiny to "examine whether the attorneys' fees arrangement shortchanges the class," before or after class certification. *Briseño*, 998 F.3d at 1023-24.

## ARGUMENT

### A. The District Court Failed to Apply Heightened Scrutiny to This Pre-Certification Class Settlement Marked by Glaring Indicia of Collusion

The district court failed to apply the appropriate level of scrutiny, constituting an error of law reviewable *de novo*. Indeed, even under the abuse of discretion standard reversal would be necessary given that the district court virtually ignored all three signs of collusion identified in *Bluetooth*: (1) a disproportionate distribution of the settlement's proceeds to the settling plaintiffs' counsel via (2) a 'clear sailing' agreement, and (3) an inherently reversionary claims-made structure. Despite repeated objections by Appellants in briefings and in hearings, the district court failed to analyze these issues when it granted preliminary, and then final, approval. The court's failure to apply the correct standard alone is cause for reversal.

When presented with a proposed class action settlement—particularly prior to class certification—district courts must look for "subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations," including "(1) 'when counsel receive a disproportionate distribution of the settlement;' (2) 'when the parties negotiate a 'clear sailing' arrangement' (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) 'when the parties create a reverter that returns unclaimed [funds] to the defendant.'" *Allen*, 787 F.3d at 1224 (quoting *In re Bluetooth*, 654 F.3d at 947). "[T]he district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis*, 697 F.3d at 864 (internal citations and quotation marks omitted).

It is well established that failure to apply the requisite heightened scrutiny is reversible error. *See Saucillo v. Peck*, 25 F.4th 1118, 1133 (9th Cir. 2022) (vacating approval of the class action settlement because the district court abused its discretion by employing an erroneous legal standard); *McKinney-Drobnis*, 16 F.4th at 598 (failure to adequately investigate and address the three warning signs of implicit collusion articulated in *In re Bluetooth* is abuse of discretion); *Kim v. Allison*, 8 F.4th 1170, 1179 (9th Cir. 2021) (reversing district court's approval of settlement because it did not apply heightened scrutiny to pre-certification settlement that included clear

sailing provision and awarded fee request "that outstripped the likely financial benefit to the class.").

Moreover, the settlement here was reached through suspiciously secretive and early settlement negotiations, which CPK and the settling plaintiffs hid from Appellants after CPK determined that Appellants' counsel would not blindly accept a claims-made settlement. While it is not necessarily collusive for CPK to settle with plaintiffs other than Appellants, this presents another "subtle sign" of collusion, especially given that the settlement was reached on the eve of proceedings to determine lead counsel pursuant to Rule 23(g). Ignoring all these troubling circumstances, the district court rubber-stamped the settlement in contravention of its gatekeeping role. *Allen*, 787 F.3d at 1224; *In re Bluetooth*, 654 F.3d at 947.

District courts must ensure that class counsel do not "collude with the defendant to strike a quick settlement without devoting substantial resources to the case." *Briseño*, 998 F.3d at 1024. This is precisely what happened here. The settling plaintiffs struck a quick and low-ball settlement to avoid a contested leadership battle that they might not have won while securing a hefty fee award for themselves, without having to do the sort of work that might merit it.

### B. The Settlement Is Not Fair, Reasonable, and Adequate

"'[S]ettlement class actions present unique due process concerns for absent class members,' . . . and the district court has a fiduciary duty to look after the

interests of those absent class members." *Allen*, 787 F.3d at 1223 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.1998)). The interests of absent class members were not well served here.

Rule 23(e) authorizes district courts to approve class action settlements when they are "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2). The Rule directs courts to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; [and]
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment . . . .

Fed. R. Civ. P. 23(c)(2).

## 1. The Relief Provided to the Class by the Settlement Is Inadequate

Appellants explained to the district court that "CPK's outer limit of liability is at least approximately $38 million," and could be as high as $77 million. 3-ER-310. While Appellants engaged in substantive litigation that entailed risk, and largely prevailed, including with respect to the statutory damages under CCPA, the

settling plaintiffs took on essentially no risk, instead settling immediately for a no floor claims-made settlement that guaranteed nothing to the class other than attorneys' fees, and notice and administration costs. As it turned out, the cash claims benefit to the class is under $497,974.50, less than nuisance as compared to the $77 million exposure.

The settlement easily could have required CPK to create a non-reversionary settlement fund, but if the settlement had been structured that way, it would have been impossible to justify a similar award of attorney fees to settling plaintiffs' counsel without a significantly larger total outlay by CPK. To justify an $800,000 fee award under the Ninth Circuit's 25% "benchmark," a non-reversionary settlement fund would have had to be at least $3.2 million.

