# No. 23-55288

# In the United States Court of Appeals For the Ninth Circuit

IN RE: CALIFORNIA PIZZA KITCHEN DATA BREACH LITIGATION

AVIVA KIRSTEN AND JEREMY PITTMAN,
*Objectors-Appellants,*

v.

KANSAS GILLEO, SYDNEY RUSEN, ESTEBAN MORALES, DOUG WALLACE, ALONDRA MEZA, BRETT RIGAS AND EVENCIO DIAZ,
*Plaintiffs-Appellees,*

CALIFORNIA PIZZA KITCHEN, INC., et al.,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California, Los Angeles
District Court Case No. 8:21-cv-01928-DOC-KES
The Honorable David O. Carter

## ANSWERING BRIEF OF APPELLEE CALIFORNIA PIZZA KITCHEN, INC.

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Jon P. Kardassakis, SBN 90602
Michael K. Grimaldi, SBN 280939
633 West 5th Street, Suite 4000
Los Angeles, CA 90071
Tel.: 213.250.1800; Fax: 213.250.7900

*Attorneys for Defendant-Appellee*
**CALIFORNIA PIZZA KITCHEN, INC.**

**CORPORATE DISCLOSURE STATEMENT**
**(Fed. R. App. P. 26.1)**

Defendant-appellee California Pizza Kitchen, Inc. is owned by

CPK Holdings Inc., which is owned by CPK Parent Inc.

DATED: January 30, 2024      LEWIS BRISBOIS BISGAARD &
SMITH LLP


By: _/s/ Michael K. Grimaldi_
Jon P. Kardassakis
Michael K. Grimaldi
*Attorneys for Defendant-Appellee*
**CALIFORNIA PIZZA
KITCHEN, INC.**

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................... 2

TABLE OF AUTHORITIES ................................................................. 7

INTRODUCTION ............................................................................. 14

STATEMENT OF ISSUES ................................................................. 18

STATEMENT OF THE CASE ............................................................ 19

    A.    CPK is hit with a ransomware attack and pays the ransom so no information would be leaked. ......................... 19

    B.    CPK gives the required statutory notice to employees who "may" have been affected and provides free identity-theft insurance. ...................................................... 20

    C.    Class action complaints are filed against CPK. .................. 21

    D.    The district court consolidates four actions while *Kirsten's* counsel pursued their own litigation in a separate action. .................................................................. 22

    E.    CPK mediates twice with the *Gilleo* plaintiffs and settles the consolidated action with the mediator's guidance ......................................................................... 23

    F.    The class action settlement provides favorable terms for the settlement class. ...................................................... 24

    G.    *Kirsten*'s counsel wanted to litigate and thus were not included in the mediations .................................................. 26

    H.    *Kirsten's* counsel tries to hijack the consolidated case by filing a motion to become interim lead counsel. .............. 27

    I.    *Gilleo's* counsel moves for preliminary approval of the class settlement. .............................................................. 29

J.    The court conducts an evidentiary hearing where the mediator testifies that the mediations were adversarial and not collusive....................................................31

K.   The court finds the mediator's testimony convincing and grants preliminary approval of the settlement. ............34

L.    The *Kirsten* case is weak and should have been dismissed for lack of Article III standing. ............................34

M.  The claims administrator completes the notice process and *Gilleo*'s counsel moves for final approval of the settlement..................................................................................38

N.   The court grants final approval of the class action settlement with the undisputed evidence showing the personal information of class members was not leaked to the dark web and thus could not have been misused. .....40

SUMMARY OF ARGUMENT ..................................................42

STANDARD OF REVIEW......................................................43

ARGUMENT ...........................................................................46

I.    The District Court Applied the Proper Criteria in Approving the Class Action Settlement...........................................46

II.   The District Court Did Not Abuse Its Discretion in Finding the Settlement Resulted from a Fair Process Absent Collusion. ......................................................................50

A.   The unrebutted evidence from the mediator's testimony is the settlement resulted from two adversarial arms-length mediations................................................................52

B.   There was no reverse auction and *Kirsten*'s counsel did not have a stronger bargaining position...............................54

C.     There is no clear sailing on fees because the *Kirsten* plaintiffs were always going to challenge any fee award. .................................................................. 56

D.     There was no "reverter" of settlement member benefits to CPK. ......................................................................... 58

E.     *Gilleo*'s counsel did not receive a disproportionate distribution of the gross settlement amount. ....................... 59

III.   The District Court Did Not Abuse Its Discretion in Finding the Settlement Fair, Reasonable, and Adequate .......................... 61

A.     Plaintiffs' case is weak. ....................................................... 62

B.     The "costs, risks, and delay of trial and appeal" would have been massive as this appeal shows. .............................. 63

C.     The settlement benefits offered were significant and in line with or better than comparable data-security settlements. .......................................................................... 66

D.     Class members reacted positively to the settlement with only one objection from interested counsel. ................. 71

E.     Claims-made settlements are permitted and consistent with this circuit's policy of facilitating class action settlements. .......................................................................... 73

IV.   The Settlement Is Fair Given CPK's Significant Defenses to Liability and Damages. ................................................................... 75

A.     Plaintiffs cannot establish actual injury traceable to CPK .................................................................................... 75

B.     CCPA damages are not available here. ............................... 78

      1.     The *Kirsten* plaintiffs did not give pre-suit notice and the violation (if any) was cured, thus barring CCPA statutory damages ............................................. 79

2.      Only California residents may seek CCPA
        statutory damages........................................................81

V.      The Settlement Properly Releases Claims Including the
        CCPA Claim. ...............................................................84

VI.     The Fee Award Should Not Affect the Approval of the Class
        Settlement As It Was a Separate Award Resulting from a
        Separate Motion. .........................................................85

CONCLUSION ........................................................................87

CERTIFICATE OF COMPLIANCE.......................................88

STATEMENT OF RELATED CASES ...................................89

CERTIFICATE OF SERVICE...............................................90

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arnold v. FitFlop USA, LLC*,
No. 11-CV-0973, 2014 U.S. Dist. LEXIS 58800
(S.D. Cal. Apr. 28, 2014) ....................................................... 72

*Bateman v. Am. Multi-Cinema, Inc.*,
623 F.3d 708 (9th Cir. 2010) ................................................ 83

*Bock v. Washington*,
33 F.4th 1139 (9th Cir. 2022) .............................................. 75

*Bostick v. Herbalife Int'l of Am., Inc.*,
No. CV 13-2488, 2015 WL 12731932
(C.D. Cal. May 14, 2015) ...................................................... 73

*Bowerman v. Field Asset Servs., Inc.*,
39 F.4th 652 (9th Cir. 2022) ................................................ 78

*Bravo v. City of Santa Maria*,
810 F.3d 659 (9th Cir. 2016) ................................................ 86

*Brightk Consulting Inc. v. BMW of N. Am., LLC*,
No. SACV21-02063-CJC, 2023 U.S. Dist. LEXIS 168723
(C.D. Cal. Sep. 12, 2023) ................................................. 53, 57

*Briseño v. Henderson*,
998 F.3d 1014 (9th Cir. 2021) ...................... 45, 51, 60–61, 83

*Broomfield v. Craft Brew Alliance, Inc.*,
No. 17-cv-01027-BLF, 2020 U.S. Dist. LEXIS 74801
(N.D. Cal. Feb. 5, 2020) ........................................................ 72

*California v. IntelliGender, LLC*,
771 F.3d 1169 (9th Cir. 2014) .............................................. 62

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .............................. 46, 49, 58, 61, 69, 83

*Carter v. Vivendi Ticketing United States LLC,*
No. SACV22-01981-CJC, 2023 U.S. Dist. LEXIS 210744
(C.D. Cal. Oct. 30, 2023) ........................................... 64, 65–68, 70, 72

*Churchill Vill., L.L.C. v. GE,*
361 F.3d 566 (9th Cir. 2004)........................................... 45, 47, 49, 71

*City of Riverside v. Rivera,*
477 U.S. 561 (1986).............................................................................. 86

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).............................................................................. 71

*Fraley v. Batman,*
638 F. App'x 594 (9th Cir. 2016)....................................................... 74

*Gardiner v. Walmart Inc.,*
No. 20-cv-04618-JSW, 2021 U.S. Dist. LEXIS 75079
(N.D. Cal. Mar. 5, 2021)..................................................................... 81

*Gaston v. Fabfitfun, Inc.,*
No. 2:20-cv-09534-RGK-E, 2021 U.S. Dist. LEXIS 250695
(C.D. Cal. Dec. 9, 2021)...................................................................... 64

*Gonzalez v. City of Maywood,*
729 F.3d 1196 (9th Cir. 2013).......................................................... 86

*Graves v. United Indus. Corp.,*
No. 2:17-cv-06983-CAS-SKx, 2020 U.S. Dist. LEXIS 33781
(C.D. Cal. Feb. 24, 2020).................................................................... 66

*Griffey v. Magellan Health Inc.,*
No. CV-20-01282-PHX-MTL, 2022 U.S. Dist. LEXIS
98785 (D. Ariz. June 1, 2022) ........................................................... 80

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998)......................................... 18, 45–46, 74

*Hashemi v. Bosley, Inc.,*
No. CV 21-946, 2022 U.S. Dist. LEXIS 119454
(C.D. Cal. Feb. 22, 2022).............................................................. 68–69

*Hashemi v. Bosley, Inc.*,
No. CV 21-946 PSG, 2022 U.S. Dist. LEXIS 210946
(C.D. Cal. Nov. 21, 2022) .....................58, 60, 62, 64–65, 67, 70–72, 84

*Hayden v. Retail Equation, Inc.*,
No. SACV20-01203-DOC-DFM, 2022 U.S. Dist. LEXIS
119792 (C.D. Cal. May 4, 2022)..........................................................82

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010)...............................................................84

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022).......................................63–64

*Index Newspapers LLC v. U.S. Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020).......................................................71, 77

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018)...........................................66, 69, 72

*In re Apple Inc. Device Performance Litig.*,
50 F.4th 769 (9th Cir. 2022) ................................ 44, 46–47, 49, 73, 77

*In re Baby Prods. Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013) ................................................................85

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011)........................................... 44, 52, 59–60

*In re Google LLC St. View Elec. Commc'ns Litig.*,
611 F. Supp. 3d 872 (N.D. Cal. 2020)................................................69

*In re Home Depot, Inc., Customer Data Sec. Breach Litig.*,
No. 1:14-md-02583-TWT, 2016 U.S. Dist. LEXIS 200113
(N.D. Ga. Aug. 23, 2016)....................................................................69

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019)...........................................48, 50, 55, 62

*In re Illuminate Educ. Data Sec. Incident Litig.*,
No. SACV 22-1164, 2023 U.S. Dist. LEXIS 76652
(C.D. Cal. Apr. 19, 2023) ................................................................ 76

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2007) .............................. 65

*In re Outlaw Labs., LP Litig.*,
No. 18-cv-840-GPC-BGS, 2023 U.S. Dist. LEXIS 180097
(S.D. Cal. Oct. 5, 2023) ................................................................ 86

*In re Target Corp. Customer Data Sec. Breach Litig.*,
No. 14-2522 (PAM), 2017 U.S. Dist. LEXIS 75455 (D.
Minn. May 17, 2017) ................................................................. 69

*In re Waste Mgmt. Data Breach Litig.*,
No. 21cv6147, 2022 U.S. Dist. LEXIS 32798 (S.D.N.Y.
Feb. 24, 2022) ................................................................................ 81

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
No. 16-MD-02752-LHK, 2020 U.S. Dist. LEXIS 129939
(N.D. Cal. July 22, 2020) ....................................................... 68–69

*In re Zappos.com, Inc.*,
888 F.3d 1020 (9th Cir. 2018) ............................................. 64

*Johnson v. MGM Holdings, Inc.*,
943 F.3d 1239 (9th Cir. 2019) ............................................. 86

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ........................................... 55, 62

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998) ............................................. 43

*Lowery v. Rhapsody Int'l, Inc.*,
75 F.4th 985 (9th Cir. 2023) ............................................... 86