The entire settlement class consists of a little over 100,000 individuals, and CPK had contact information for all of them. (3-ER-367 SA ¶¶ 1, 12). Accordingly, a $3.2 million settlement fund could have been distributed to class members directly, without any claims process whatsoever.

Instead, by structuring the settlement as a claims-made deal, settling plaintiffs were able to secure an outsized fee award while CPK was able to minimize its total outlay. The settlement's claims-made structure thus worked to the advantage of the settling plaintiffs' counsel and CPK but was a gross disservice to the class. The settlement was not fair and should not be allowed to stand on appeal.

### 2. Claims-Made Settlements Such as This One Embody the Concerns Present in Reversionary Settlements

Courts must be careful of the danger that parties will overestimate the value of the settlement to inflate fees when unclaimed value reverts to defendants. *See Roes, 1-2*, 944 F.3d at 1053 ("[T]he danger of unjustifiably inflating the settlement value of coupons is even more grave when the value of unused coupons will revert back to defendants."); *In re Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018).

Claims-made settlements present the same risks posed by other types of reversionary settlements. Both are vulnerable to an artificial inflation of settlement value by plaintiffs' counsel to justify excessive fees. Therefore, "courts must consider the actual or realistically anticipated benefit to the class—not the maximum or hypothetical amount—in assessing the value of a class action settlement." *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 992 (9th Cir. 2023). In the absence of a non-reversionary fund that sets a floor on the defendant's exposure, parties can inflate the settlement value to their benefit. "[I]f the likely redemption rate is low . . . then [defendant] and class counsel can inflate the perceived settlement value while knowing that [defendant] is unlikely to pay more than a fraction of that amount." *Roes, 1-2*, 944 F.3d at 1054.

For instance, in this case, settling plaintiffs represented to the district court in their briefing and at hearings in support of preliminary approval that a

"conservative" estimate for the value of the settlement was $3.7 million. 3-ER-346; 4-ER-530:21-531:2. This inflated figure was used to justify the requested fee award. However, just as the unclaimed portion of a reversionary fund is returned to the defendant if not depleted by claimants, the difference between the hypothetical $3.7 million and the ultimately claimed cash value here totaling less than $1,470,545 (which undoubtedly will sink when claims are validated by the administrator), remained with CPK. At least $2,229,455 of the inflated $3.7 million reverted to CPK.

The district court acknowledged the inflation inherent in settling plaintiffs' evaluation of their settlement and the reversionary nature of the settlement at the preliminary approval hearing: "Our best guess is maybe 3.2 million. Maybe 2.5. And by the way, that money is not being lost by the Defendant here. That's my problem." 4-ER-530:1-6. "I want to make certain that it isn't valued at 3.2 and then money goes back to you." 4-ER-532:24-25. Referring to the calculation based on settling plaintiffs' estimation of a $3.7 million total value and a 21% ratio, the district court said:

> So on the face when you first read that it looks great. We're under 25 percent. The problem is it's reversionary. And the problem is that depending upon both of us guessing, you know, who's going to make these claims, what that number is, $800,000 for the amount of work that's done regardless is extraordinary. It's too much. And, therefore, if it was non-reversionary, I'd have less of a concern. But reversionary, I've got a tremendous concern about these fees."

4-ER-529:6-13.

Nevertheless, on final approval, the district court failed to apply heightened scrutiny or even discuss the reversionary nature of the settlement. "By disregarding the contents of the clear sailing fee provision here, including both the disproportionate amounts negotiated and the reversionary kicker arrangement, the district court effectively 'delete[d]' it from the settlement—an approach that is beyond the scope of the court's discretion." *In re Bluetooth*, 654 F.3d at 948 (quoting *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982)). The district court's final approval of the class action settlement must be reversed.

### 3. The Settlement Agreement Contained a Collusive Clear-Sailing Provision

While clear-sailing arrangements are not *per se* prohibited, "[t]he *very existence* of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class." *In re Bluetooth*, 654 F.3d at 948 (citation omitted); *Roes, 1-2*, 944 F.3d at 1050-51 (citations omitted). Clear sailing provisions are "disfavored" because they are "important warning signs of collusion." *Id*.; *see also Briseño*, 998 F.3d at 1026-27 ("A clear sailing provision signals the potential that a defendant agreed to pay class counsel excessive fees in exchange for counsel accepting a lower amount for the class members.").