*Masterson v. IMA Fin. Grp., Inc.*,
No. 2:23-cv-02223-HLT-ADM, 2023 U.S. Dist. LEXIS
222701 (D. Kan. Dec. 14, 2023) ......................................... 63

*McKinney-Drobnis v. Oreshack,*
16 F.4th 594 (9th Cir. 2021) .............................................................. 57

*Negrete v. Allianz Life Ins. Co.,*
523 F.3d 1091 (9th Cir. 2008) ........................................................... 28

*Officers for Justice v. Civil Serv. Com.,*
688 F.2d 615 (9th Cir. 1982) ....................................................... 66, 68

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
31 F.4th 651 (9th Cir. 2022) .............................................................. 78

*Rodriguez v. River City Bank,*
No. 34-2021-00296612-CU-BC-GDS, 2021 Cal. Super.
LEXIS 105085 (Sac. Super. Ct. Sep. 2, 2021) ................................... 81

*Rodriguez v. West Publ'g Corp.,*
563 F.3d 948 (9th Cir. 2009)............................................................. 74

*Roes v. SFBSC Mgmt., LLC,*
944 F.3d 1035 (9th Cir. 2019)........................................................... 49

*Savage v. Glendale Union High Sch. Dist. No. 205,*
343 F.3d 1036 (9th Cir. 2003)........................................................... 36

*Schneider v. Chipotle Mexican Grill, Inc.,*
336 F.R.D. 588 (N.D. Cal. 2020) ...................................................... 72

*Shames v. Hertz Corp.,*
No. 07-CV-2174-MMA(WMC), 2012 U.S. Dist. LEXIS
158577 (S.D. Cal. Nov. 5, 2012)................................................... 59, 74

*Six (6) Mexican Workers v. Ariz. Citrus Growers,*
904 F.2d 1301 (9th Cir. 1990)........................................................... 73

*St. Louis, I.M. & S. Ry. Co. v. Williams,*
251 U.S. 63 (1919)............................................................................ 83

*Staton v. Boeing Co,*
327 F.3d 938 (9th Cir. 2003)............................................................. 46

*Thomas v. Kimpton Hotel & Rest. Grp., LLC*,
   No. 19-cv-01860-MMC, 2022 U.S. Dist. LEXIS 72525
   (N.D. Cal. Apr. 20, 2022) ............................................................ 65, 77

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ................................................ 37, 59, 64, 75–76

*Vasquez v. Coast Valley Roofing, Inc.*,
   266 F.R.D. 482 (E.D. Cal. 2010) ........................................................ 62

*Wallis v. BNSF Ry. Co.*,
   No. C13-40, 2014 U.S. Dist. LEXIS 56834 (W.D. Wash.
   Apr. 23, 2014), *aff'd sub nom. Wallis v. BNSF Ry.*, 680 F.
   App'x 515 (9th Cir. 2017) ............................................................. 86–87

*Wynne v. Audi of Am.*,
   No. 21-cv-08518-DMR, 2022 U.S. Dist. LEXIS 131625
   (N.D. Cal. July 25, 2022) ................................................................... 82

## Statutes

Cal. Civ. Code § 3 ....................................................................................... 81

Cal. Civ. Code § 1798.81.5(a)(1) ................................................................ 80

Cal. Civ. Code § 1798.140(i) ........................................................... 40, 79, 81

Cal. Civ. Code § 1798.150(a) ..................................................... 67, 79, 81–82

Cal. Civ. Code § 1798.150(a)(2) .................................................................. 82

Cal. Civ. Code § 1798.150(b) ........................................................ 40, 68, 79–81

Cal. Civ. Code § 1798.185(d) ...................................................................... 81

## Rules and Regulations

Fed. R. Civ. P. 12(b) .................................................................................... 54

Fed. R. Civ. P. 12(b)(1) ................................................................................ 36

Fed. R. Civ. P. 23(e) ......................................................................... 45, 49, 55

Fed. R. Civ. P. 23(e)(2) ................................................. 42, 44–47

Fed. R. Civ. P. 23(e)(2)(A)–(D) ................................................. 45

Fed. R. Civ. P. 23(e)(2)(C)(i) ................................................. 63

Fed. R. Civ. P. 23(e)(3) ................................................. 44

Fed. R. Civ. P. 26(f) ................................................. 26

## Other Authorities

Federal Judicial Center, Judges' Class Action Notice and
   Claims Process Checklist and Plain Language Guide at 3
   (2010), www.fjc.gov/sites/default/files/2012/NotCheck.pdf ............... 38

**INTRODUCTION**

This appeal arises out of a ransomware attack against defendant-appellee California Pizza Kitchen, Inc. ("CPK") and a challenge to the class settlement that resulted after two mediations in the subsequent class action litigation against CPK. CPK paid the ransom and there has been no evidence indicating any data was made available on the attacker's leak site. (1-SER-50.) Additionally, cybersecurity experts found no indication any of the data was publicly available or discussed on the dark web. (1-SER-46.) There is thus no evidence of actual harm to potentially affected persons.

After paying the ransom, CPK sent statutorily-required notification letters to individuals whose information *may* have been impacted. Soon after sending notice, CPK was sued in five putative class actions in the district court.

The plaintiffs in the first four cases, which were later consolidated—Kansas Gilleo, Esteban Morales, Doug Wallace and Brett Rigas (collectively, "the *Gilleo* plaintiffs")—entered into a settlement with CPK. The plaintiffs in the fifth case—appellants/objectors Aviva Kirsten and Jeremy Pittman ("the *Kirsten* plaintiffs") did not want to

settle early. The *Kirsten* plaintiffs wanted to litigate to generate a higher lodestar to claim higher attorneys' fees and thus did not participate in the successful mediation. They resort to making wild and unsupported accusations of collusion in an effort to torpedo the class settlement because it does not include paying fees to their counsel.

The district court took the *Kirsten* plaintiffs' collusion accusations seriously and conducted an evidentiary hearing that included live testimony from the mediator who supervised the two-day mediation that resulted in a class settlement. (4-ER-511–51.) At the hearing on preliminary approval of the settlement, the mediator, who had mediated "at least a dozen data breach cases…maybe more" (4-ER-546) testified as to the arms-length negotiations that resulted in the settlement.

The settlement offers reimbursement of ordinary out-of-pocket expenses incurred by class members, an additional category of benefits for reimbursement of extraordinary expenses, a $100 cash payment to California subclass members to account for the alleged violation of the California Consumer Privacy Act (CCPA), and credit-monitoring insurance. (4-ER-514–17.) This is likely better than the *Gilleo* plaintiffs

would have obtained if they chose to litigate as they would have difficulty proving liability and damages.

Indeed, the mediator testified that "one of the most difficult parts of these cases for plaintiffs…is the damage issue." (4-ER-520.) "It's very hard to have a client that can show that…their data has been acquired, breached, and that it was caused by this particular breach." (*Id.*) The mediator declared he was "strongly of the view that the settlement in this action represents a well-reasoned and sound resolution of this complex and risky litigation.…The settlement is the reasonable result of a hard-fought, arm's length process extending over two sessions that was reflective of the parties' exhaustive assessments of the risks and potential rewards of the claims being settled." (1-SER-133.) He declared that "[a]t all times during the mediation, the negotiations, while very professional, nonetheless were completely adversarial, non-collusive, and at arm's-length." (1-SER-134.) From his personal observation, "the parties negotiated aggressively, effectively, in good faith, with a high level of professionalism, and at arm's-length." (*Id.*)

After hearing live testimony and having the opportunity to directly examine and assess the credibility of the witness, the court

granted preliminary approval of the settlement, finding the settlement "adequate, fair, and reasonable." (4-ER-547–48.) The court saw nothing to support the *Kirsten* plaintiffs' accusations of collusion and appropriately noted their "[c]ounsel's pretty aggressive in terms of wanting to become lead counsel. So it might be a torpedo effect here from the very beginning, shoving the majority of the cases off to the side." (4-ER-528.)

At the hearing on final approval of the settlement, the *Kirsten* plaintiffs offered the same unsupported collusion accusations and the court properly rejected them. (4-ER-495 ("I've gone through the collusion arguments of the past. In other words, when the preliminary approval took place, we had those arguments concerning collusion, and I rejected those….").) Nothing has changed. There is no merit to the accusations. The *Kirsten* plaintiffs have appealed because they are disappointed that they were not allowed to take the lead on these class claims and request fees for themselves. Their disgruntled challenges should not overturn this favorable class settlement.

The settlement was well received by the settlement class, drawing no objections other than from the *Kirsten* plaintiffs. Only four class members opted-out of participation.

That the *Kirsten* plaintiffs would prefer a different settlement does not mean that the district court applied the wrong legal standard or abused its discretion in approving the settlement. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (possibility "that the settlement could have been better...does not mean the settlement presented was not fair, reasonable or adequate").

Given the district court's "expos[ure] to the litigants, and their strategies, positions and proof," there is no sound basis to say that the court abused its discretion in approving the settlement. *Id.* at 1026. The class should not be deprived of this well-received settlement by *Kirsten* counsel's quest for their own payday.

The final judgment and order approving the class settlement should be affirmed.

## STATEMENT OF ISSUES

1.     Did the district court properly exercise its discretion in finding the settlement resulted from a fair process absent collusion?

2.     Did the district court properly exercise its discretion in finding the settlement fair, reasonable and adequate?

3.     Did the district court properly approve the settlement given CPK's significant defenses to liability and damages?

4.     Does the settlement properly release the CCPA claim?

5.     Did the district court properly exercise its discretion in granting class counsel's attorneys' fee request?

CPK asserts the answer to these questions is "yes."

## STATEMENT OF THE CASE

### A.     CPK is hit with a ransomware attack and pays the ransom so no information would be leaked.

In September 2021, CPK was the victim of a ransomware attack by a group known as Conti. Conti had gained access to and encrypted files on CPK's system and left a ransomware note, which demanded payment in exchange for a decryption key and an agreement not to publish any accessed data. (1-SER-50.)

Conti emphasized that their reputation was important to them and, as such, they would honor the terms of the deal if the ransom was paid. There is no evidence the attackers had any interest in misusing the information other than for extorting a ransom. Conti's business

model was to make money by demanding ransom. No one would pay the ransom if Conti published or misused stolen data after payment. (1-SER-50.)

CPK paid the ransom. In exchange, Conti revealed the vulnerability through which they had accessed CPK's network, provided a decryption key, and *promised not to publish any data accessed during the incident*, and delete any copy in their possession. The endpoint-protection systems on CPK's network detected no subsequent attempt to re-enter CPK's systems. (1-SER-50.) No evidence was found indicating the accessed data was made available on the attacker's "leak site." (*Id.*) CPK received no reports of information misuse beyond the subsequent lawsuits. (1-SER-50–51.)

## B. CPK gives the required statutory notice to employees who "may" have been affected and provides free identity-theft insurance.

On November 15, 2021, CPK sent notification letters to 103,767 former or current employees (30,781 of which had California addresses). (1-SER-50.) CPK advised there was "a disruption to certain systems on [CPK's] computing environment" in which "certain files on [CPK's] systems had been subject to unauthorized access." (2-SER-292.) The

letter stated there was "**no indication that your specific information was accessed or misused**[.]" (*Id.*) (Emphasis in original).

The letter explained CPK was providing free access to "Experian's IdentityWorks." (2-SER-292.) This service provided: Experian credit report at signup, credit monitoring, identity restoration, Experian IdentityWorks ExtendCARE, and "[u]p to $1 Million Identity Theft Insurance." (2-SER-293.)

## C.    Class action complaints are filed against CPK.

After CPK's letters went out, five class actions were filed in the United States District Court for the Central District of California. Plaintiffs in the first four cases—(1) *Gilleo, et al. v. California Pizza Kitchen, Inc.,* No. 8:21-cv-01928-DOC-KES (Nov. 23, 2021); (2) *Morales v. California Pizza Kitchen, Inc.*, No. 8:21-cv-01988-DOC-KES (Dec. 2, 2021); (3) *Wallace, et al. v. California Pizza Kitchen, Inc.*, No. 8:21-cv-01970-DOC-KES (Dec. 2, 2021); and (4) *Rigas, et al. v. California Pizza Kitchen, Inc.,* No. 8:21-cv-02004-DOC-KES (Dec. 7, 2021)—alleged CPK failed to adequately safeguard its employees' private information, and sought monetary and equitable relief. Each case named CPK as the sole

defendant, brought similar claims, and purported to represent the same putative nationwide class and state subclasses of all persons whose personally identifying information ("PII") was potentially accessed. (1-SER-120.)