"When a district court encounters such a provision, it must 'peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class,' even when the settlement has been negotiated 'with a neutral mediator before turning to fees.'" *McKinney-Drobnis*, 16 F.4th at 610 (quoting *In re Bluetooth*, 654 F.3d at 948). Courts must be careful "to avoid awarding 'unreasonably high' fees simply because they are uncontested." *In re Bluetooth*, 654 F.3d at 948 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)).

The settlement agreement expressly contained a clear sailing agreement: "CPK agrees not to object to Plaintiffs' request for combined attorneys' fees and costs to Class Counsel in an amount not to exceed a total of $800,000." 3-ER-373 SA ¶ 5(a). Nevertheless, the district court never scrutinized the clear sailing agreement despite Appellants' repeated cautioning. Especially with the other indicia of collusion present, the existence of this term in the settlement and the district court's failure to address it favor reversal of the court's order.

### 4. The Court Abused Its Discretion By Ignoring Other Circumstances Indicating Collusion

The not-so-subtle signs of collusion present here go beyond those identified in *Bluetooth*. In addition to ticking all three boxes described in *Bluetooth*: (1) the settling plaintiffs delayed contested briefing for appointment of class counsel under Rule 23(g) while they secretly finalized the settlement with CPK; (2) CPK tested Appellants' counsel to see if they would agree to a claims-made structure without

any necessary information, and then excluded Appellants' counsel from mediation, secretly mediating with the weakest plaintiffs' counsel, who most likely agreed to a claims-made structure without any information or discovery; (3) CPK and the settling plaintiffs presented a one-sided stipulation to the court that consolidated and stayed the settling plaintiffs' cases while inexplicably allowing CPK to attempt to dismiss Appellants' case; and (4) CPK denied that any mediation was under way while negotiating a Rule 26 report with Appellants.

### 5. The Settlement Improperly Releases the CCPA Claim Advanced by Appellants for Inadequate Consideration

While the settling plaintiffs and CPK furtively negotiated the settlement, Appellants litigated the case, including the valuable CCPA claim that the settling plaintiffs ultimately settled but did not advance. The CCPA claim was arguably the most valuable claim in the litigation against CPK and afforded the most leverage for negotiations because of its statutory damages provision. Appellants asserted a CCPA claim, and while the settlement stated that the settling plaintiffs likewise asserted such a claim, they did not. *Compare* 5-ER-686 *Gilleo* Complaint *with* SA at 1 (Recitals).

"A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'"

*Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). While Appellants alleged facts supporting a CCPA claim, including that their PII was stolen in an unencrypted format (*Kirsten* FAC ¶ 158), the settling plaintiffs did not make such allegations. *See* 5-ER-686 *Gilleo* Compl.

Because they did not assert, or allege the basis for, a CCPA claim, the settling plaintiffs were not adequate class representatives to settle that claim and bind Appellants and all absent class members to a release of it. *See Hesse.*, 598 F.3d at 588-89. In this regard, the settlement's release raises significant due process concerns that the district court ignored. *See id.* Final approval should be reversed.

> **6.  Allowing the Lower Court's Approval of This Settlement to Stand Would Encourage Collusive Settlements That Reward Settling Plaintiffs' Counsel at the Expense of Class Members**

As mentioned in the Introduction, permitting defendants to collude with one group of plaintiffs' counsel at the outset of litigation, as happened here, in order to secure a low-ball settlement before lead counsel have been appointed or class certification has been litigated creates perverse incentives for competing plaintiffs' counsel to settle early and cheap, rather than risking a leadership fight that, if they lose, will mean less money for them, even if continued litigation likely would benefit the class.

This risk is not hypothetical. Indeed, the present settlement is part of CPK's counsel's *modus operandi* of obtaining defendant-favorable, claims-made settlements, with defense counsel's chosen opponents. *See, e.g.*, *Rosario v. PIH Health, Inc.*, No. 2:21-cv-07221-JAK (C.D. Cal.), ECF No. 23-1 at 1-2 (May 27, 2022) (describing how the same defense counsel here reached a claims-made settlement with a litigant in federal court although four related data breach cases had been pending over a year-and-a-half in state court, and federal jurisdiction was lacking); *Serrano v. Inmediata Corp.*, No. 3:19-cv-01811-JAG (D.P.R.), ECF No. 37 (July 23, 2021) (granting preliminary approval to claims-made settlement in District of Puerto Rico despite pending, more advanced litigation in the Southern District of California entitled *Stasi v. Inmediata Health Grp. Corp.*, No. 3:19-cv-02353-J).