Subsequently, a fifth case, *Kirsten, et al., v. California Pizza Kitchen, Inc.,* No. 2:21-cv-09578-DOC-KES (Dec. 10, 2021), was filed by the *Kirsten* plaintiffs. (1-SER-121.)

A sixth case was filed in state court. (3-ER-340.)

**D.    The district court consolidates four actions while *Kirsten's* counsel pursued their own litigation in a separate action.**

The district court related the five federal cases. (2-SER-331.) CPK and plaintiffs' counsel for the first four actions—*Gilleo, Morales, Wallace* and *Rigas*—stipulated to consolidate these four actions. (2-SER-281–89.) The stipulation noted the fifth case—the *Kirsten* case. (2-SER-283 n.1.) *Gilleo's* counsel invited *Kirsten's* counsel to work together, but *Kirsten's* counsel declined and indicated they would file a leadership motion. (1-SER-121.)

On February 15, 2022, the court consolidated the four cases designating them as *In re California Pizza Kitchen Data Breach*

*Litigation.* (3-ER-433–36.) The *Kirsten* plaintiffs litigated their case separately, never again raising the issue of consolidation. (1-SER-121.)

**E.    CPK mediates twice with the *Gilleo* plaintiffs and settles the consolidated action with the mediator's guidance.**

Prior to mediating, the parties to the consolidated cases exchanged confirmatory discovery on a variety of topics, including applicable insurance coverage, which was an insurance policy whose limits were being eroded by litigation expenses. (1-SER-121.) CPK preferred to settle rather than incur litigation expenses for years to prove this was a no-injury case. CPK agreed to mediate the consolidated cases and informed all plaintiffs' counsel it wanted to enter into early settlement discussions. (1-SER-121; 2-SER-254.) The parties selected Bruce Friedman—a well-regarded private mediator with considerable experience mediating data-security class actions—to preside over the mediation. (1-SER-121.)

The parties participated in an all-day mediation on March 10, 2022, but were unable to reach an agreement during this first session. (1-SER-122.)

The parties returned for a second mediation on March 15 and they reached an agreement on the material terms of class-wide relief. The

parties did not negotiate attorneys' fees until *after* they reached agreement on class relief. (1-SER-122.)

The parties to the consolidated cases apprised the court of the settlement. (1-SER-122.) The court stayed all proceedings in the consolidated cases pending the filing of a motion for preliminary approval. (*Id.*; 2-SER-274–75.)

**F.  The class action settlement provides favorable terms for the settlement class.**

The settlement provides relief for the class defined as: "All persons who were sent notice of the Data Security Incident announced by defendant on or about November 15, 2021." (3-ER-369.) The settlement provides additional relief for a California subclass. (3-ER-372.) The settlement class and California subclass are estimated to include 103,767 and 30,781 individuals, respectively. (3-ER-370.) The settlement was designed so these individuals could easily file a claim for monetary benefits and credit monitoring as follows:

*Monetary Benefits*: The settlement provides for three forms of monetary relief:

(1) reimbursement of ordinary expenses up to $1,000 per person for unreimbursed out-of-pocket expenses related to the security incident

including up to three hours of lost time spent dealing with effects of the incident at $20 per hour. (3-ER-371; 1-SER-122–23.)

(2) reimbursement of extraordinary expenses up to $5,000 per person for documented, unreimbursed out-of-pocket losses due to identity theft (this is a different benefit than the free insurance). (3-ER-370–71; 1-SER-123.) There is no aggregate cap on these benefits. (1-SER-122.)

(3) California subclass members were eligible for an additional payment of $100 (subject to the $1,000 ordinary-expense cap) to compensate for the alleged violation of the CCPA. (3-ER-372; 1-SER-123.)

*Three-Bureau Credit-Monitoring Benefit*: All class members could claim two years of three-bureau credit monitoring, which includes a credit report at sign-up, credit monitoring, identity restoration, and up to $1 million in identity-theft insurance. (3-ER-372; 1-SER-123–24.) For those enrolled in the twelve months of identity monitoring CPK previously provided as part of its incident response, this credit monitoring offered under the settlement was in addition to that period. (3-ER-372; 1-SER-124.)

*Business Practice Commitments*: CPK agreed to maintain certain remedial measures including continuous threat-assessment processes to increase security. (1-SER-125; 3-ER-375.)

## G. *Kirsten*'s counsel wanted to litigate and thus were not included in the mediations.

CPK wanted to settle *all* the cases to put this criminal ransomware attack behind it. CPK's counsel reached out to *Kirsten's* counsel to see what type of settlement they would be interested in and if they would provide a proposed term sheet. (2-SER-254.) *Kirsten*'s counsel and CPK engaged in "some settlement discussions, but [*Kirsten*'s counsel] never provided [CPK] a substantive response as to what they wanted. They proposed to schedule a mediation far out and engage in discovery before that mediation." (*Id.*) *Kirsten*'s counsel did not express an interest in an early settlement to resolve this no-injury case early and instead preferred to engage in expensive discovery to generate a larger claim for attorneys' fees before settlement talks. CPK never received a competing proposal from *Kirsten*'s counsel. (*Id.*)

At the *Kirsten* Rule 26(f) conference, CPK's counsel "did not say" that he was waiting for lead counsel to be appointed before engaging in substantive settlement discussions. (2-SER-254.) Rather, CPK's counsel

said he had "*no update*" on CPK's position on settlement with the

*Kirsten* plaintiffs in light of their proposal to push settlement

discussions down the road. (*Id.*) (Emphasis in original.) CPK's counsel

explained to *Kirsten*'s counsel that CPK was "discussing settlement

with *all* the plaintiff parties in all the actions." (2-SER-255 (emphasis in

original).) *Kirsten*'s counsel claimed CPK was not discussing settlement

with them, which was not true as CPK's counsel had reached out to

discuss settlement with their team. (*Id.*)

## H.   *Kirsten's* counsel tries to hijack the consolidated case by filing a motion to become interim lead counsel.

After *Gilleo*'s counsel notified the court of the settlement (2-SER-

276–78), *Kirsten*'s counsel tried to wrest control of the consolidated case

by filing a "motion to appoint Tina Wolfson and Todd S. Garber as

interim lead counsel for the plaintiffs and opposition to the motion to

stay proceedings." (3-ER-386–401.) *Kirsten*'s counsel lobbed accusations

against CPK and the *Gilleo* plaintiffs and argued the court should

appoint them as lead counsel, disregarding the fact that the court had

already consolidated four cases that they were not party to. (*Id.*)

*Kirsten*'s counsel asserted without any proof that there was an

appearance of collusion and reverse auction[1] between *Gilleo*'s counsel and CPK's counsel. (3-ER-395–401.)

In opposition, CPK explained that *Kirsten*'s counsel "did not sign and was not a party to the stipulation to consolidate the four other" actions. (2-SER-263.) CPK asserted that the court had already issued orders granting consolidation (3-ER-433–36) and *staying all deadlines* in light of the settlement (2-SER-274–75) and thus the motion for lead counsel was also stayed. (2-SER-263.) CPK also claimed "[t]here is no need for applications for lead counsel in *In Re CPK* because all the parties in *In Re CPK* have agreed in principle to a settlement (and [*Kirsten's* counsel] are not part of that action)." (*Id.*) According to CPK, *Kirsten*'s counsel filed their motion to stop *In Re CPK* from settling because *Kirsten*'s counsel did not like that other litigants settled without them after they excluded themselves. (2-SER-264.)

At the hearing on *Kirsten*'s motion to be appointed lead counsel, the court ruled "[t]he motion is held in abeyance pending consolidated

---

[1]     "A reverse auction is said to occur when 'the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.'" *Negrete v. Allianz Life Ins. Co.*, 523 F.3d 1091, 1099 (9th Cir. 2008).

Plaintiffs' motion for preliminary approval of settlement." (1-SER-171.) The court noted, "I get concerned with accusations. When an accusation is made, it's hard to undo whatever has been said…." (4-ER-556.) The court told *Kirsten*'s counsel that even if their accusations "were right, I'm not sure I would interject you as lead counsel" and the court would be "uncomfortable with that." (4-ER-557.) With respect to the accusations, the court made clear that it needed to see the settlement agreement and hear live testimony from the mediator during the preliminary-approval hearing. (*Id.*) The court knew it was its "responsibility to decide if [the] settlement is fair and reasonable." (4-ER-565.) The also court noted it wanted to leave the consolidated case and *Kirsten* "divided." (4-ER-565–66.)

## I.     *Gilleo's* counsel moves for preliminary approval of the class settlement.

*Gilleo*'s counsel filed a motion for preliminary approval of the class settlement along with a declaration from the mediator, Bruce Friedman. (3-ER-327; 1-SER-132–36.) Friedman declared he has "mediated and settled dozens of data breach class actions." (1-SER-134.) Friedman explained that the first day of mediation was spent trying to reach agreement on the materials terms of a resolution of the class

claims. (*Id.*) "Only upon reaching agreement in principle as to the settlement's material terms did the parties broach the issue of attorneys' fees, costs and service awards, which the parties spent the remainder of their second session negotiating." (*Id.*)

Friedman declared that during the mediation, there was "significant points of disagreement between the parties about the strength of their respective claims and defenses, as well as the nature and scope of the relief required to reach a global resolution of all claims." (1-SER-134.) He noted the parties disagreed about "the type and amount of credit monitoring services." (*Id.*) He "observed first-hand that this was a hard-fought negotiation conducted by well-prepared adversaries resulting in a significant recovery for the class and an equitable settlement for all concerned, particularly considering the insurance coverage available and the fact that the *policy was a burning limits policy, meaning defense costs were paid out of the same policy*." (1-SER-135 (emphasis added).)

Friedman stated that these types of data-security cases involve "significant risk for both sides." (1-SER-135.) Plaintiffs face "difficult issues involving proving causation and exfiltration and/or disclosure of

the plaintiffs' and the class' personally identifying information." (1-SER-136.)

## J. The court conducts an evidentiary hearing where the mediator testifies that the mediations were adversarial and not collusive.

At the preliminary-approval hearing, the court swore Friedman in to give testimony. (4-ER-511–12.) Friedman explained that data-security cases "tend to have a similarity to them in terms of the settlements" as the "issues tend to be similar." (4-ER-514–15.) He testified that "Plaintiffs started at a pretty high place, Defendants started at a low place, and we negotiated," to which both the court and the mediator remarked, "[n]othing too unusual about that." (4-ER-515.) Friedman explained that all except one of his numerous data-breach cases were settled in a claims-made format like the settlement here. (4-ER-546.) He stated that as to the end result, "this case certainly falls within the parameters…I don't believe I've mediated any other cases that wasn't in this form, claims-made…with various aspects to it in terms of credit monitoring, payments to class members who make a claim." (4-ER-546–47.)

Friedman testified that all the terms were negotiated at arm's length including the compensation for time spent, extraordinary expenses, and the CCPA damages amount. (4-ER-513–16.) He confirmed the credit-monitoring benefit was "very highly negotiated" as the parties could not agree on the "number of years or the three-bureau product." (4-ER-516, 538.) The *Gilleo* plaintiffs' counsel confirmed, they "fought hard" for the "two years [of] three bureau credit monitoring" because CPK "did not want to provide that benefit." (4-ER-542.)

Friedman testified that "the most difficult parts of these cases for plaintiffs…is the damage issue….It's very hard to have a client that can show that…their data has been acquired, breached, and that it was caused by this particular breach." (4-ER-520.) The court appreciated the significance of this issue, responding "[a]bsolutely." (*Id.*) The court explained it is a question of whether the information is "on the deep web or dark web" and if it is "going to be regurgitated" and whether there is "actual harm." (*Id.*; 4-ER-518.)