To fulfill their fiduciary duties to absent class members, district courts must apply heightened scrutiny to such settlements to safeguard against collusion between litigants and avoid settlements that prioritize benefit to counsel to the class's detriment. *See Allen*, 787 F.3d at 1223. In order to make it clear that defendants may not collude with their choice of plaintiff's counsel to settle class actions at a deep discount while maximizing attorneys' fees for the chosen plaintiff's counsel who agree to play that game, this Court must reverse the district court's judgment and order approving the present settlement, as well as its award of exorbitant fees to

settling plaintiffs' counsel, with clear instructions on how to proceed so as to avoid a similar outcome on remand.

Appellants respectfully suggest that the Court should reverse the judgment and order below, with instructions to consider applications for lead counsel under Rule 23(g) and to scrutinize strictly any other pre-certification settlement so as to ensure that it is fair, reasonable, and adequate, and not the product of collusion.

### C.    The $800,000 Fee and Expense Award Should Be Reversed

#### 1.    Settling Plaintiffs' Claimed Lodestar Was Not Justified Given the Minimal Work Performed

There is no dispute that courts often utilize the lodestar method in determining the reasonableness of attorneys' fees where the settlement does not involve a common fund. Since this case involved a claims-made settlement, application of the lodestar method, supported by a percentage of the recovery cross-check, was appropriate. The district court, however, abused its discretion by effectively rubber-stamping settling plaintiffs' lodestar calculation and multiplier, without any apparent analysis or any comparison of the fee award to what the class would get after claims were validated.

"The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 949 (citing *Staton*, 327 F.3d at 965).

The requested fee was excessive for the amount of work performed by the settling plaintiffs' counsel. Counsel reached their collusive settlement early in the litigation, having conducted no motion practice and no discovery. As the district court stated: "$800,000 for the amount of work that's done regardless is extraordinary. It's too much." 4-ER-529:6-13. It should have significantly adjusted the lodestar downward.

Even if the number of hours presented by settling plaintiffs' counsel was truthful, it was not reasonable and should not have been compensated in whole. There was enormous inefficiency in the management of this relatively short-lived case. Settling plaintiffs' declarations show that a total of at least 17 of their attorneys worked on the settlement and most of the hours were billed by senior counsel rather than less expensive associates. *See* 2-ER-148, 2-ER-198-99, 2-ER-229, 2-ER-257. The district court should have scrutinized the bills and significantly adjusted the lodestar downward to compensate for these inefficiencies.

The district court noted the inefficiencies in the management of the case with the following remarks at the final approval hearing: "What's going on here, Counsel? Why are all these people listed? Is this just a law firm that wants to run up the bill? I'm just kidding you, but I'm not kidding you now. Why are all these people listed? Why are all these people listed?" 4-ER-479:2-7. "Because you have an attorney's fee in front of the Court also and this causes me great concern when I see

this. I have to tell you, frankly, the reason I'm bearing down on you a little bit is just to question why I'm supposed to give attorney's fees in the amount you're asking." *Id.* 16-21.

The district court never explained how the concerns it raised at oral argument about the lodestar were assuaged in any way, when it rubber-stamped the settling plaintiffs' claimed lodestar in two short paragraphs of its Final Judgment and Order. 1-ER-007 (ECF 87 at ¶¶ 12-13). After raising those concerns, the court apparently never investigated the hours billed by settling plaintiffs, nor did it require settling plaintiffs' counsel to submit itemized billing records. This was reversible error. *See In re Magsafe Apple Power Adapter Litig.*, 571 F. App'x 560, 564 (9th Cir. 2014) ("[T]he court did not explain why this figure is reasonable beyond a few boilerplate recitations about the attorneys' skill and the risks of proceeding with the litigation that never reference the specific facts of this case."); *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 739 (9th Cir. 2016) ("[T]he district court must 'provide a concise but clear explanation of its reasons for the fee award.' . . . The district court must state not only the grounds on which it relied, but also how it weighed the various competing considerations.") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

> **2.     The Positive Multiplier the District Court Applied Was Not Merited By the Results Obtained**

The court may adjust a lodestar figure up or down using a positive or negative

multiplier reflecting a host of reasonableness factors, "including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Hanlon,* 150 F.3d at 1029. "Foremost among these considerations, however, is the benefit obtained for the class." *In re Bluetooth*, 654 F.3d at 942; *see also Lowery*, 75 F.4th at 993 ("It does not matter that class action attorneys may have devoted hundreds or even thousands of hours to a case. The key factor in assessing the reasonableness of attorneys' fees is the benefit to the class members.").