CPK's counsel highlighted that in the *Kirsten* case, the court granted CPK's original motion to dismiss the *Kirsten* complaint because the *Kirsten* plaintiffs were unable to allege any actual harm. (4-ER-533–

34.) CPK's counsel explained that a claims-made settlement is desirable because this was a "ransomware case where the ransom was paid -- and the reason why we [pay the ransom] is so that no data will be misused. We are willing to take the risk that the folks who we paid the ransom to are in fact never going to misuse that data." (4-ER-534.) The court responded, "[w]e're taking our best guess about the dark web and if anybody's ever going to pull it up" and that to counter this difficulty "[t]wo years, three years sounds reasonable" for credit monitoring. (4-ER-538.)

After hearing *Kirsten*'s counsel's criticism of the settlement, the court requested *Kirsten*'s counsel make a better offer. *Kirsten*'s counsel's "opening demand" was "a non-reversionary fund of $10 million." (4-ER-539.) This offer did not consider the significant injury/causation issues.

*Gilleo*'s counsel explained "the benefits that are being offered to the class are better than some of the common-fund settlements that [*Kirsten's* counsel] has brokered. Because there's not going to be any proration. The class members are going to get more. They're going to get the hundred dollars guaranteed if they bother to check the box." (4-ER-541.) The court noted *Kirsten's* counsel has been "aggressive in terms of

wanting to become lead counsel" and explained she was providing a "torpedo effort here from the very beginning" by attempting to "shov[e] the majority of the cases off to the side." (4-ER-528.)

## K. The court finds the mediator's testimony convincing and grants preliminary approval of the settlement.

The court credited and complimented the mediator and noted "[t]hese are hard cases" and explained that the mediator was "extraordinar[il]y helpful." (4-ER-547, 550.) Based on the mediator's testimony and the rest of the argument, the court found the settlement is "adequate, fair, and reasonable." (4-ER-548.) The court granted the *Gilleo* plaintiffs' motion for preliminary approval of the settlement (1-SER-110–18) and denied the *Kirstin* plaintiffs' lead counsel motion as moot. (1-SER-109.)

## L. The *Kirsten* case is weak and should have been dismissed for lack of Article III standing.

The *Kirsten* plaintiffs struggled to allege facts to demonstrate Article III standing, much less prove recoverable damages. CPK moved to dismiss the *Kirsten* plaintiffs' complaint because they did not allege facts to demonstrate they suffered unauthorized use of any of their information, identity theft, fraud, or economic harm. Nor did they allege any instance of a putative class member suffering identity theft or

misuse. (3-ER-449.) The court granted CPK's motion without prejudice, finding plaintiffs lacked Article III standing because "there is nothing to suggest that the PII has been used, or misused, by those who committed the data breach. The mere fact that Plaintiffs' PII has been *stolen does not amount to a concrete injury* for which the Court can provide a remedy." (2-SER-259 (emphasis added).)

The *Kirsten* plaintiffs amended their complaint (2-SER-216–51) but alleged "no new substantive allegations" for plaintiff Kirsten. (2-SER-184.) Plaintiff Pittman alleged he discovered "fraudulent charges on his debit card," and was "locked out of his Amazon.com account." (*Id.*; 2-SER-219.)

CPK moved to dismiss the amended complaint again raising a factual challenge to standing because there was no causal link between information about Pittman that was potentially accessed in the data-security incident and any unauthorized use of his debit card or Amazon.com account. (2-SER-184–85.) CPK submitted a declaration from its Senior Vice-President and Head of Human Resources, Shannon Kirk, who declared that "CPK does not ask for, have, or keep the debit card information of any employee" and it "does not ask for, have, or

keep the Amazon.com account information of any employee on file." (2-SER-185, 210.) The alleged misuse of Pitman's debit card or Amazon account could not have been caused by the CPK ransomware attack for the simple reason that CPK did not have any information about Pittman's debit card or Amazon account. This factual showing shifted the burden to the *Kirsten* plaintiffs to provide evidence of traceability. *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039–40 n.2 (9th Cir. 2003).

Pittman failed to provide a declaration or any evidence to rebut CPK's evidence. His opposition did not refute that he had never given CPK information about his debit card or Amazon account. (1-SER-137–69.) He did not explain how there could be a causal connection between the ransomware attack and misuse of his debit card or Amazon account when CPK had no information about those accounts.

The court only granted CPK's motion to dismiss in part. The court did not address the 12(b)(1) factual challenge and did not discuss Kirk's declaration or the lack of evidence to tie misuse of Pitman's debit card or Amazon account to the CPK ransomware attack. (2-ER-270–87.)

The evidence, however, remains undisputed that the *Kirsten* plaintiffs have an exceptionally weak case. Kirsten did not allege any evidence of misuse and Pittman never provided evidence to suggest the ransomware attackers who accessed CPK's records could have obtained information about his debit card or Amazon account from CPK. Whatever the cause of Pittman's alleged debit card or Amazon misuse, it was not traceable to CPK's data-security incident. Kirk's declaration, which challenged any claim that misuse of Pitman's debit card or Amazon account could have been caused by the CPK ransomware attack, was undisputed. (2-SER-210.)

The *Kirsten* plaintiffs trumpet that they were able to survive CPK's motion to dismiss, but surviving a motion to dismiss at the pleading stage is a far cry from surviving summary judgment, establishing liability, causation, and damages. If the class members cannot prove actual injury, they have no standing and cannot seek damages. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). The

*Kirsten* plaintiffs would be exposed by a summary judgment motion because they have no injury traceable to the ransomware attack.[2]

## M. The claims administrator completes the notice process and *Gilleo*'s counsel moves for final approval of the settlement.

After preliminary approval, the claims administrator completed the notice process. The administrator mailed 103,380 direct postcard notices to each class member and provided a toll-free number. (1-SER-9, 12.) To increase the success of the notice-and-claims process, the parties agreed to send 4,349 direct reminder email notices and conducted a social-media campaign. (1-SER-11–12.) "[T]he individual direct notice efforts reached approximately 91.2% of the identified members of the Settlement Class and the California Settlement Subclass." (1-SER-12.) This far surpasses the seventy percent generally required to comport with due process.[3] The claims administrator attested that "industry standard best practices were followed[.]" (1-SER-56.)

Only four individuals opted-out of the settlement. (1-SER-12–13.)

---

[2] The *Kirsten* case is currently stayed pending the outcome of this appeal. (2-SER-356.)

[3] Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide at 3 (2010), www.fjc.gov/sites/default/files/2012/NotCheck.pdf.

After *Gilleo*'s counsel moved for final approval of the class action settlement (2-ER-42–77), *Kirsten*'s counsel filed the only objection (1-SER-13) repeating the same accusations advanced on appeal. (2-ER-80–103.)

CPK filed a response to the *Kirsten* objection, providing undisputed evidence showing why the security incident did not result in injuries to the class. (1-SER-21–51.) CPK hired Kroll, LLC, a cybersecurity forensic investigator, to examine the effects of the ransomware attack. Kroll conducted dark-web searches of the files involved in the attack and found *no evidence of CPK's files on the dark web*. (1-SER-24, 46.) Kroll's Managing Director of Cyber Threat Intelligence declared that the lack of information on the dark web was not surprising because the ransom was paid, and Conti's modus operandi was not to leak information when they were paid. (1-SER-47.) Conti's business model is to demand ransom so that any data they managed to exfiltrate will not be misused. If Conti disclosed or misused information after a ransom was paid, no one would ever pay them a ransom again. (*Id.*)

In response to *Kirsten*'s counsel's claim that the class is entitled to $77 million in statutory damages under the CCPA, CPK showed that this number lacks any nexus with reality. (1-SER-28.) First, CPK responded to *Kirsten*'s counsel's notice-of-CCPA-violation letter, stating that any violation had been cured and no future violations would occur. (1-SER-28–31.) As a matter of law, this was a complete defense to the CCPA statutory-damages claim. Cal. Civ. Code § 1798.150(b). Second, CPK showed *Kirsten*'s inclusion of non-California residents in their statutory-damages arithmetic was incorrect (1-SER-31–32) because the CCPA only applies to "California resident[s]." *Id.* § 1798.140(i).

**N.    The court grants final approval of the class action settlement with the undisputed evidence showing the personal information of class members was not leaked to the dark web and thus could not have been misused.**

At the final-approval hearing, *Gilleo*'s counsel, Rachele Byrd, explained "this settlement is comparable, if not superior, to those approved in similar data breach class actions." (4-ER-483.) Byrd noted the court "encouraged us to do our very, very best to get notice out to the class, and we feel like we have done that….We did more than is required by the settlement agreement[.]" (*Id.*) Byrd "reported 1,828 claims, which is 1.8 percent claims rate[.]" (4-ER-484.) The actual value

of the settlement when adding up direct class benefits, at the time of the hearing, was $1,161,149.27 (4-ER-485–86), calculated as follows:

| Claim-Based Remedies | Count | Amount Claimed |
|---|---|---|
| California statutory damages award to California subclass members | 803 | $80,300 |
| Ordinary out-of-pocket expense reimbursement | 176 | $384,134.77 |
| Compensation for lost time | 979 | $50,320 |
| Extraordinary expense reimbursements for a victim of actual identity theft | 45 | $191,354.50 |
| Credit monitoring | 1,264 | $455,040[4] |

*Kirsten*'s counsel repeated their objections at the final-approval hearing, and the court rejected them, explaining "*I've gone through the collusion arguments* of the past….[W]hen the preliminary approval took place, we had those arguments concerning collusion, and *I rejected those*." (4-ER-495 (emphasis added).)

The court found no issues with the class action settlement itself, the circumstances surrounding it, or the total benefit to the class. While

---

[4] Byrd explained "[t]he credit monitoring will be either Equifax Complete Premier or TransUnion myTrueIdentity 3-Bureau Credit Monitoring. The former has a retail value of $19.95 per month, and we believe the latter is of comparable value. Valuing the credit monitoring conservatively at $15 per month results in a value of $360 per Settlement Class member." (1-SER-125.) At $15 per month for two years, the value of the 1,264 credit-monitoring claims is $455,040. (2-ER-27.)

the court ordered additional briefing on attorneys' fees, the record reflects that the court carefully weighed the evidence and arguments. (4-ER-499–500.) The evidence propelled the court to find the settlement fair, adequate, and reasonable. (1-ER-4; 4-ER-495.)

The court entered a final judgment and order approving the settlement and dismissing the consolidated cases with prejudice. (1-ER-2–10.)

## SUMMARY OF ARGUMENT

The litigation against CPK is a lawyer-driven exercise in which the class members suffered no demonstrable harm. Liability is doubtful. The cash and credit-monitoring benefits afforded to the class as part of the settlement are more than fair, reasonable, and adequate.

The court applied the appropriate Rule 23(e)(2) factors and did not abuse its discretion in finding the settlement fair, reasonable, and adequate. The undisputed evidence from the mediator shows the settlement was reached via arms-length negotiations and offers substantial relief to the class—relief the class would probably not improve upon if litigation continued. The settlement was favorably received—the only objection came from *Kirsten* counsel angling for fees.

(If the *Kirsten* plaintiffs really believed they could show significant damage for themselves, they could have opted-out of participation in the settlement and maintained their previously filed suits on an individual basis. They chose not to do that.) The *Kirsten* plaintiffs overlook "the strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998). The settlement represents a fair resolution of the litigation. Approval of the settlement should be affirmed.

The district court also properly exercised its discretion in awarding attorneys' fees to the *Gilleo* plaintiffs. In any event, the parties structured the settlement so the class benefits would stand no matter what happens with fees. Thus, the fee award should not affect the approval of the class settlement.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to approve a class action settlement for clear abuse of discretion. Under this '*extremely limited*' review, [this Court] will affirm if the district judge applies the proper legal standard and makes findings of fact that are not clearly

erroneous." *In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 778 (9th Cir. 2022) (citations omitted); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 940 (9th Cir. 2011) (court's approval of class action settlement is subject to reversal only for "clear abuse of discretion").

Federal Rule of Civil Procedure 23(e)(2) authorizes district courts to approve class action settlements when they are "fair, reasonable, and adequate[.]" Approval of the settlement can occur "only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:"

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)–(D).