In the two paragraphs of the Final Judgment and Order addressing the fee award, the court did not describe the multiplier it applied to settling plaintiffs' counsel's claimed lodestar, much less explain why that multiplier was appropriate under the circumstances. 1-ER-007 (ECF 87 at ¶¶ 12-13). This Court has made clear that, when applying the requisite heightened scrutiny to an award of attorney fees under such circumstances, a district court should "explain[] why a multiplier was necessary to adequately compensate class counsel." *In re Magsafe Apple Power Adapter Litig.*, 571 Fed. App'x at 564. That explanation should be "sufficient to 'assure itself—and us—that the amount awarded was not unreasonably excessive in light of the results achieved.'" *Id.* at 564-65 (quoting *In re Bluetooth*, 654 F.3d at 943).

This Court should reverse the lower court's decision to rubber-stamp settling plaintiffs' sought-after fee award here.

> **3.** **The Court Abused Its Discretion by Failing to Apply Heightened Scrutiny to the Cross-Check Using the Percentage Method and Awarding Fees and Expenses that Amounted To at Least 54% of Total Settlement Value.**

The district court adopted the settling plaintiffs' 36.3% fee-to-recovery ratio, which was based on an inflated settlement value. Even if accepted at face value, the 36% fee percentage is excessive because there were no circumstances meriting an award 11.3% higher than the 25% benchmark. *In re Bluetooth*, 654 F.3d at 944. "If the cross-check reveals that a contemplated fee award exceeds 25% of the benefit to the class, the court should take a hard and probing look at the award because this disparity may suggest that the fee amount is unreasonable." *Lowery*, 75 F.4th at 994. There are no special circumstances here that might warrant such a significant upward adjustment, such as length and complexity of litigation, or an exemplary result for the class. *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1127 (9th Cir. 2002) (citing *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). To the contrary, given the very cheap and very fast settlement, a downward adjustment from the 25% benchmark was warranted. *See McKnight v. Hinojosa*, 54 F.4th 1069, 1077 (9th Cir. 2022) (affirming award of attorney fees where "[t]he district court reduced the fee award below the 25% benchmark because of the modest

degree of success and because it found awarding the 25% benchmark would have overcompensated class counsel").

Had the district court applied heightened scrutiny to the percentage cross-check, it may have realized that in fact $800,000 constitutes at least 54% of the total cash benefit totaling $1,470,545, comprised of the $497,974.50 maximum cash value of submitted claims ($176,000 claims for ordinary expenses adjusted to $1000 per claim under the terms of the Settlement Agreement prior to validation by the administrator, plus an un-audited $50,320.00 for claims for lost time, plus an un-audited $191,354.50 for extraordinary claims, plus an un-audited $80,300.00 for California Statutory Claim Benefit), cost of notice and administration ($172,570) and attorneys' fees ($800,000). (The retail value of the credit monitoring services is not a cash benefit that would be part of any hypothetical cash fund, and thus does not belong in the total cash benefit calculation.) Awarding counsel with a fee of 54% (or 53% if expenses are taken off the top) in this case is a clear abuse of discretion.

The district court appeared to appreciate the 25% benchmark in this Circuit based on its remarks at the preliminary approval hearing. Referring to the requested award of $800,000 in relation to the estimated (but never achieved) value of $3.7 million that settling plaintiffs' counsel presented to the court at preliminary approval, the district court noted: "So on the face when you first read that it looks great. We're under 25 percent." 4-ER-529:6-7. Similarly, the district court made its concerns

known about higher percentages: "the argument could be made this is 40 percent. The argument could be made that this is 50 percent." 4-ER-530:7-8.

Despite voicing such concerns, the district court ultimately approved a fee award that far exceeded the high fee-to-recovery ratios it apparently sought to avoid at preliminary approval. The court never provided any explanation as to why an upward deviation from this Circuit's 25% benchmark was justified here. *See In re Magsafe Apple Power Adapter Litig.*, 571 Fed. App'x at 564-65 ("The district court also did not cross-check the attorneys' fee award against the percentage-of-the-recovery method . . . contribut[ing] to our determination that we 'lack a sufficient basis for determining the reasonableness of the award.'") (quoting *In re Bluetooth*, 654 F.3d at 943).

Accordingly, the Court should reverse the district court's grant of final approval and its award of attorneys' fees.