Before these factors for determining whether a settlement is "fair, reasonable, and adequate" were included in Rule 23(e), this circuit "filled in the gaps," instructing courts to consider the following factors (sometimes called the "*Churchill,*" "*Hanlon*" or "*Stanton*" factors):

> (1) the strength of the plaintiffs' case;
>
> (2) the risk, expense, complexity, and likely duration of further litigation;
>
> (3) the risk of maintaining class action status throughout the trial;
>
> (4) the amount offered in settlement;
>
> (5) the extent of discovery completed and the stage of the proceedings;
>
> (6) the experience and views of counsel;
>
> (7) the presence of a governmental participant; and
>
> (8) the reaction of the class members to the proposed settlement.

*Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021); *Churchill Vill., L.L.C. v. GE*, 361 F.3d 566, 575 (9th Cir. 2004).

The new Rule 23(e) factors supplement, rather than displace, these *Churchill* factors. Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. "District courts may consider some or all of

these factors." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020).

"It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026. Ultimately, "the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because [the judge] is exposed to the litigants, and their strategies, positions and proof." *Staton v. Boeing Co*, 327 F.3d 938, 953 (9th Cir. 2003).

Additionally, the "district court's decision to award attorney's fees and costs to class counsel, as well as the method of calculation, [is reviewed] for abuse of discretion." *Apple*, 50 F.4th at 778.

## ARGUMENT

### I. The District Court Applied the Proper Criteria in Approving the Class Action Settlement.

The *Kirstin* plaintiffs claim the district court applied the wrong standard and ignored signs of collusion. Appellants' Opening Brief ("AOB") 22–24. Yet, they cite no place in the record where the court failed to apply the correct legal standard. To the contrary, the court applied the appropriate Rule 23(e)(2) factors and found the settlement

"adequate, fair, and reasonable" (4-ER-548) under the "extra scrutiny" that applies to class settlements. *Apple*, 50 F.4th at 776. The court articulated sound reasons at the hearing and in the final-approval order rejecting the *Kirstin* plaintiffs' arguments, particularly given the substantial hurdles regarding class certification, liability, and damages. (4-ER-482–500; 1-ER-3–10.)

There is no evidence the court applied a presumption that the settlement is fair and reasonable. The court found, based on the evidence presented at three hearings, that "[t]he Settlement Agreement is fair, reasonable, adequate and in the best interests of Settlement Class members." (1-ER-4.) The court found "[t]he Settlement Agreement was negotiated at arm's-length, in good faith and without collusion, by capable and experienced counsel with the assistance of an experienced third-party neutral, with full knowledge of the facts, the law, and the risks inherent in litigating the Consolidated Cases, and with the active involvement of the Parties." (*Id.*) Over the course of three hearings, the court analyzed each Rule 23(e)(2) factor and *Churchill* factor independently, without any fairness presumption. (4-ER-477–566; 2-SER-347–48.)

A court's reference to a permissible consideration cannot be equated to applying a "presumption." The district court appropriately noted the experienced mediator's view that the settlement was both fair and vigorously negotiated. (4-ER-547–48, 550.) This Court has endorsed such considerations as valid fairness indicators. *In re Hyundai & Kia Fuel Econ. Litig.,* 926 F.3d 539, 569 (9th Cir. 2019) ("the settlement here 'was negotiated over multiple mediation sessions with a respected and experienced mediator'").

Nor did the court ignore purported "subtle signs" of collusion as the *Kirsten* plaintiffs claim. AOB 30. To the contrary, *Kirsten*'s counsel repeated this collusion objection at three hearings. (4-ER-483, 490–91, 523–24, 558.) The court rejected it each time and explained "I've gone through the collusion arguments of the past. In other words, when the preliminary approval took place, we had those arguments concerning collusion, and *I rejected those*." (4-ER-495 (emphasis added); 1-ER-4.) The court analyzed *Gilleo* counsel's fee request and determined the request was commensurate with the benefits to class members under the settlement. (1-ER-4, 7.) That determination implicitly negated any

notion that the so-called "clear-sailing" provision[5] in the settlement agreement was suggestive of collusion. *See Roes*, 944 F.3d at 1051. The settlement contains no true "reverter" of settlement benefits that return unclaimed funds to the defendant. There was no basis to analyze whether a "reverter" was suggestive of collusion. *Campbell*, 951 F.3d at 1127 ("reverter" analysis inapplicable where the settlement contains no reverter provision). The court gave a "reasoned response" to *Kirsten*'s objection. *Apple*, 50 F.4th at 782.

The *Kirsten* plaintiffs do not meet their burden to identify what factors were not considered. Under Rule 23(e), the court only needs to "after a hearing" "consider" the various factors. *Roes*, 944 F.3d at 1048 ("a district court 'may consider some or all of the [*Churchill*] factors'").

It speaks volumes that the settlement administrator mailed 103,380 postcard notices to class members about the settlement (1-SER-8), only four elected to opt-out (1-SER-12–13) and the only objectors are the two *Kirsten* plaintiffs who could have opted-out and pursued their own previously-filed suit. But they remained a part of the settlement

---

[5]    A "clear sailing" arrangement is an arrangement where the defendant will not object to a certain fee request by class counsel. *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019).

class so their attorneys (who clearly are disgruntled because they are not sharing in the award of attorneys' fees) can pursue this appeal. If this settlement was not fair to the class, more than four class members would have opted-out and more than two would have objected.

The *Kirsten* plaintiffs cannot transform their disagreement with the court's findings into an argument that the court ignored the appropriate factors or gave weight to irrelevant ones. Because the court assessed the settlement through the appropriate lens, the *Kirsten* plaintiffs shoulder a heavy burden to demonstrate the court abused its discretion. *Hyundai*, 926 F.3d at 556 ("Parties seeking to overturn the settlement approval must make a 'strong showing' that the district court clearly abused its discretion"). The *Kirsten* plaintiffs have not met their heavy burden to show the district court applied the wrong standard or clearly abused its discretion.

## II.    The District Court Did Not Abuse Its Discretion in Finding the Settlement Resulted from a Fair Process Absent Collusion.

The *Kirsten* plaintiffs make unsupported collusion accusations but ignore the settlement process and that the mediator testified the two

mediation sessions were adversarial and at arm's length. (4-ER-513–16.)

This circuit has made clear that courts should not "unnecessarily meddle in class settlements negotiated by the parties [and] that courts [do not] have a duty to maximize the settlement fund for class members." *Briseño*, 998 F.3d at 1027. Rather, "the parties can agree on any 'fair, reasonable, and adequate' settlement amount." *Id.* That is why "the identified signs of collusion" are not "an independent basis for withholding settlement approval." *Id.* "Disproportionate fee awards, clear sailing agreements, and kicker clauses all may be elements of a good deal." *Id.* The court only needs to analyze these provisions and the settlement agreement as a whole "to ensure that the parties have not colluded at class members' *expense*." *Id.* at 1028 (emphasis added). This Court "'will *rarely overturn* an approval of a' compromised settlement 'unless the terms of the agreement contain convincing indications that...self-interest rather than the class's interest in fact *influenced the outcome of the negotiations*.'" *Id.* at 1022 (emphasis added).

*Kirsten*'s counsel has not shown that any of the settlement terms they claim are collusive negatively affected the "outcome of the negotiations" and caused the class to receive less.

### A. The unrebutted evidence from the mediator's testimony is the settlement resulted from two adversarial arms-length mediations.

The *Kirsten* plaintiffs complain CPK did not alert them that it was seeking to mediate. AOB 6. The record, however, demonstrates that CPK notified *Kirsten*'s counsel on a call before mediations that CPK was discussing settlement with "*all* the plaintiff parties." (2-SER-255 (emphasis in original).) *Kirsten*'s counsel has no right to feign surprise. Nor is there anything that requires all potentially-interested constituencies be notified and invited to participate in mediation. The notice and objection process, of which the *Kirsten* plaintiffs availed themselves, provides a sufficient forum for all recognized stakeholders in a potential class settlement.

Although "the mere presence of a neutral mediator...is not on its own dispositive" to show a lack of collusion, it is "a factor weighing in favor of a finding of non-collusiveness[.]" *Bluetooth*, 654 F.3d at 948. At the preliminary-approval hearing, the court examined Mediator

Friedman, who testified that the mediation was adversarial and the parties engaged in extended negotiations over class benefits. (4-ER-513–17, 538.) Friedman stated that the benefits fall well within the "parameters" of the data-security settlements that he had mediated. (4-ER-546.) Two mediation sessions were necessary because the parties fought over the terms and were unable to reach agreement on the first day. (1-SER-122.) The mediator made clear the negotiation over class benefits was finalized before negotiations started on fees. (*Id.*; 1-SER-134.) That the parties negotiated the class member benefits first "suggests that any fees did not come at the expense of Class Member benefits." *Brightk Consulting Inc. v. BMW of N. Am., LLC*, No. SACV21-02063-CJC, 2023 U.S. Dist. LEXIS 168723, at *23 n.5 (C.D. Cal. Sep. 12, 2023).

The court considered the evidence and made a factual finding there was no collusion. (4-ER-547–48.) The court found Friedman's testimony credible and helpful, stating, "I want to compliment you….These are hard cases" and noting that Friedman was "extraordinary helpful to me." (4-ER-547, 550.) The court did not rubber

stamp approval, but instead took the time to investigate and found the *Kirsten* plaintiffs' accusations lack merit.

**B. There was no reverse auction and *Kirsten*'s counsel did not have a stronger bargaining position.**

The *Kirsten* plaintiffs suggest they have a stronger bargaining position, but the *Kirsten* case had barely survived the pleading stage when the consolidated action settled. *Kirsten* calls this surviving "dispositive motions." AOB 8. Surviving a Rule 12(b) motion to dismiss does not equate with prevailing on the merits. The district court did not address CPK's factual challenge to standing in its motion to dismiss *Kirsten's* first amended complaint, and thus there is a substantial question whether the *Kirsten* plaintiffs could prove an injury in fact traceable to the data incident. (2-ER-270–87.)

The *Kirsten* plaintiffs suggest the *Gilleo* plaintiffs lacked negotiating leverage because their complaints were not tested with a motion to dismiss. The touchstone for settlement approval is not whether other counsel might have negotiated a different or better deal, but whether the settlement before the court is fair, and was reached by an arm's length process. "[T]he question whether a settlement is

fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

This Court's en banc decision in *Hyundai,* 926 F.3d 539, is instructive. The initial panel decision in *Hyundai* (since vacated) concluded that impaired bargaining power by the settling plaintiffs' counsel rendered them susceptible to a less advantageous deal. 881 F.3d 679, 702–03. The en banc decision eschewed that analytical approach and focused instead on whether the settlement terms offered adequate relief and whether the negotiating process was fair—finding it significant that, as here, the settlement was reached under the auspices of a mediator. 926 F.3d at 569–70. This Court did not discuss relative bargaining strength as a separate factor for review. Equally important, this Court re-emphasized that a determination that a class settlement is fair, adequate, and reasonable must be accorded substantial deference and "review 'is extremely limited.'" *Id.* at 569.

The *Kirsten* plaintiffs contend CPK conducted a "reverse auction" to play the *Gilleo* plaintiffs and *Kirsten* plaintiffs against one another.

AOB 11. Not so. CPK's counsel made it clear to all plaintiffs' counsel that CPK wanted to settle at this early stage. (2-SER-254–55.) The *Kirsten* plaintiffs did not want to provide a term sheet in response to CPK's request. CPK never received a competing proposal from *Kirsten*'s counsel. There was no possibility of so-called reverse bidding. (*Id.*) When the court asked *Kirsten*'s counsel at the preliminary-approval hearing what they would have offered to settle, the demand was a $10 million fund. (4-ER-539.) This "offer" was a nonstarter untied to the facts of the claim.

### C. There is no clear sailing on fees because the *Kirsten* plaintiffs were always going to challenge any fee award.

The *Kirsten* plaintiffs contend the settlement contains a collusive clear-sailing provision. AOB 29. While CPK agreed not to oppose attorneys' fees (3-ER-373), the parties anticipated at the time they settled that *Kirsten*'s counsel would oppose preliminary approval and fees because they refused to consolidate and participate. *Kirsten*'s counsel filed an objection to the settlement and multiple briefs opposing fees. (2-ER-12–18, 39–41, 80–104.) While CPK agreed not to oppose, there was no "clear sailing" because the fee motion was opposed by

*Kirsten's* counsel. The court spent much of the final-approval hearing discussing *Kirsten*'s counsel's objection to the fees. (4-ER-486–501.) The record shows class counsel faced opposition to their fee request and that the court scrutinized the request.