### 4. The Fee Award Is Excessive in Comparison to the Results Obtained for Class Members

Settling plaintiffs fell short of the standard they set for themselves at preliminary approval by achieving a class benefit that is less than a third of their original, "conservative" estimate that the settlement would be worth $3.7 million. At the preliminary approval hearing, the district court suggested it would not be inclined to approve the requested fees "where there [may] be 800,000 claims made and I'm paying out 800,000." 4-ER-548:10-11. Yet, the district court ended up doing

worse than the result it was concerned about: the $800,000 fee it awarded was almost double the maximum potential cash claims value of $497,974.50.

"[T]he plain language" of Rule 23(e)(2) "indicates that a court must examine whether the attorneys' fees arrangement shortchanges the class. In other words, . . . Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class's in determining whether the settlement is 'adequate' for class members." *Briseño*, 998 F.3d at 1024. This requires the district court to apply "heightened scrutiny" to assess "whether the division of funds between the class members and their counsel is fair and 'adequate.'" *Id.* at 1025 (quoting Fed. R. Civ. P. 23(e)(2)(C)).

"Even though a district court has discretion to choose how it calculates fees," this Court has "said many times that it abuses that discretion when it uses a mechanical or formulaic approach that results in an unreasonable reward." *In re Bluetooth*, 654 F.3d at 944. "[T]he district court must justify any fee award it makes by comparing it to the benefit provided to the class." *Lowery*, 75 F.4th at 991. "Except in extraordinary cases, a fee award should not exceed the value that the litigation provided to the class." *Id.* at 994.

In Paragraph 12 of the Final Judgment and Order, the district court blindly accepted the settling plaintiffs' claimed "total class benefit" of $2,133,719. As explained above, this blind acceptance fell far short of the court's duty to apply

heightened scrutiny. As discussed in the preceding section, this number was grossly inflated by counsel's reliance on un-audited claim numbers. 2-ER-033 ¶ 8 ("The claims have not yet been audited, and the caps on reimbursement claims have not yet been applied.")). But even accepting settling plaintiffs' numbers, and assuming that the un-audited numbers were in fact final and accurate, the fee award exceeded the value of all payments that would be delivered to class members. 2-ER-027 at ¶ 2 ("Settlement Class Members submitted claims totaling $706,109.27 in settlement benefits.").

Considering this disparity, and the court's failure to apply the required heightened scrutiny to the settlement and the award of fees to settling plaintiffs' counsel, the Final Judgment and Order should be reversed.

## CONCLUSION

Appellants respectfully request that the Court reverse the district court's Final Judgment and Order granting final approval to the settlement and awarding of $800,000.00 in attorneys' fees and expenses to the settling plaintiffs' counsel.

Dated: October 2, 2023                    Respectfully submitted,

                                          */s/ Tina Wolfson*
                                          Tina Wolfson (SBN 174806)
                                          twolfson@ahdootwolfson.com
                                          Theodore Maya (SBN 223242)
                                          tmaya@ahdootwolfson.com
                                          Christopher Stiner (SBN 276033)
                                          cstiner@ahdootwolfson.com

Deborah De Villa (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

Todd. S. Garber
tgarber@fbfglaw.com
Andrew C. White
awhite@fbfglaw.com
**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
One North Broadway, Suite 900
White Plains, NY 10601
Telephone: (914) 298-3281
Facsimile:  (914) 824-1561

Seth A. Meyer (*pro hac vice* to be filed)
sam@kellerlenkner.com
Alex J. Dravillas (*pro hac vice* to be filed)
ajd@kellerlenkner.com
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220

*Counsel for Plaintiffs Aviva Kirsten and*
*Jeremy Pittman in No. 2:21-cv-09578-*
*DOC (KESx)*

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, counsel for the Appellant is unaware of any other case pending in this Court that will directly affect, or will be directly affected by, this Court's decision in the pending appeal.

Dated: October 2, 2023

*/s/ Tina Wolfson*
Tina Wolfson

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   No. 22-55288

I am the attorney or self-represented party.
**This brief contains  9,730  words,** including _____0_____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties.
   [ ] a party or parties are filing a single brief in response to multiple briefs.
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  */s/  Tina Wolfson*                    **Date**  October 2, 2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

# CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2023, I electronically filed the foregoing Movants-Appellants' Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system. I certify that all participants in the case are registered Appellate Electronic Filing system users and that service will be accomplished by the Appellate Electronic Filing system.

Dated: October 2, 2023

*/s/ Tina Wolfson*
Tina Wolfson