In any event, a clear-sailing provision is not a "death knell" for approval, but rather means the court must scrutinize the settlement for signs that the fee request is unreasonably high. *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 610 (9th Cir. 2021). The court found that fees were not unreasonably high—especially given the known objector that opposed the settlement at every turn. (1-ER-7–8; 4-ER-488–89.) "Because the Settlement Agreement does not use a common fund, the fee award *will not reduce the benefits to the Class*, which, in conjunction with the reasonableness of the fees sought, *mitigates collusion* concerns." *Brightk*, 2023 U.S. Dist. LEXIS 168723, at *22–23 (emphasis added).

This Court has affirmed class settlements with clear-sailing provisions where the "evidence is insufficient to prove that the class would have gotten meaningfully more…relief if [the defendant] had merely been permitted to oppose class counsel's fee application[.]"

*Campbell*, 951 F.3d at 1127. Given the: (1) claims-made structure of the settlement, (2) opposition to the fee award by *Kirsten's* counsel, and (3) the court's rigorous review of the fees at the final-approval hearing and supplemental briefs, the class would not have gotten more if CPK opposed.

### D. There was no "reverter" of settlement member benefits to CPK.

The *Kirstin* plaintiffs assert that claims-made settlements present the same risks posed by other types of reversionary settlements. AOB 27. The settlement, however, is not a reversionary settlement. The parties are using a claims process—rather than a common fund—in recognition of the fact that the majority of the class likely suffered no injury. No money reverts back to CPK. Rather, money does not leave CPK's pocket until a claim is made and all valid claims are paid. There is no true reverter clause. "[D]istributing 'unclaimed' funds to the Class would result in many Class Members receiving a windfall for injuries they never suffered—and thus lack standing to prosecute." *Hashemi v. Bosley, Inc.*, No. CV21-946 PSG, 2022 U.S. Dist. LEXIS 210946, at *20 (C.D. Cal. Nov. 21, 2022).

Awarding unclaimed reimbursements or deducted attorneys' fees to uninjured class members would contradict Supreme Court authority. *TransUnion*, 141 S. Ct. at 2208 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *Shames v. Hertz Corp.*, No. 07-CV-2174-MMA(WMC), 2012 U.S. Dist. LEXIS 158577, at *46 (S.D. Cal. Nov. 5, 2012) ("[B]ecause the attorneys' fees in this case are wholly separate from the class settlement—and will have no impact one way or the other on the amount the class recovers— a 'savings' for Defendants does not implicate the concerns the Ninth Circuit expressed about [a] 'kicker' provision").

### E. *Gilleo*'s counsel did not receive a disproportionate distribution of the gross settlement amount.

*Gilleo*'s counsel requested $773,632.95 in attorneys' fees, which is 36.3 percent of the $2,133,719 total settlement benefit (including claims, administration costs, fees, etc.). (2-ER-21, 24, 27–29.) *Kirsten*'s counsel did not show *Gilleo*'s counsel "receive[d] a disproportionate distribution of the settlement." *Bluetooth*, 654 F.3d at 947. *Kirsten*'s counsel effectively ignores the credit-monitoring benefit—a significant benefit valued at $455,040. (2-ER-27.) The *Kirsten* plaintiffs do not cite

any case showing that thirty-six percent or even up to fifty percent is disproportionate. They also overlook that as objectors, they caused an increase in litigation costs.

This is a far cry from the situation in *Briseño*, 998 F.3d 1014, where this Court held that a nearly $7 million attorneys' fee award was a "lion's share" compared to the less than $1 million provided to the class who did not receive direct notice of the settlement. *Id.* at 1026. Here, the proposed fee award represents about thirty-six percent of the value, which is close to the common-fund benchmark. *Bluetooth*, 654 F.3d at 942 (awarding twenty-five percent to attorneys in fees and leaving seventy-five percent for the class is typically reasonable in common-fund settlements). Unlike *Briseño*, the parties gave best-practicable "direct notice." (1-SER-9–12, 56.)

The *Kirsten* plaintiffs also complain the claims had not yet been "validated" by the administrator. AOB 16. Counsel, however, did not have the final numbers until after final approval. Litigants cannot complete the settlement process before it is approved. *Hashemi*, 2022 U.S. Dist. LEXIS 210946, at *19. At the final-approval juncture, courts have "discretion to refrain from attempting to measure the

unmeasurable" and must "attempt to approximate the value."

*Campbell*, 951 F.3d at 1126. That is what the district court did. The

court noted there was a 1.8 percent claims rate at the time, that the

"figures" had not yet "been verified," and correctly observed the court

has to "take counsel as a good faith representation[.]" (4-ER-484–87.)

The court did not abuse its discretion in determining the fees were

proportionate to the settlement value provided. The *Kirstin* plaintiffs

fail to shoulder the heavy burden to demonstrate the class lost

monetary benefits *caused by* collusion. Indeed, "[n]o one factor is

dispositive" and thus "any error in the district court's discussion of [a

particular] factor is harmless." *Campbell*, 951 F.3d at 1127. This case

does not have the "squadron of red flags" like *Briseño*, 998 F.3d 1014,

1019. Overturning approval of the settlement would encourage self-

serving and unnecessary litigation—by counsel who are not appointed

lead counsel—that would rack up fees, rather than help class members.

## III. The District Court Did Not Abuse Its Discretion in Finding the Settlement Fair, Reasonable, and Adequate.

This Court "consider[s] the overall fairness of 'the settlement

taken as a whole, rather than the individual component parts,' because

'[n]either the district court nor this court ha[s] the ability to 'delete,

modify or substitute certain provisions.'"" *Hyundai*, 926 F.3d at 569; *Lane*, 696 F.3d at 824. Viewed in its entirety, the settlement provides not only fair compensation, but a windfall to those who suffered no misuse of their sensitive information. The settlement reflects "the bargaining and compromise inherent in settling disputes." *California v. IntelliGender, LLC*, 771 F.3d 1169, 1179 (9th Cir. 2014).

## A. Plaintiffs' case is weak.

"An important consideration in judging the reasonableness of a settlement is the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *Vasquez v. Coast Valley Roofing, Inc.,* 266 F.R.D. 482, 488 (E.D. Cal. 2010). "This factor generally weighs in favor of approval when plaintiffs must overcome barriers to make their case." *Hashemi*, 2022 U.S. Dist. LEXIS 210946, at *8.

There are significant barriers here. "[D]amages methodologies in data breach cases are largely untested and have yet to be presented to a jury." *Id.* at *9. Even if plaintiffs could establish liability (which they likely could not do here), any damages award would be minimal because class members "have suffered no financial injury at all—just increased

risk of financial injury." *Id.* Given the uncertainty of the case, the settlement, which offered thousands of dollars to class members who suffered injury (if any) and two years of identity-theft protection, would be reasonable even if plaintiffs had a strong case. *Id.* (3-ER-367–85.) The court did not abuse its discretion in finding this factor weighs in favor of final approval. (4-ER-547 (noting "We're all taking a guess" as to how to evaluate data-security cases).)

### B. The "costs, risks, and delay of trial and appeal" would have been massive as this appeal shows.

Under Rule 23(e)(2)(C)(i), courts consider "the costs, risks, and delay of trial and appeal" in determining whether the relief provided for the class is adequate. Here, plaintiffs would have a difficult time establishing causation.

Causation-related standing issues and whether there was misuse of the person's information caused by the breach are not only common, but this is the most critical issue in data-security litigation. *Masterson v. IMA Fin. Grp., Inc.*, No. 2:23-cv-02223-HLT-ADM, 2023 U.S. Dist. LEXIS 222701, at *10 (D. Kan. Dec. 14, 2023) (lack of standing because "[t]he only link between the data breach and the claimed misuse is that the misuse came after the data breach"); *I.C. v. Zynga, Inc.*, 600 F.

Supp. 3d 1034, 1051 (N.D. Cal. 2022) (no standing to bring data-breach claims because compromise of PII, "without more, fails to satisfy the injury-in-fact element in the absence of an identity theft"); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1026 (9th Cir. 2018) (finding standing because there were allegations of misuse). "[T]ying Plaintiffs' alleged injuries to this particular data breach [would] be difficult," if not impossible. *Carter v. Vivendi Ticketing United States LLC*, No. SACV22-01981-CJC, 2023 U.S. Dist. LEXIS 210744, at *17 (C.D. Cal. Oct. 30, 2023). In *TransUnion*, 141 S. Ct. 2190, the Supreme Court magnified uncertainty endemic to data-security litigation by calling into question class-wide standing to recover damages stemming from "an asserted risk of future harm." *Id.* at 2211–12.

Given the major causation issues, the "complicated and technical factual overlay," and likely appeals, plaintiffs would have faced prolonged litigation and significant obstacles at trial that could have resulted in no recovery. *Hashemi*, 2022 U.S. Dist. LEXIS 210946, at *10.

"Historically, data breach cases have experienced minimal success in moving for class certification." *Gaston v. Fabfitfun, Inc.*, No. 2:20-cv-

09534-RGK-E, 2021 U.S. Dist. LEXIS 250695, at *6 (C.D. Cal. Dec. 9, 2021); *Thomas v. Kimpton Hotel & Rest. Grp., LLC,* No. 19-cv-01860-MMC, 2022 U.S. Dist. LEXIS 72525, at *10 (N.D. Cal. Apr. 20, 2022) (denying certification because the court would have to "consider[] the individual experience of each putative class member" thus making individual issues predominate over common issues). And "coming up with a feasible trial plan would be difficult given that no data breach case for damages has ever proceeded to trial." *Hashemi*, 2022 U.S. Dist. LEXIS 210946, at *11.

The parties were represented by experienced data-breach counsel who exchanged informal pre-mediation discovery. (1-SER-121.) By exchanging informal discovery, "the parties were able to realistically value the scope of Defendant's potential liability and assess the costs, risks, and delay of continuing to litigate." *Carter*, 2023 U.S. Dist. LEXIS 210744, at *15. "[S]ubstantial litigation costs would be required to take the case to trial." *Id.* Even if plaintiffs could secure a better result than the settlement at trial, any result obtained would take significantly longer and there is a risk plaintiffs could have received much less or nothing. *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D.

Cal. 2007) (class settlement offers an "immediate and certain award" compared with significant obstacles posed through continued litigation). The settlement removes these risks "by ensuring Class Members a recovery that is 'certain and immediate, eliminating the risk that class members would be left without any recovery . . . at all." *Graves v. United Indus. Corp.*, No. 2:17-cv-06983-CAS-SKx, 2020 U.S. Dist. LEXIS 33781, at *21–22 (C.D. Cal. Feb. 24, 2020).

"These general risks are heightened in data breach cases like this one" because data-security is an "especially risky practice area." *Carter,* 2023 U.S. Dist. LEXIS 210744, at *16; *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 317 (N.D. Cal. 2018) ("Data-breach litigation is in its infancy with threshold issues still playing out in the courts.").

### C. The settlement benefits offered were significant and in line with or better than comparable data-security settlements.

Another factor in assessing the fairness of the settlement is the amount of the settlement. This Court has explained that "[t]he proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice v. Civil Serv. Com.*, 688 F.2d 615, 625 (9th Cir. 1982)

(emphasis in original). The settlement here offers: (1) reimbursement for ordinary expenses up to $1,000 per class member including lost time that required only an attestation that the time (up to three hours) was spent; (2) reimbursement for extraordinary expenses up to $5,000 per class member; (3) a cash payment of $100 per California subclass member; and (4) two years of identity-theft protection. (3-ER-370–72; 1-SER-122–24.)

The settlement is consistent with or *better than* comparable data-security settlements. *Hashemi*, 2022 U.S. Dist. LEXIS 210946, at *12 (settlement reimbursed ordinary expenses and lost time up to $300; up to $5,000 for extraordinary expenses; CCPA statutory claim benefits of $50; and two years credit monitoring); *Carter*, 2023 U.S. Dist. LEXIS 210744, at *5–6 (approving settlement that gave $1,000 ordinary expenses; $5,000 extraordinary expenses; $100 CCPA benefits; and two years credit monitoring or a cash payment up to a total of $100).

Although the California subclass could have theoretically sought statutory damages between $100 and $750 if they established a violation of the CCPA (Cal. Civ. Code § 1798.150(a)), "no action for individual statutory damages or class-wide statutory damages may be

initiated against the business" where, as here, "the business actually cures the noticed violation and provides the consumer an express written statement that the violations have been cured and that no further violations shall occur." *Id.* § 1798.150(b).

The settlement here was more favorable to the California subclass because the settlement offered $100 to each California subclass member. Settlements are often "a yielding of absolutes and an abandoning of highest hopes." *Officers*, 688 F.2d at 624. The *Kirsten* plaintiffs pie-in-the-sky damage assessments fail to account for the risks, costs, and delays the class faces by prosecuting claims to judgment. *Id.* at 625.

In data-security cases like this, "it is difficult to estimate Plaintiffs' expected recovery were this case to proceed to trial given the relative dearth of precedent and exemplar cases that have proceeded to trial." *Hashemi v. Bosley, Inc.*, No. CV21-946, 2022 U.S. Dist. LEXIS 119454, at *19 (C.D. Cal. Feb. 22, 2022). "[O]ther courts have approved settlements in privacy and security cases when each class member received just a few dollars or less." *Carter*, 2023 U.S. Dist. LEXIS 210744, at *13; *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No.

16-MD-02752-LHK, 2020 U.S. Dist. LEXIS 129939, at *47–48 (N.D. Cal. July 22, 2020) (approving $117.5 million settlement fund with a class size of approximately 194 million and collecting cases where recovery was only a few dollars per person or less); *Hashemi*, 2022 U.S. Dist. LEXIS 119454, at *19 (collecting cases with estimated settlement values of less than $1 per class member); *In re Anthem, Inc.*, 327 F.R.D. at 318 (describing settlement value of $0.68 per class member as "meaningful consideration" in data-breach case); *In re Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-02583-TWT, 2016 U.S. Dist. LEXIS 200113, at *39–41 (N.D. Ga. Aug. 23, 2016) (estimated settlement value of $0.52 per class member fair and reasonable given the substantial risks of data-security litigation); *In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-2522 (PAM), 2017 U.S. Dist. LEXIS 75455, at *28 (D. Minn. May 17, 2017) (estimated settlement value of approximately $0.21 per class member was fair).

Some privacy class actions settle for only non-monetary relief. *Campbell*, 951 F.3d at 1122–23 (affirming final approval of settlement providing injunctive relief for alleged privacy violations); *In re Google LLC St. View Elec. Commc'ns Litig.*, 611 F. Supp. 3d 872, 894–95 (N.D.

Cal. 2020) (granting final approval providing injunctive relief for alleged illegal gathering of network data).

The uncapped settlement funds offered here are adequate as there is no dispute the current reimbursement process remedies compensable losses of class members who submit a claim. The fact that only four individuals opted-out of the settlement and forty-five out of 103,767 class members made extraordinary reimbursement claims totaling $191,354.50 strongly suggests the reimbursement cap of $5,000 is reasonable, and any increased reimbursement cap would have a negligible effect on the class. (4-ER-485; 1-SER-12–13.) If any settlement class member had the ability to prove significantly more damage, he or she could have opted-out and pursued an individual claim.

The *Kirsten* plaintiffs complain the "value of $455,040 for credit monitoring valued at $15 per month…is significantly greater than the actual cost of providing that service," but they do not provide any evidence showing this is not the market value of these services. AOB 14. Most data-security cases are settled with some form of credit monitoring. *Carter*, 2023 U.S. Dist. LEXIS 210744, at *5–6; *Hashemi*,

2022 U.S. Dist. LEXIS 210946, at *4. The primary theory of data-security cases is the breach *could* cause the malicious actors to inflict *future* injuries on individuals whose information was compromised. This risk of future injury is often how data-security plaintiffs hope to establish standing. The Supreme Court has "repeatedly reiterated" that threatened injury is not enough. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The plaintiff must establish a threatened injury that is "certainly impending" or that "there is a substantial risk the harm will occur." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 825 (9th Cir. 2020). Credit monitoring guards against possible future loss.

Weighing the risks of ongoing litigation against the meaningful remedies the settlement provides, the court did not abuse its discretion in finding the benefits offered are reasonable.

**D.  Class members reacted positively to the settlement with only one objection from interested counsel.**

Another factor courts consider in evaluating the fairness of the settlement is the reaction of the class to the settlement. *Churchill*, 361 F.3d at 575. There was only one objection from the *Kirsten* plaintiffs

and only four opt-outs here. (1-SER-12–13.) The only objection was filed by *Kirsten*'s counsel who chose not to opt-out, which would have allowed them to pursue their previously-filed suit. Only four opt-outs and no other objectors creates a strong presumption the settlement is beneficial to the class. *Hashemi*, 2022 U.S. Dist. LEXIS 210946, at *16 (only two objections and two opt-outs created "a strong presumption" the settlement was beneficial to the class); *Arnold v. FitFlop USA, LLC*, No. 11-CV-0973, 2014 U.S. Dist. LEXIS 58800, at *20–21 (S.D. Cal. Apr. 28, 2014) (that only one objected was filed "present[ed] the most compelling argument favoring settlement"). The district court here correctly found the positive reaction to the settlement weighs in favor of approval.

There was a 1.8 percent claims rate here (1,828 claims) (4-ER-484), which is in line with claims rates in other data-security settlements. *Carter*, 2023 U.S. Dist. LEXIS 210744, at *28 (approving 1.6% claims rate); *In re Anthem, Inc.*, 327 F.R.D. at 321 (approving 1.8% claims rate); *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 599 (N.D. Cal. 2020) (approving 0.83% claims rate, which was "on par with other consumer cases, and does not otherwise weigh against approval"); *Broomfield v. Craft Brew Alliance, Inc.*, No. 17-cv-01027-

BLF, 2020 U.S. Dist. LEXIS 74801, at *19 (N.D. Cal. Feb. 5, 2020)

("claims rate of about two percent"); *Bostick v. Herbalife Int'l of Am.,*

*Inc.*, No. CV 13-2488, 2015 WL 12731932, at *27 (C.D. Cal. May 14,

2015) ("response rate of less than 1%"); *Six (6) Mexican Workers v. Ariz.*

*Citrus Growers*, 904 F.2d 1301, 1306 (9th Cir. 1990) ("Settlements of

large class action suits have been approved even where less than five

percent of the class files claims.").

The claims rate is consistent with a lack of actual injury. This

Court has recognized that often it "is unknown why many class

members submit[] no claim" and that it is "possible that they simply

lacked interest in pursuing compensation." *Apple*, 50 F.4th at 781 n.8.

This claims rate must be viewed in the context of a "no injury" case.

### E. Claims-made settlements are permitted and consistent with this circuit's policy of facilitating class action settlements.

*Kirsten*'s counsel objected because they do not like claims-made

settlements. AOB 27, 33. While *Kirsten*'s counsel wished for a

"monetary fund," fixed-amount funds in data-security cases are unusual

because of the lack of injury for most class members. "[T]here is nothing

inherently objectionable with a claims-submission process, as class

action settlements often include this process, and courts routinely approve claims-made settlements." *Shames,* 2012 U.S. Dist. LEXIS 158577, at *31; *Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 967 (9th Cir. 2009) (upholding approval of claims-made settlement agreement); *Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) (no abuse of discretion where settlement distributed cash only if class members submitted claim forms).

In the data-security context and in consumer class actions where there are thousands or millions of class members, this settlement structure is often the only way to facilitate resolution, especially where the majority suffered no injury. *Kirsten's* counsel's preference for a different settlement structure is irrelevant. This Court does not address "whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. *Kirsten's* counsel has not shown the court abused its discretion in finding the settlement fair, reasonable, adequate and free from collusion.

**IV. The Settlement Is Fair Given CPK's Significant Defenses to Liability and Damages.**

   **A.   Plaintiffs cannot establish actual injury traceable to CPK.**

One of CPK's strongest defenses to liability and/or class certification is that plaintiffs cannot establish Article III injury/traceability. Standing requires plaintiffs to show they and the class suffered present or a material risk of future identity theft caused by the incident. "No concrete harm, no standing." *TransUnion*, 141 S. Ct. at 2200. "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 2208. "[T]he risk of future harm on its own does not support Article III standing...." *Id.* at 2213. "[T]he Supreme Court is clear that where a risk of future harm has not yet materialized, the 'plaintiffs' argument for standing for their damages claims based on an asserted risk of future harm is unavailing.'" *Bock v. Washington*, 33 F.4th 1139, 1145 (9th Cir. 2022). There is no class-wide standing to recover damages stemming from "an asserted risk of future harm." 141 S. Ct. at 2211.

Plaintiffs have not plausibly alleged a present injury or material risk of future identity theft. CPK's factual challenge in its motion to

dismiss the *Kirsten* plaintiffs first amended complaint showed the

*Kirsten* plaintiffs suffered no misuse of data traceable to CPK. (2-SER-

186–92.) It is likely many class members would be unable to

demonstrate standing to seek damages or injunctive relief.

As to monetary damages, plaintiffs allege they "have been placed

at an imminent, immediate, and continuing increased risk of harm from

fraud" (5-ER-732), but they offer nothing to support the claim. No

plaintiff in any of the actions offered evidence of actual identity theft,

fraud or even attempted fraud traceable to the incident. Plaintiffs fail to

make any connection between their potentially-affected information and

their alleged harms. Such allegations do not "demonstrate that the risk

of future harm materialized." *TransUnion*, 141 S. Ct. at 2211; *see also*

*In re Illuminate Educ. Data Sec. Incident Litig.*, No. SACV 22-1164,

2023 U.S. Dist. LEXIS 76652, at *7–9 (C.D. Cal. Apr. 19, 2023).

Plaintiffs also seek injunctive relief, alleging an "increased risk of

future harm." (5-ER-628, 718.) A person exposed to a risk of future

harm may pursue injunctive relief to prevent the harm from occurring

only if "the risk of harm is sufficiently imminent and substantial."

*TransUnion*, 141 S. Ct. at 2210. Plaintiffs do not and cannot allege facts

showing a risk that is imminent and substantial because their potentially-affected data has not been misused. CPK paid the ransom, CPK's expert did not find the data on the dark web, and the ransomware group disbanded. (1-SER-46–47, 50.) This unrebutted expert evidence showed that all class members likely could never prove liability or damages. Even if they could, injunctive relief against CPK would not prevent future identity theft committed by third parties.

This risk of whether plaintiffs could prove class-wide injury is likely "one of the factors that induced them to settle." *Apple*, 50 F.4th at 782. CPK would more than likely be able to prove the lack of a present injury and that no threatened injury is "certainly impending." *Index Newspapers*, 977 F.3d at 825. The monetary compensation the class will receive in the settlement is likely more than they would receive if this case was litigated.

A class certification motion for purposes other than settlement would have been vigorously contested. CPK's counsel successfully defeated class certification in *Thomas,* 2022 U.S. Dist. LEXIS 72525, at *16. Here, the original "Notice of Data Event" letter only said that an individual's information "*may* have been affected." (2-SER-212

(emphasis added).) Receiving notice does not equate to an individual's data actually being affected or that there is any actual injury, let alone an injury caused by this specific ransomware attack. Moreover, the type of information at issue varied significantly from person to person. The only way to separate out who was injured and who was not is an individualized review of the evidence. This amounts to "highly individualized inquiries." *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 662 (9th Cir. 2022) (where "highly individualized inquiries" were necessary to determine the existence of damages—as opposed to the question of calculating damages—class certification was inappropriate); *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022).

### B. CCPA damages are not available here.

The settlement is fair given that plaintiffs' CCPA claim for statutory damages fails as a matter of law. (1-SER-28–32.)

The CCPA grants consumers a right of action against a business if unauthorized access to their nonencrypted and unredacted personal information occurs because of the business's failure to implement appropriate security practices. Statutory damages under the CCPA may

be set by the court between $100 to $750 per consumer or actual damages, whichever is greater. Cal. Civ. Code § 1798.150(a).

The *Kirsten* plaintiffs claim the CCPA statutory damages are "potentially worth" a staggering "77 million" and suggest the relief provided to the class is inadequate. AOB 1. They do not explain how they calculated this number, which bears no connection to reality. They overlook that the CCPA only allows recovery of statutory damages if a thirty-day pre-suit notice is given and the defendant fails to cure. Cal. Civ. Code § 1798.150(b). That did not occur here. Furthermore, a CCPA claim is only available to California residents. *Id.* § 1798.140(i). The asserted $77 million value is based on all class members nationwide, which the statute does not authorize.

### 1. *The Kirsten plaintiffs did not give pre-suit notice and the violation (if any) was cured, thus barring CCPA statutory damages.*

A California resident may only seek statutory damages if they provide *pre-suit* notice:

> Actions pursuant to this section may be brought by a consumer if, *prior to initiating any action* against a business for statutory damages on an individual or class-wide basis, *a consumer provides a business 30 days' written notice* identifying the specific provisions of this title the consumer

alleges have been or are being violated. In the event a cure is possible, if within the 30 days the business actually cures the noticed violation and provides the consumer an express written statement that the violations have been cured and that no further violations shall occur, no action for individual statutory damages or class-wide statutory damages may be initiated against the business.

Cal. Civ. Code § 1798.150(b) (emphasis added).

On December 10, 2021, the *Kirsten* plaintiffs sent CPK a letter entitled "Notice Pursuant to Cal. Civ. Code §1798.81.5(a)(1)." (1-SER-38.) They filed suit that same day. (2-SER-296.) Providing written notice the same day as filing a lawsuit does not satisfy the thirty-day pre-suit notice requirement. *Griffey v. Magellan Health Inc.*, No. CV-20-01282-PHX-MTL, 2022 U.S. Dist. LEXIS 98785, at *19–21 (D. Ariz. June 1, 2022) (dismissing CCPA claim when notice was sent three days before complaint was filed).

The CCPA claim also lacks merit because CPK provided a written response within thirty days of receipt of the *Kirsten* plaintiffs' letter stating it had cured any violation related to the ransomware attack and no further violation would occur. (1-SER-41–42.) This bars the claim for

statutory damages. Cal. Civ. Code § 1798.150(b);[6] *Rodriguez v. River City Bank*, No. 34-2021-00296612-CU-BC-GDS, 2021 Cal. Super. LEXIS 105085, at \*21–24 (Sac. Super. Ct. Sep. 2, 2021) (response letter barred CCPA claim for statutory damages); *In re Waste Mgmt. Data Breach Litig.*, No. 21cv6147, 2022 U.S. Dist. LEXIS 32798, at \*17–19 (S.D.N.Y. Feb. 24, 2022).

When the *Kirsten* plaintiffs amended their complaint, they did not even amend their CCPA claim to plead a claim for statutory damages. (2-SER-248.)

### 2. *Only California residents may seek CCPA statutory damages.*

A CCPA claim may be filed by a "consumer," which is defined as "a natural person who is a California resident." Cal. Civ. Code §§ 1798.140(i), 1798.150(a). A court may award *California* residents

---

[6]     Although this subsection was amended after the CPK ransomware attack occurred, the amendment is not retroactive. Cal. Civ. Code, §§ 3 ("No part of it is retroactive, unless expressly so declared."), 1798.185(d) ("Notwithstanding any other law, civil and administrative enforcement of the provisions of law added or amended by this act shall not commence until July 1, 2023, and shall only apply to violations occurring on or after that date."); *Gardiner v. Walmart Inc.*, No. 20-cv-04618-JSW, 2021 U.S. Dist. LEXIS 75079, at \*5–6 (N.D. Cal. Mar. 5, 2021) (CCPA cannot be applied retroactively).

statutory damages between $100 and $750 after consideration of "the relevant circumstances." *Id.* § 1798.150(a). The *Kirsten* plaintiffs incorrectly value the exposure at $77 million by including 72,986 non-California class members at the maximum $750 per person. AOB 25.

The *Kirsten* plaintiffs provide no legal basis for their inclusion of non-California settlement class members in their arithmetic. The CCPA is limited to California residents. *Hayden v. Retail Equation, Inc.*, No. SACV20-01203-DOC-DFM, 2022 U.S. Dist. LEXIS 119792, at *16 (C.D. Cal. May 4, 2022) ("CCPA claims brought by out-of-state Plaintiffs also fail because the CCPA does not apply to non-California residents."); *Wynne v. Audi of Am.*, No. 21-cv-08518-DMR, 2022 U.S. Dist. LEXIS 131625, at *13 (N.D. Cal. July 25, 2022) ("the CCPA provides a private right of action that is tied to a defendant's failure to protect California residents' personal information").

The *Kirsten* plaintiffs also fail to explain what "relevant circumstances" would warrant awarding maximum statutory damages. Cal. Civ. Code § 1798.150(a)(2). There is no reasonable possibility the maximum would be awarded here considering a ransomware group targeted CPK and CPK paid the ransom. (1-SER-50.)

The *Kirsten* plaintiffs estimate $77 million in damages for a claim their complaint did not plead for shock value. A judgment anywhere close to this amount with no evidence of actual injury would be so grossly disproportionate to any actual damages that it could not withstand constitutional scrutiny. *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66–67 (1919) (statutory penalty violates due process when it is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable"); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 723 (9th Cir. 2010).

The district court did not abuse its discretion in approving the settlement that authorizes $100 for California subclass members. The class here gave up next to nothing in exchange for substantial payments that are better than or identical to other settlements. This Court has held that "the relief provided to the class cannot be assessed in a vacuum" (*Campbell*, 951 F.3d at 1123) and that "a 'class [does] not need to receive much for [a] settlement to be fair [when] *the class [gives] up very little.*'" *Briseño*, 998 F.3d at 1028 (emphasis added). Unlike *Briseño*, this is not a case where the "relief is practically worthless." *Id.* at 1029.

**V. The Settlement Properly Releases Claims Including the CCPA Claim.**

The *Kirsten* plaintiffs contend the settlement improperly releases their CCPA claim. AOB 31–32. This is unfounded. The *Kirsten* plaintiffs admit that settlements may release all claims (pled or unpled) based on the same underlying facts. *Id.* (citing *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'")). All the cases here are based on the "identical factual predicate."

Whether the CCPA claim was pled and whether facts to support it were alleged is not the test of whether a release of the claim is appropriate. *Hesse*, 598 F.3d at 590. Class action settlements— including this one—regularly release related claims that were or could have been asserted. (3-ER-379–80); *Hashemi*, 2022 U.S. Dist. LEXIS 210946, at *5 (granting approval where settlement included class release of "all claims arising from the data breach"). The settlement properly releases the CCPA claim.

## VI. The Fee Award Should Not Affect the Approval of the Class Settlement As It Was a Separate Award Resulting from a Separate Motion.

The district court found *Gilleo* counsel's request for $800,000 in fees and costs "to be fair and reasonable[.]" (1-ER-7.) This was based on a lodestar calculation of 1,028.10 hours at an average hourly rate of $668.88 and the cross-check showing it represented 36.3 percent of the class benefit. (*Id.*)

The parties structured the settlement so the class benefits would stand no matter what happens with fees. The parties agreed "[t]he Court-approved Class Counsel Payment will not affect any benefits provided to Class Members or Plaintiffs." (3-ER-374.) Unlike a settlement-fund case, with a claims-made case, if a court awards less fees, the class does not get more. There is no reason to undo a reasonable claims-made settlement—and all the time and money that went into it—because of the fee award. The claims rate and total claims amount was not known to the parties when the fees were negotiated. Should this Court deem the fees excessive, the proper course would be to affirm the settlement and reduce the fee award. *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013) (where court

determines fee award should be reduced, appropriate course is not to invalidate settlement but to simply "decrease the fee award").

A fee award can exceed the value the litigation provided to the class if there is "sufficient justification." *Lowery v. Rhapsody Int'l, Inc.*, 75 F.4th 985, 994 (9th Cir. 2023). A lodestar higher than the damages award is not "per se unreasonable." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1209 (9th Cir. 2013). "Courts regularly grant fee awards that exceed the damages award, sometimes many times over, across a variety of fee-shifting statutes." *In re Outlaw Labs., LP Litig.*, No. 18-cv-840-GPC-BGS, 2023 U.S. Dist. LEXIS 180097, at *30 n.7 (S.D. Cal. Oct. 5, 2023) (citing *City of Riverside v. Rivera*, 477 U.S. 561, 564–65, 567 (1986) (approving $245,456.25 in fees for police excessive force case with 33,350 in damages); *Bravo v. City of Santa Maria*, 810 F.3d 659, 662, 665, 667 (9th Cir. 2016) (approving $1,023,610.41 fee award where parties settled a warrantless search claim for $360,000 with some defendants and won a $5,000 compensatory award against other defendants); *Johnson v. MGM Holdings, Inc.*, 943 F.3d 1239, 1241–42 (9th Cir. 2019) (approving $184,665 fee award where the class settled for $138,000); *Wallis v. BNSF Ry. Co.*, No. C13-40, 2014 U.S. Dist.

LEXIS 56834, at *1, 6–7 (W.D. Wash. Apr. 23, 2014), *aff'd sub nom.*

*Wallis v. BNSF Ry.*, 680 F. App'x 515 (9th Cir. 2017) (granting fees of

$231,306.66 where jury awarded $20,000 in damages)).

Fees were increased here because of *Kirsten*'s counsel's tactics of

making wild unsupported accusations and objecting to the settlement.

*Kirsten*'s counsel's objections did not accomplish any substantive benefit

for the class. Instead, they helped erode a wasting insurance policy that

is being depleted by litigation costs. (1-SER-121.) The district court did

not abuse its discretion in finding the fee award fair and reasonable.

## CONCLUSION

CPK respectfully requests that this Court affirm the final

judgment and order approving the settlement.

DATED: January 30, 2024      LEWIS BRISBOIS BISGAARD &
SMITH LLP


By:   */s/ Michael K. Grimaldi*
      Jon P. Kardassakis
      Michael K. Grimaldi
      *Attorneys for Defendant-Appellee*
      **CALIFORNIA PIZZA
KITCHEN, INC.**

## CERTIFICATE OF COMPLIANCE
### Fed. R. App. P. 32(G) and Circuit Rule 32-1
### For Ninth Case Number 23-55288

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the Appellees' Answering Brief by Defendant California Pizza Kitchen, Inc., is proportionately spaced, has a typeface of Century Schoolbook 14-point or more and contains 13,952 words.

DATED: January 30, 2024      LEWIS BRISBOIS BISGAARD & SMITH LLP

By: */s/ Michael K. Grimaldi*
Jon P. Kardassakis
Michael K. Grimaldi
*Attorneys for Defendant-Appellee*
**CALIFORNIA PIZZA KITCHEN, INC.**

## STATEMENT OF RELATED CASES
## FOR CASE NUMBER 23-55288

Appellee California Pizza Kitchen, Inc. is not aware of any related cases pending before this Court within the meaning of Ninth Circuit Rule 28-2.6.

DATED: January 30, 2024 LEWIS BRISBOIS BISGAARD & SMITH LLP

By: */s/ Michael K. Grimaldi*
Jon P. Kardassakis
Michael K. Grimaldi
*Attorneys for Defendant-Appellee*
**CALIFORNIA PIZZA KITCHEN, INC.**

# CERTIFICATE OF SERVICE

*In re: Aviva Kirsten, et al. v. California Pizza Kitchen, Inc.*

Ninth Circuit Number 23-55288

I hereby certify that on January 30, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

**ANSWERING BRIEF OF APPELLEE CALIFORNIA PIZZA KITCHEN, INC.; 2-VOLUME SUPPLEMENTAL EXCERPTS OF RECORD & INDEX VOLUME**

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Lynn Sylvestre*

Lynn Sylvestre