No. 23-55288

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE: CALIFORNIA PIZZA KITCHEN DATA BREACH LITIGATION

AVA KIRSTEN, *Plaintiff – Appellant,*

KANSAS GILLEO, *Plaintiff – Appellee,*

JEREMY PITTMAN, individually and on behalf of all others similarly situated, *Plaintiff - Appellant,*

SYDNEY RUSEN; et al., *Plaintiffs – Appellees,*

v.

CALIFORNIA PIZZA KITCHEN, INC., *Defendant – Appellee.*

Appeal From The United States District Court
For The Central District of California, Santa Ana
The Honorable David O. Carter
Case No. 8:21-cv-01928-DOC-KES

## ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

SIRI & GLIMSTAD LLP
Mason Barney
200 Park Avenue, 17th Fl.
New York, NY 10166
(212) 532-1091
(646) 417-5967 (fax)
mbarney@sirillp.com

MILBERG COLEMAN
BRYSON PHILLIPS
GROSSMAN PLLC
David K. Lietz
5335 Wisconsin Ave. NW
Suite 440
Washington, DC 20015
(866) 252-0878
(202) 686-2877 (fax)
dlietz@milberg.com

CAFFERTY CLOBES
MERIWETHER &
SPRENGEL LLP
Daniel O. Herrera
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
(312) 782-4880
(312) 782-4485 (fax)
dherrera@caffertyclobes.com

WOLF HALDENSTEIN
ADLER FREEMAN &
HERZ LLP
Rachele R. Byrd
750 B Street, Suite 1820
San Diego, CA 92101
(619) 239-4599
(619) 234-4599 (fax)
byrd@whafh.com

*Attorneys for Plaintiffs—Appellees*

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ..................................................................................1

II. STATEMENT OF THE ISSUES ........................................................4

III. JURISDICTIONAL STATEMENT ..................................................5

IV. STATEMENT OF THE CASE .........................................................5

    A. Statement of Facts..........................................................................5

    B. Procedural History .........................................................................6

        1. The Filing and Consolidation of Related Actions .....................6

        2. Settlement Discussions and Mediation.......................................9

        3. Notice of the Settlement and Appellants' Immediate Opposition............11

        4. Terms of the Settlement..............................................................12

        5. Motion for Preliminary Approval...............................................14

        6. Motions for Final Approval, Attorneys' Fees and Service Awards.........16

V. SUMMARY OF THE ARGUMENT .................................................18

VI. STANDARDS OF REVIEW............................................................20

VII. ARGUMENT ..................................................................................22

    A. The District Court Applied the Proper Standard of Review .........22

    B. The District Court Properly Exercised Its Discretion to Approve the Fair,

        Reasonable, and Adequate Class Settlement..................................25

1. The Relief Provided to the Settlement Class is Fair and Adequate, and Well Within the Range of Similar Settlements ........................................27

2. Attorneys' Fees Were Sought and Awarded on a Lodestar Basis ..........36

3. The District Court Considered the Attorneys' Fees Provision in the Settlement Agreement ...............................................................................38

4. The District Court Did Not Abuse Its Discretion In Dismissing Appellants' So Called "Signs of Collusion" ...........................................39

5. The Settlement Properly Releases the CCPA Claims and Provides Adequate Relief for California Settlement Subclass Members................44

6. Allowing the Settlement to Stand Could Not Possibly Encourage Collusion in Future Settlements Because There Was No Collusion Here .........................................................................................46

C. The Court Should Affirm the $800,000 Fee and Expense Award................49

1. Class Counsel's Lodestar Is Justified......................................................49

2. The Results Obtained More than Justify the Modest Multiplier..............53

3. Even Under Heightened Scrutiny Using the Percentage Method to Cross-Check, the Fee is Justified and Reasonable Compared to the Total Benefit to the Class.............................................................................56

VIII. CONCLUSION ............................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>

*Abdullah v. United States Sec. Assoc.,*
    No. CV 09-9554 PSG (Ex), 2017 WL 11630767
    (C.D. Cal. Dec. 4, 2017) ................................................................55

*Adlouni v. UCLA Health Systems Auxiliary, et al.,*
    No. BC 589243 (Los Angeles Super. Ct.) ....................................32

*Ashker v. Newsom,*
    81 F.4th 863 (9th Cir. 2023) .........................................................21

*Atkinson v. Minted, Inc.,*
    No. 3:20-CV-03869-VC, 2021 WL 6028374
    (N.D. Cal. Dec. 17, 2021)........................................................32, 55

*Briseno v. Henderson,*
    998 F.3d 1014 (9th Cir. 2021) ................................................24, 28

*Browning v. Yahoo! Inc.,*
    No. C04-01463, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007).......27, 28, 30

*Calderon v. Wolf Firm,*
    No. SACV 16-1266-JLS (KESx), 2018 WL 6843723
    (C.D. Cal. Mar. 13, 2018).............................................................31

*Carrera Aguallo, et al. v. Kemper Corp., et al.*
    No. 1:21-cv-01883 (N.D. Ill. Mar. 18, 2022).........................31, 46

*Castellon v. Penn-Ridge Transp., Inc.,*
    No. ED CV18-02136 JAK (KKx), 2020 U.S. Dist. LEXIS 245742
    (C.D. Cal. Nov. 3, 2020)...............................................................36

*City of Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974) ...................................................26, 28

*Class Plaintiffs v. Seattle,*
    955 F.2d 1268 (9th Cir. 1992) ...............................................................44, 45

*Cochran, et al. v. The Kroger Co., et al.,*
    No. 5:21-cv-01887, 2021 WL 8824962
    (N.D. Cal. Nov. 5, 2021) ......................................................................*passim*

*Coleman, et al. v. Boys Town National Research Hospital,*
    District Court of Douglas County, Nebraska,
    Case No. D01CI18008162 ...............................................................................34

*Fehlen v. Accellion, Inc.,*
    No. 21-cv-01353 (N.D. Cal.) .................................................................32, 34

*Gallucci v. Boiron, Inc.,*
    No. 11cv2039 JAH(NLS), 2012 WL 12864924,
    (S.D. Cal. Apr. 25, 2012) ................................................................................22

*Garity v. APWU Nat'l Labor Org.,*
    840 F. App'x 924 (9th Cir. 2020) ...................................................................58

*Gates v. Deukmejian,*
    987 F.2d 1392 (9th Cir. 1992) .................................................................49, 51

*Gordon v. Chipotle Mexican Grill, Inc.,*
    No. 17-cv-01415-CMA-SKC, 2019 WL 6972701
    (D. Colo. Dec. 16, 2019) ...............................................................................30

*Grays Harbor Adventist Christian Sch. v. Carrier Corp.,*
    No. 05-05437 RBL, 2008 WL 1901988
    (W.D. Wash. April 24, 2008) .................................................................36, 59

*Hammond v. Bank of N.Y. Mellon Corp.,*
    No. 08 Civ. 6060(RMB)(RLE), 2010 WL 2643307
    (S.D.N.Y. June 25, 2010) ...............................................................................29

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .................................................20, 21, 27, 53

*Hashemi v. Bosley, Inc.,*
    No. CV 21-946 PSG (RAOx), 2022 WL 2155117 (C.D. Cal. 2022)............29

*In re Anthem, Inc. Data Breach Litig.,*
    327 F.R.D. 299 (N.D. Cal. 2018) ................................................................30

*In re Anthem, Inc. Data Breach Litig.,*
    No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ....54

*In re Bluetooth Headset Prod. Liab. Litig.,*
    654 F.3d 935 (9th Cir. 2011) ......................................................38, 43, 53, 56

*In re Capital One Consumer Data Security Breach Litig.,*
    No. 1:19-md-02915-AJT-JFA (E.D. Va.) ....................................................32

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.,*
    No. 3:08-MD-01998, 2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) ..........55

*In re Equifax Inc. Customer Data Sec. Breach Litig,*
    No. 17-MD-2800, 2020 WL 256132 (N.D. Ga. Mar. 17, 2020).......27, 33, 54

*In re Google Inc. Street View Elec. Commc'n Litig.,*
    21 F.4th 1102 (9th Cir. 2021) ........................................................................22

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.,*
    293 F.R.D. 21 (D. Me. 2013)..........................................................................29

*In re Hyundai and Kia Fuel Econ. Litig.,*
    926 F.3d 539 (9th Cir. 2019) ........................................................................21

*In re Mego Fin. Corp. Sec. Litig.,*
    213 F.3d 454 (9th Cir. 2000) ........................................................................20

*In re Online DVD-Rental Antitrust Litig.,*
    779 F.3d 934 (9th Cir. 2015) ........................................................................21

*In re Premera Blue Cross Customer Data Security Breach Litig.,*
    No. 3:15-md-2633-SI (D. Or.).........................................................................33

*In re Sonic Corp. Customer Data Sec. Breach Litig.,*
    No. 1:17-md-2807, 2019 WL 3773737 (N.D. Ohio Aug. 12, 2019)..............54

*In re Target Corp. Customer Data Sec. Breach Litig.,*
    No. 14-2522 (PAM/JJK), 2015 WL 7253765
    (D. Minn. Nov. 17, 2015) ........................................................29, 32

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products
    Liability Litig.,*
    895 F.3d 597 (9th Cir. 2018) ........................................................20

*In re Yahoo! Inc. Customer Data Breach Litig.,*
    No. 5:16-MD-02752-LHK (N.D. Cal.) ........................................................32

*Kazi v. PNC Bank, N.A.*
    No. 18-cv-04810-JCS, 2021 WL 965372
    (N.D. Cal. Mar. 15, 2021)..............................................................45

*Kolar v. CSI Financial Services, LLC dba Clear Balance,*
    No. 37-2021-00030426-CU-NP-CTL
    (San Diego Super. Ct. January 2023) ..........................................30

*Lane v. Facebook, Inc.,*
    696 F.3d 811 (9th Cir. 2012) ....................................................2, 24

*Linney v. Cellular Alaska P'ship,*
    151 F.3d 1234 (9th Cir. 1998) ................................................21, 28

*Linnins v. HAECO Ams., Inc.,*
    No. 1:16CV486, 2018 WL 5312193 (M.D.N.C. Oct. 26, 2018)..................55

*Lowery v. Rhapsody Int'l, Inc.,*
    75 F.4th 985 (9th Cir. 2023)..............................................*passim*

*Marshall v. Northrop Grumman Corp.,*
    No. 16-CV-6794 AB (JCx), 2020 WL 5668963
    (C.D. Cal. Sep. 18, 2020) ..............................................................51

*Moore v. Verizon Comms. Inc.,*
    No. C 09–1823 SBA, 2014 WL 588035 (N.D. Cal. Feb. 14, 2014) ............52

*Moreno v. City of Sacramento,*
    534 F.3d 1106 (9th Cir. 2008) ......................................................52

*Munoz v. Pentair Water Pool & Spa, Inc.,*
    No. 2:19-cv-02310- JAK (SKx),
    2021 U.S. Dist. LEXIS 220386 (C.D. Cal. Nov. 12, 2021) ........................55

*Negrete v. Allianz Life Ins. Co.,*
    523 F.3d 1091 (9th Cir. 2008) ......................................................40

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty of San Francisco,*
    688 F.2d 615 (9th Cir. 1982) ...............................................*passim*

*Pagan, et al. v. Faneuil Inc.,*
    No. 3:22-cv-00297 (E.D. Va. Feb. 17, 2023) ................................46

*Rodriguez v. W. Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ......................................................20

*Rosales v. El Rancho Farms,*
    No. 1:12-cv-01934, 2015 WL 4460918 (E.D. Cal. July 21, 2015) ..............43

*Schulte v. Fifth Third Bank,*
    805 F.Supp.2d 560 (N.D. Ill. 2011) ............................................27

*Southern Independent Bank v. Fred's, Inc.,*
    No. 2:15-CV-799-WKW, 2019 WL 1179396
    (M.D. Ala. Mar. 13, 2019) ..........................................................29

*Strategic Partners, Inc. v. FIGS, Inc.,*
    No. CV 19-2286 GW (KSx), 2020 WL 3064440
    (C.D. Cal. Apr. 29, 2020) ..........................................................51

*Vizcaino v. Microsoft Corp.,*
    290 F.3d 1043 (9th Cir. 2002) ................................................38, 55

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ..................................................................20

*Wing v. Asarco Inc.,*
    114 F.3d 986 (9th Cir. 1997) ...................................................36, 59

*Winstead v. ComplyRight, Inc.,*
    No. 1:18-CV-4990 (N.D. Ill.) ........................................................33

## STATUTES & RULES

California Consumer Privacy Act ("CCPA") ...................................*passim*
    Cal. Civ. Code § 1798.150 .............................................6, 44, 46

Civil Local Rule 16-15.7.....................................................................11

Federal Rules of Civil Procedure
    Rule 12(b)(6) ............................................................................29
    Rule 23(e) .................................................................................25
    Rule 23(e)(2)............................................................................ 25
    Rule 56.....................................................................................29

## I.    INTRODUCTION

In this complex and disputed data breach case, Plaintiffs-Appellees[1] reached a settlement with Defendant California Pizza Kitchen ("CPK") that provides for substantial relief for all members of the Settlement Class.[2] The parties reached the settlement with the active assistance of Bruce A. Friedman of JAMS, a highly experienced and well-regarded mediator. Mr. Friedman submitted a declaration in support of the settlement and at the district court's request testified under oath at the settlement hearing, where he was examined extensively by the Court.

Notably, the settlement was well-received by the Class, with a high claims rate, only four opt-outs, and one lone objection by two plaintiffs and their counsel in a parallel, related case (Appellants).

The district court considered the reasonableness and adequacy of the settlement, the Settlement Class members' support thereof, and the mediator's endorsement of the settlement. In the sound exercise of its considerable discretion,

---

[1]    Plaintiffs-Appellees are Kansas Gilleo, Sydney Rusen, Esteban Morales, Douglas Wallace, Brett Rigas, and Evencio Diaz and are collectively referred to herein as "Plaintiffs."

[2]    The "Settlement Class" is defined as "All persons who were sent notice of the Data Security Incident announced by defendant on or about November 15, 2021." 3-ER-369. The "California Settlement Subclass" is defined as "All persons residing in California who were sent notice of the Data Security Incident announced by defendant on or about November 15, 2021." *Id*. There are an estimated 103,767 Settlement Class members, including 30,781 members of the California Settlement Subclass. 3-ER-370.

the district court approved the settlement, finding it to be fair, reasonable, and adequate after subjecting the settlement and the attorneys' fee motion to extraordinary scrutiny.

Despite these facts, Appellants invite this Court to intrude directly "into the discretion of the district court by setting aside its determination that a settlement agreement is fundamentally fair." *Lane v. Facebook, Inc.*, 696 F.3d 811, 825 (9th Cir. 2012). There is no basis for the Court to take this "rare" action, as there was no clear abuse of discretion by the district court.

This appeal, Appellants' *fourth* attempt to derail the settlement, is nothing more than a collection of highly inflammatory accusations and specious assertions by disgruntled would-be lead counsel, who wish to wrest control of this case after walking away from it. Those wholly unfounded accusations and assertions—nothing more than unsubstantiated and unwarranted second guessing—are belied by the record. The district court applied a heightened (and indeed an extraordinary) level of scrutiny to this settlement, spanning multiple hearings, sworn written and in-person testimony by the well-regarded mediator, and multiple rounds of briefing. The district court fully considered what Appellants allege to be "classic indicia of collusion" and found no collusion. Appellants were not excluded from this case but, in fact, *excluded themselves* because their counsel did not want to work cooperatively with Plaintiffs' counsel. Furthermore, the mediator testified both in a

declaration and orally at length at the preliminary approval hearing about the arm's-length nature of the settlement negotiations. The district court did the opposite of "rubber stamping" this settlement and the attorneys' fees, only approving the settlement and the attorneys' fees after months of careful consideration of all the hearings, testimony, and briefing.

Moreover, this case is not "potentially worth $77 million to the class," and despite repeatedly claiming this to be the case, Appellants offered the district court, and now offer this Court, nothing to substantiate this irresponsible assertion. Rather, Appellants' assertion is based only upon a speculative interpretation of the law, no actual case law, and no real-world results. Appellants would exchange the benefits of early settlement—which the trial court and the mediator both recognized—with the opportunity to use the class members as guinea pigs and risk a settlement that stands up well compared to other settlements. Similarly, Appellants' contention that the settlement benefits are worth only $497,974 ignores the actual relief obtained for the Settlement Class. Appellants cite no authority for their argument that the value of the credit monitoring benefit should be excluded from the calculation.

Appellants reveal their true motive in bringing this appeal in the introduction to their brief, when they ask this Court to issue "instructions that the district court consider applications for lead counsel under Rule 23(g)." (App. Br. at 3.) This appeal is not about the terms of the settlement, which are nothing less than fair, reasonable,

and adequate. Rather, this appeal is brought by disgruntled attorneys who refused to work cooperatively with Class Counsel, abandoned this case because they could not run it, are now offended that they did not end up leading this case, and ask this Court to take the unprecedented step of not only dismantling the work of the district court in meticulously evaluating and approving this settlement, but also to interfere with how the district court manages the litigation should this Court find a reason to remand for further proceedings. This Court should not be party to righting some perceived injury to disgruntled counsel who feel deprived of a payday.

Appellants fail to satisfy their burden to establish a clear abuse of discretion. For this reason, the Court should affirm the judgment of the district court.

## II.    STATEMENT OF THE ISSUES

The issues presented for appeal are:

1.    Whether the district court abused its discretion in approving a settlement of this data breach class action where: (a) there was no aggregate cap on the amount of monetary benefits that could be claimed; (b) every Settlement Class member was entitled to claim a credit monitoring benefit of 2 years with 3 credit bureaus; and (3) the settlement included injunctive relief.

2.    Whether the district court abused its discretion in approving Plaintiffs' and Class Counsel's motion for attorneys' fees and expenses of $800,000 where: (a) their expenses totaled $26,367.05; (b) their lodestar totaled $687,681; and the

value of the settlement is estimated to be between $2,133,719 and $40 million (not including the value of the injunctive relief).

## III.   JURISDICTIONAL STATEMENT

Plaintiffs agree with Appellants' Jurisdictional Statement.

## IV.   STATEMENT OF THE CASE

### A.   Statement of Facts

On or about September 15, 2021, California Pizza Kitchen, Inc. ("CPK") discovered it had experienced a data security incident during which the personally identifiable information ("PII") of more than 100,000 current and former employees may have been accessed (but was not necessarily exported from the CPK systems) (the "Data Incident"). 3-ER-367, 370; 5-ER-722. In November 2021, following a forensic investigation, CPK sent notice of the Data Incident to approximately 103,767 individuals whose PII may have been subject to unauthorized access. 3-ER-367; 5-ER-726. CPK offered these individuals one year of free one bureau credit and identity monitoring services (5-ER-616, ¶ 28), although CPK has since concluded that only a very small percentage of Settlement Class members had their Social Security Numbers potentially exposed during the Data Incident. 4-ER-518-19, 11:24-12:2; 4-ER-543:6-13.

Five lawsuits concerning this Data Incident ultimately were filed in the United States District Court for the Central District of California.[3] The actions all similarly allege that CPK failed to adequately safeguard its current and former employees' (and their family members') electronically stored PII and seek monetary and equitable relief.

## B. Procedural History

### 1. The Filing and Consolidation of Related Actions

The first of the five related actions, the *Gilleo* action, was filed on November 23, 2021. 5-ER-753; PSER-005, ¶ 2.[4] Plaintiff Sydney Rusen, a citizen of California, who was one of the Plaintiffs in *Gilleo*, had standing to assert claims under the California Consumer Privacy Act ("CCPA"), but did not include a CCPA claim in the initial complaint. PSER-019, ¶ 3. Instead, in compliance with Cal. Civ. Code § 1798.150, prior to asserting a claim for damages under the CCPA, Plaintiff Rusen, on December 6, 2021, provided CPK with 30 days' notice of the claim, with the

---

[3] *Gilleo, et al. v. California Pizza Kitchen, Inc., et al.*, No. 8:21-cv-01928-DOC-KES (filed Nov. 23, 2021); *Morales v. California Pizza Kitchen, Inc.,* No. 8:21-cv-01988-DOC-KES (filed Dec. 2, 2021); *Wallace, et al. v. California Pizza Kitchen, Inc.*, No. 8:21-cv-01970-DOC-KES (filed Dec. 2, 2021); *Rigas, et al. v. California Pizza Kitchen, Inc.*, No. 8:21-cv-02004-DOC-KES (filed Dec. 7, 2021); and *Kirsten, et al. v. California Pizza Kitchen, Inc.*, No. 2:21-cv-09578-DOC-KES (filed Dec. 10, 2021).

[4] References to "PSER" are to the Supplemental Excerpts of Record of Plaintiffs-Appellees. References to "SER" are to the Supplemental Excerpts of Record of Appellee California Pizza Kitchen, Inc.

intent to include the CCPA claim in an amended complaint. *Id.*, ¶¶ 4-7. CPK responded on January 24, 2022. *Id.*, ¶ 8.

As of December 8, 2021, two days before Appellants' action (the *Kirsten* action) was filed, Class Counsel had already self-organized and agreed to work cooperatively. PSER-005, ¶ 2; PSER-029, ¶ 2. After learning about the fifth-filed *Kirsten* action, on December 23, 2021, Plaintiffs internally circulated a draft stipulation for consolidation that included Appellants' action. PSER-032, ¶ 5. Plaintiffs' counsel then reached out to counsel for Appellants on January 6, 2022 "to see if counsel on all five cases could prosecute the litigation together[.]" PSER-029-30, ¶ 6. Appellants' counsel responded that they were not interested in prosecuting "all five cases as one[,]" and instead would challenge Plaintiffs' counsel in the first four filed cases for leadership. *Id.* Despite this rejection, on February 8, 2022, Plaintiffs sent the draft consolidation stipulation (that had been reviewed and approved by CPK's counsel) to Appellants' counsel. PSER-034, ¶ 15. Appellants responded by demanding edits—such as adding their counsel to the caption page and listing them first on the signature page—and insisted on an absurdly short briefing schedule of seven (7) days for contested leadership motions. *Id.*, ¶ 16. The next day, Plaintiffs' counsel affirmed in an email to Appellants' counsel that all parties agreed to file a stipulation consolidating all the cases, but that they needed to meet and

confer on a reasonable briefing schedule for leadership. *Id.*, ¶ 17. Appellants' counsel did not respond to the email.

After waiting for five days for a response from Appellants, on February 14, 2022, Plaintiffs filed a revised stipulation consolidating only the first four filed cases (because they were the only parties that had consented to the stipulation) and setting a schedule for the filing of leadership motions, a consolidated complaint, CPK's response, and a briefing schedule on any motion to dismiss. *Id.*, ¶¶ 18-19; 2-SER-281-90. Plaintiffs noted in a footnote that they had made efforts to include the *Kirsten* case, but those efforts failed, and the *Kirsten* case was not being consolidated with the other four cases. *Id.* ¶ 20; 2-SER-283 n.1. The Stipulation and the Proposed Order also provided, as is standard, that any action "*subsequently* filed in, transferred to, or removed to" the Central District of California "that arises out of the same or similar operative facts as the Consolidated Action, shall be consolidated with the Consolidated Action for pre-trial purposes." 2-SER-285, ¶ 4 (emphasis added); 3-ER-435, ¶ 4 (emphasis added). They further provided, "If the Court determines that *a later-filed case* is related, *the clerk* is directed to:" (a) "Place a copy of this Order in the separate file for such action;" (b) "Serve on Plaintiffs' counsel in the new case a copy of this Order;" (c) "Direct that this Order be served upon defendants in the new case;" and "Make appropriate entry in the Master Docket." 2-SER-285, ¶ 5 (emphasis added); 3-ER-435, ¶ 4 (emphasis added). The district court approved the

Stipulation on February 15, 2022, and entered an order which consolidated the first four filed cases and titled the consolidated action *In re California Pizza Kitchen Data Breach Litigation*, Master File No. 8:21-cv-01928-DOC-KES (the "Lead Case"). 3-ER-433-36. At no time thereafter did Appellants seek, either by way of stipulation or motion, to have their action consolidated with the Lead Case. Instead, they proceeded to litigate their case separately. PSER-006, ¶ 5.

## 2. Settlement Discussions and Mediation

In January 2022, counsel for Plaintiff *Wallace* began to explore with CPK the possibility of settlement. PSER-032, ¶¶ 6-7. The parties to *Wallace* also engaged in a mandatory pre-motion meet and confer with CPK's counsel where they discussed CPK's anticipated motion to dismiss, which raised questions about the viability of the claims in the litigation. *Id.*, ¶ 8. Plaintiff Wallace's counsel then drafted a settlement proposal term sheet and circulated it amongst Plaintiffs' counsel. *Id.*, ¶ 9. The term sheet proposed a claims-made settlement, included a demand for compensation for the class's California statutory claims, including the CCPA claim, and made clear that further discussions would hinge on CPK's willingness to provide confirmatory discovery. *Id.*, ¶¶ 11-12; PSER-006, ¶ 6.

After the district court entered the consolidation order, CPK agreed to explore settlement and the parties in the Lead Case scheduled a formal mediation. PSER-006, ¶ 5. Prior to mediating, the parties exchanged informal discovery on a variety

of topics, including applicable insurance coverage (which was a wasting policy that was being eroded by litigation costs), as well as the nature of the data breach and the information that may have been accessed. PSER-006, ¶ 6; 1-SER-121, ¶ 7. The Parties selected Bruce A. Friedman of JAMS, a well-regarded mediator with considerable experience mediating data breach actions, to preside over the mediation, and exchanged briefs prior thereto. *Id*. Attached to Plaintiffs' mediation brief was the proposed term sheet that they had sent to CPK's counsel on January 26, 2022, and which served as Plaintiffs' opening demand to begin the mediation. PSER-034-35, ¶ 21.

At the all-day mediation on March 10, 2022, the parties spent the entire day negotiating the material terms of a resolution of the class claims prior to reaching an impasse. *Id*., ¶ 22; 1-SER-134, ¶ 6; 1-SER-122, ¶ 8; PSER-006-07, ¶ 7. The parties did not discuss attorneys' fees or service awards at this first mediation session and instead returned for a second mediation session on March 15, 2022. 1-SER-134, ¶ 6; PSER-035, ¶ 23; 1-SER-122, ¶ 8; PSER-006-07, ¶ 7. At the second session on March 15, 2022, the parties reached agreement on the material terms of class-wide relief, then spent the remainder of that second session negotiating the issues of attorneys' fees, costs and service awards. 1-SER-122, ¶ 8; 1-SER-134, ¶ 6; PSER-006-07, ¶ 7; PSER-035, ¶ 24. After several hours, the parties reached agreement on all material

terms of the settlement, then spent the next few weeks reducing their agreement to writing. 1-SER-122, ¶ 8; PSER-006-07, ¶ 7.

### 3. Notice of the Settlement and Appellants' Immediate Opposition

On March 16, 2022, pursuant to Civil Local Rule 16-15.7, the Parties notified the district court that they had reached a settlement in principle. 2-SER-277; PSER-007, ¶ 8. That same day, Plaintiffs submitted a Stipulation and Proposed Order requesting the district court stay the action, except for Plaintiffs' motions for preliminary and final approval of the settlement, and set a deadline for the filing of a motion for preliminary approval. 2-SER-278.

The very next day, on March 17, 2022, in response to the filing of the stipulation and demonstrating they were well-aware of the progress of the case, Appellants filed a motion to have their counsel appointed lead counsel and opposed Plaintiffs' request for a stay. 2-SER-354. Despite knowing nothing about the terms of the settlement, Appellants were quick to label the settlement "a reverse auction" and assert that this "potentially collusive" settlement "should disqualify [Plaintiffs' counsel] from appointment as Lead Counsel (were they even qualified in the first instance)." 3-ER-399:5; 3-ER-401:12-14. The district court, also on March 17, 2022, approved the stipulation and entered an order staying all deadlines and directing Plaintiffs to file their motion for preliminary approval within forty-five days. *Id*. CPK filed an opposition to Appellants' motion for lead counsel on March 28, 2022.

3-ER-386-88. In support of the opposition and in response to Appellants' baseless accusations of collusion, counsel for CPK explained in a declaration that at some point prior to March 14, 2022, he had a call with counsel for Appellants "to see what type of settlement [they] would be interested in," and although they engaged in "some settlement discussions," Appellants' counsel "never provided [him with] a substantive response as to what they wanted" and instead "wanted to schedule a mediation far out and engage in discovery before that mediation." 2-SER-254, ¶ 3.

The district court held hearings on Appellants' motion on April 18, 2022, and April 22, 2022. 2-SER-355. At the latter hearing the district court expressed concern at the accusations levied by Appellants against CPK's and Plaintiffs' counsel. 4-ER-556:12-557:4. Because Judge Carter decided he couldn't "possibly make a decision based upon these accusations" until he saw the settlement (4-ER-557:6-10, 557:22-558:4; 554:25-555:5), in an exercise of restraint and good judgment, he ordered Appellants' leadership motion held in abeyance pending Plaintiffs' motion for preliminary approval of the settlement. 4-ER-565:14-16; 2-SER-342.

### 4.    Terms of the Settlement

Plaintiffs and CPK finalized and executed a Settlement Agreement on May 2, 2022. The settlement provides for three separate forms of monetary relief: (1) reimbursement, up to $1,000 per person, for documented, ordinary and unreimbursed out-of-pocket expenses related to the Data Incident, including

compensation for time spent dealing with the effects of the Data Incident for up to three hours at $20 per hour (3-ER-370-71, ¶ 3); (2) reimbursement of extraordinary expenses due to identity theft, up to $5,000 per Settlement Class member (3-ER-371-72, ¶ 3(c)); and (3) a California Statutory Claim benefit of $100 per California Settlement Subclass member, which is subject to the $1,000 cap for ordinary expenses and lost time reimbursement, but is available to all California Settlement Subclass members who filed a claim (3-ER-372, ¶ 3(d)). There is no aggregate cap on these benefits, thus every valid claim will be paid in full (subject to the individual caps) regardless of the number of claims filed. 3-ER-370-72, ¶ 3.

In addition to the cash benefits outlined above, <u>all</u> Settlement Class members were given the opportunity to claim two years (24 months) of three-bureau credit monitoring, which includes a credit report at sign-up, credit monitoring, identity restoration, and up to $1 million in identity theft insurance. 3-ER-372, ¶ 3(e). For Settlement Class members who selected and enrolled in the 12 months of identity monitoring previously offered by CPK, the credit monitoring offered under this settlement shall be *in addition* to that period. *Id*.

CPK also agreed to maintain certain remedial measures ("Business Practice Commitments") for a period of three (3) years following the Effective Date of the settlement. These Business Practice Commitments include continuous threat assessment processes to maintain CPK's security posture and provide protection

against threats now and in the future, specifically with respect to the PII of current and former employees. 3-ER-375-76, ¶ 6. All costs associated with implementing the Business Practice Commitments will be borne by CPK, separate and apart from the relief afforded to Settlement Class members. *Id*.

In addition to the foregoing, the Settlement Agreement also provides that Plaintiffs can apply to the district court for an award of attorneys' fees and expenses of up to $800,000 and service awards for the named plaintiffs of $2,000 each, and that CPK would not object to such requests. 3-ER-373-74, ¶ 5.

Finally, the Settlement Agreement provides that CPK will pay for Notice. 3-ER-378, ¶ 7(c). Payment of these notice costs, along with the attorneys' fees award and service awards, were separate and in addition to any funds available to Settlement Class members. *Id*. As such, because there was no aggregate cap on the settlement, these awards and administrative costs did not have any effect on the amount that Settlement Class members will receive.

### 5.    Motion for Preliminary Approval

On May 2, 2022, Plaintiffs filed their Motion for Preliminary Approval and included a declaration from the mediator, Mr. Bruce Friedman. 1-SER-132-36; *see* 1-SER-133, ¶ 2 ("The settlement is the reasonable result of a hard-fought, arm's-length process.") Appellants opposed the motion with their premature settlement objections (3-ER-298-320), and Plaintiffs filed a reply. The Court held a hearing on

June 29, 2022, which lasted more than an hour and during which Judge Carter placed Mr. Friedman under oath and examined him extensively about the mediation and the settlement. 4-ER-508-52. Appellants' counsel, Ms. Wolfson, once again accused Appellants and CPK of collusion and of having conducted a reverse auction. Contrary to these accusations, Mr. Friedman testified at length about the arm's-length nature of the settlement negotiations. 4-ER-518:13-519:2; 4-ER-538:15-19. When the Court pressed Ms. Wolfson as to what her opening demand would be at a mediation in this case, she stated it would be $10 million. 4-ER-539:15-25. On June 30, 2022, the district court granted the motion for preliminary approval of the settlement. 3-ER-289-97.

Class Counsel then immediately set upon working with Epiq, the claims administrator, to ensure notice of the settlement reached as broad a swath of the Settlement Class as possible. First, the parties agreed to implement a social media advertising program, which delivered over 22.5 million impressions to potential Settlement Class members. 1-SER-058, ¶¶ 22-23. Second, Class Counsel publicized the settlement through their own social media channels to further amplify the settlement. 2-ER-246 at ¶ 7. Third, Epiq conducted a search for email addresses for those Settlement Class members for whom Defendant did not have email addresses and sent additional email notices to 60,797 Settlement Class members who (1) had not yet filed a claim; and (2) were already sent a postcard

notice but not an email notice. 1-SER-011, ¶¶ 16-17.

6. **Motions for Final Approval, Attorneys' Fees and Service Awards**

On September 14, 2022, Plaintiffs filed a motion for attorneys' fees and costs requesting a total of $800,000 (2-ER-111-13), and on October 6, 2022, they filed a motion for final approval of the settlement (2-ER-042-45). Appellants objected to the settlement and opposed the fee request. 2-ER-80-104.[5] At the November 7, 2022, hearing on the motions, Judge Carter rejected Appellants' accusations of collusion and reverse auction stating, "I've gone through the collusion arguments of the past. In other words, when the preliminary approval took place, we had those arguments concerning collusion, and I rejected those." 4-ER-495:6-19. Class Counsel explained in detail the benefits and value of the settlement, the efforts taken—above and beyond those required by the Settlement Agreement—to provide notice to the Settlement Class, and the basis for the fee request. 4-ER-474-501; 4-ER-482:22-487:8; 4-ER-492:19-498:24. Judge Carter inquired about the number of claims that had been filed and the total value of those claims. Class Counsel, Ms. Byrd, reported that as of November 2, 2022, there had been 1,828 claims filed, a 1.8 percent claims rate (which the district court agreed was typical for these types of cases (4-ER-

---

[5] The deadline to object or opt out of the settlement was September 27, 2022. Only 4 individuals opted out and the only objections were by the two plaintiffs in *Kirsten*—Appellants here. 1-SER-012-13, ¶ 24; 1-SER-020.

496:19-21)), valued at a total of $1,161,149. 4-ER-484:14-485:17. Ms. Byrd prefaced that statement by saying, "I want[] to make sure the Court understands that the claims administrator has not validated [the claims] yet." 4-ER-485:8-11. Ms. Byrd also explained the breakdown of the values attributable to each type of claim. 4-ER-485:19-486:6. At the end of the hearing, Judge Carter asked for supplemental briefing on the requested attorneys' fees. 4-ER-499:24-501:7.

Plaintiffs filed a supplemental brief on November 14, 2022. By that time, Class Counsel's combined lodestar was $687,681.00, and their total expenses were $26,367.05. 2-ER-028-29, ¶¶ 3, 5. Thus, after deducting the costs from the $800,000 requested for fees and costs, the portion of the request attributable to attorneys' fees was $773,632.95, amounting to a multiplier of just 1.12 over the combined lodestar. 2-ER-019-25. Furthermore, Epiq confirmed what Ms. Byrd had told the district court, that, as of November 2, 2022, it had received 1,828 claims (a 1.8% claims rate). 2-ER-032, ¶ 6; *see also* 2-ER-062-63; PSER-011, ¶ 21. Epiq also reported the following breakdown of the types of claims it had received so far and the total amounts claimed: 94 claims for ordinary expenses totaling $273,236.03; 79 claims for reimbursement of fees paid as a result of the "Data Security Incident," totaling $110,898.74 (which falls into the ordinary expenses category); 979 claims for lost time totaling $50,320; 45 claims for extraordinary expenses totaling $191,354.50; 1,264 claims for credit monitoring (which, conservatively valued at $15 per month,

had a total value of $455,040); and 803 California statutory claims totaling $80,300. 2-ER-027, ¶ 2; 2-ER-033, ¶ 7; 1-SER-125, ¶ 19. The total (unaudited) value of the settlement benefits claimed (and not including the Business Practice Changes) was therefore $1,161,149.27. 2-ER-027, ¶ 2.

On December 5, 2022, the district court held yet another hearing on the motions for final approval of the settlement and attorneys' fees. 1-ER-004; 2-SER-347.

On February 22, 2023, after the foregoing extensive briefing and five in-person hearings, and over Appellants' objections, the district court entered a Final Judgment and Order approving the settlement, awarding the requested attorneys' fees and expenses and service awards for Plaintiffs, and dismissing the litigation. 1-ER-002-10.

## V.     SUMMARY OF THE ARGUMENT

The district court, in a sound exercise of its considerable discretion, gave extraordinary scrutiny to approval of this settlement, and to the request for attorneys' fees, expenses, and service awards. The record conclusively establishes that the district court fully considered each factor that Appellants contend are "subtle signs" of collusion and found no collusion. Appellants' distortion of the record, including considerable material omissions of fact that demonstrate the district court's extraordinary scrutiny, cannot disguise that the district court applied the proper

standard of review, found no collusion, and properly approved a fair, reasonable, and adequate settlement.

Allowing the settlement to stand could not possibly encourage collusion in future settlements because there was no collusion here. On multiple occasions, the district court fully examined every allegation of collusion that Appellants recycle here and rejected them all.

The district court gave a similarly high level of scrutiny to the attorneys' fees requested on a lodestar basis, found no collusion in the negotiation of those fees despite the "clear sailing" provision Appellants repeatedly invoke, and properly exercised its discretion in granting the motion for attorneys' fees, expenses, and service awards. The fees sought were fully supported by the lodestar submitted and are not disproportionate to the relief obtained for the Settlement Class. A small and appropriate lodestar multiplier was applied by the district court, in recognition of the work performed and the results obtained by Class Counsel. This too was an appropriate exercise of the district court's discretion, applying the required high level of scrutiny.

Furthermore, contrary to Appellants' accusation that Plaintiffs lacked standing to release the CCPA claim, Plaintiff Gilleo had standing to bring that claim and asserted it when she sent CPK her CCPA demand letter, as required by the statute, before asserting the claim in an amended complaint. This argument is

therefore a red herring properly rejected by the district court.

For all these reasons, and as explained below, the district court did not abuse its discretion in approving this settlement and granting the motion for attorneys' fees, expenses, and service awards. This Court should affirm the district court's rulings.

## VI.   STANDARDS OF REVIEW

This Court reviews "approval of a class action settlement for a 'clear abuse of discretion.'" *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 963-64 (9th Cir. 2009) (citation omitted); *see also Officers for Just. v. Civil Serv. Comm'n of City & Cnty of San Francisco*, 688 F.2d 615, 626 (9th Cir. 1982). "[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is 'exposed to the litigants, and their strategies, positions and proof.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) (quoting *Officers for Just.*, 688 F.2d at 626 (9th Cir. 1982)). The Court should affirm "if the district judge applies the proper legal standard and his findings of fact are not clearly erroneous." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000). While the Court holds district courts to a high procedural standard in their review of a settlement, it "rarely overturn[s] an approval of a class action consent decree on appellate review for substantive reasons." *In re Volkswagen "Clean Diesel" Marketing, Sales*

*Practices, and Products Liability Litig.*, 895 F.3d 597, 609 (9th Cir. 2018) (internal quotations and citation omitted).

The Court's "review of the district court's decision to approve a class action settlement is extremely limited. . . . It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026 (citation omitted). "Neither the district court nor this [C]ourt have the ability to 'delete, modify or substitute certain provisions.' . . . The settlement must stand or fall in its entirety." *Id.* (quoting *Officers for Just.*, 688 F.2d at 628). "Parties seeking to overturn the settlement approval must make a 'strong showing' that the district court clearly abused its discretion." *In re Hyundai and Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998)).

The Court reviews legal questions de novo, including the interpretation of a settlement agreement, but defers "to any factual findings made by the district court in interpreting the settlement agreement unless they are clearly erroneous." *Ashker v. Newsom*, 81 F.4th 863, 874 (9th Cir. 2023) (internal quotations and citations omitted).

The Court also reviews for abuse of discretion a district court's "award of fees and costs to class counsel, as well as its method of calculation." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (internal quotations and

citations omitted). "Findings of fact underlying an award of fees are reviewed for clear error." *In re Google Inc. Street View Elec. Commc'n Litig*., 21 F.4th 1102, 1110 (9th Cir. 2021) (internal quotations and citation omitted).

## VII.  ARGUMENT

### A.    The District Court Applied the Proper Standard of Review

Appellants are wrong that the district court failed to apply "the appropriate level of scrutiny" to this settlement. Their contention is belied by the voluminous record in this case, a record that establishes that the district court gave extraordinary scrutiny to this settlement and to the request for attorneys' fees. Specifically, prior to granting the motion for preliminary approval, the district court (1) reviewed briefing and declarations from the parties, the mediator, and objectors, (2) examined the structure of the settlement—which is similar to those reached in other data breach cases, (3) heard in-person oral argument on June 29, 2022 from not only the parties to the settlement but also from Appellants' counsel (an argument that the district court permitted despite Appellants arguably lacking standing to oppose the motion as non-parties (*see Gallucci v. Boiron, Inc.*, No. 11cv2039 JAH(NLS), 2012 WL 12864924, *3 (S.D. Cal. Apr. 25, 2012)), and (4) examined under oath the parties' mediator, Bruce Friedman of JAMS—a highly experienced, well-respected mediator who the Court found to be credible—regarding the manner in which the parties negotiated the settlement with his active assistance. 4-ER-518:13-519:2; 4-ER-

538:15-19. Following this close examination, the Court determined that this settlement is "the result of vigilant, informed, non-collusive arms'-length negotiations[,]" that were entirely conducted prior to broaching the issue of attorneys' fees, and thus this settlement was not the product of collusion, notwithstanding any supposed "indicia" to the contrary. 3-ER-290, ¶ 3.

The preliminary approval was not the end of the district court's inquiry. In connection with the attorneys' fees and final approval motions, the district court reviewed initial briefing and declarations from Class Counsel and from Appellants' counsel. 2-ER-039-257; 1-SER-002-108; PSER-004-17. Then, after the initial, in-person November 8, 2022, final approval hearing, the district court requested supplemental briefing specifically on the attorneys' fee issue, which the parties submitted. 2-ER-012-38. The district court then convened another in-person hearing on December 5, 2022, devoted almost exclusively to the attorneys' fees issue.

The district court thereafter took the matter under advisement for approximately two and a half months before granting final approval, awarding attorneys' fees, and (most notably) expressly rejecting Appellants' repeated and strident arguments about alleged collusion based upon the very same factors they point to here. It is difficult to imagine just how much more, or how much more exacting, the scrutiny given to a settlement and an attorneys' fees request might be.

Appellants' arguments regarding the import of the attorneys' fees provision of the Settlement Agreement (*i.e.*, the "clear-sailing" provision), the distribution of the settlement's proceeds, and the structure of the settlement have essentially been rejected by this Court in the very case law cited by Appellants. It is not the case, as Appellants contend, that any of these "subtle signs" of collusion establish that there was in fact collusion. In *Briseno v. Henderson*, 998 F.3d 1014, 1027 (9th Cir. 2021), this Court expressly rejected the notion that "any of the identified signs of collusion [are] an independent basis for withholding settlement approval. ***Disproportionate fee awards, clear sailing agreements, and kicker clauses all may be elements of a good deal***." (Emphasis added.) All that is required is that the district court "should give a hard look at the settlement agreement to ensure that the parties have not colluded at class members' expense." *Briseno*, 998 F.3d at 1028. The record shows that the district court gave this settlement and the attorneys' fees request the requisite "hard look." This is not one of the "rare" cases where this Court should intrude "into the discretion of the district court by setting aside its determination that a settlement agreement is fundamentally fair." *Lane*, 696 F.3d at 825, citing *Staton v. Boeing Co.*, 327 F.3d 938, 960-61 (9th Cir. 2003).

Appellants' remaining arguments about "suspiciously secretive and early settlement negotiations" that were "hid[den]" from Appellants (App. Br. at 24) are unsupported by the facts and record in this case. The district court considered these

arguments and rejected them. Again, after Appellants walked away from the case, it was unnecessary for Plaintiffs and Class Counsel to involve them in the settlement negotiations, or in any other part of the litigation for that matter. The record demonstrates that this was not a "quick and low-ball settlement" designed to "avoid a contested leadership battle" in search of a "hefty fee." *Id*. Rather, the record shows that this settlement is eminently fair, reasonable, and adequate under the facts and circumstances of this case.

**B.    The District Court Properly Exercised Its Discretion to Approve the Fair, Reasonable, and Adequate Class Settlement**

The "universally applied standard" employed by federal district courts in carrying out its responsibilities to evaluate a proposed class action settlement for approval "is whether the settlement is fundamentally fair, adequate and reasonable." *Officers for Just.*, 688 F.2d at 625; *see also* Fed. R. Civ. P. 23(e)(2). In addition to the Rule 23(e) factors, the district court's ultimate determination

> will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Officers for Just.*, 688 F.2d at 625. "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s)

advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Id*. Ultimately, the district court's determination is nothing more than "an amalgam of delicate balancing, gross approximations and rough justice." *Id*. (quoting *City of Detroit v. Grinnell Corp*., 495 F.2d 448, 468 (2d Cir. 1974)).

Further, on appeal, the reviewing court's role is "even more limited." *Officers for Just.*, 688 F.2d at 625. "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Id*. (citations omitted). As the *Officers for Just.* court noted:

> "Great weight is accorded his views because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly." *Ace Heating & Plumbing Co. v. Crane Co*., 453 F.2d 30, 34 (3d Cir. 1971). We are not to substitute our notions of fairness for those of the district judge and the parties to the agreement.

*Id*. at 626. The trial court's evaluation of the settlement will be reversed by a reviewing court "only upon a strong showing that the district court's decision was a clear abuse of discretion." *Id*.

Contrary to Appellants' contentions, the settlement here is fair, reasonable, and adequate. Appellants cannot demonstrate the trial court's approval of the settlement was a clear abuse of discretion.

### 1. The Relief Provided to the Settlement Class is Fair and Adequate, and Well Within the Range of Similar Settlements

Appellants' first argument, that the relief provided to the Settlement Class is allegedly inadequate, was raised previously with the district court and is "tantamount to complaining that the settlement should be better, which is *not a valid objection*." *Browning v. Yahoo! Inc.*, No. C04-01463, 2007 WL 4105971, *5 (N.D. Cal. Nov. 16, 2007) (emphasis added) (citing *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1027 (9th Cir. 1998)); *see also In re Equifax Inc. Customer Data Sec. Breach Litig*, No. 17-MD-2800, 2020 WL 256132, *15 (N.D. Ga. Mar. 17, 2020) at *15 ("Objections that the settlement fund is too small for the class size, or that [the defendant] should be required to pay more, do not take into account the risks and realities of litigation, and are not a basis for rejecting the settlement."); *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, 595 (N.D. Ill. 2011) (same).

Any class action settlement—no matter how well negotiated and no matter how generous to the settling class—can be criticized as "inadequate." No settlement is immune from a complaint that "it is not enough" or "it should be better." For that reason, the district court's consideration of the settlement, and its exercise of discretion in approving it, are important factors in assuring the fairness, reasonableness, and adequacy of all class action settlements. The record makes it abundantly clear, beyond reasonable doubt, that the district court properly exercised

its considerable discretion only after carefully and thoroughly considering the settlement.

Such an objection is not a basis upon which a court of appeals should "unnecessarily meddle" with a sound exercise of the district court's discretion in approving this settlement. *See Briseno*, 998 F.3d at 1027 (courts should not "unnecessarily meddle in class settlements negotiated by the parties"). "Settlement, as a product of compromise, typically offers less than a full recovery." *Browning*, 2007 WL 4105971, *5 (N.D. Cal. Nov. 16, 2007) (citing *EEOC v. Hiram Walker & Sons, Inc*., 768 F.2d 884, 889 (7th Cir. 1985)). Precedent is clear that "[t]he proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Just.*, 688 F.2d at 625. And, as Appellants ignore, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see also Linney*, 151 F.3d at 1242 (same).

The adequacy of the settlement is demonstrated when compared to the strength of the plaintiffs' claims and the circumstances of the data breach. *City of Detroit*, 495 F.2d at 455. Here, prevailing on the merits was uncertain. As the law governing data breach class actions is rapidly evolving, such actions face hurdles at all stages of litigation. Some actions are dismissed at the pleading stage. *See*

*Hammond v. Bank of N.Y. Mellon Corp.*, No. 08 Civ. 6060(RMB)(RLE), 2010 WL 2643307, at *1 (S.D.N.Y. June 25, 2010) (collecting data breach actions dismissed at the Rule 12(b)(6) or Rule 56 stage); *Hashemi v. Bosley, Inc.*, No. CV 21-946 PSG (RAOx), 2022 U.S. Dist. LEXIS 210946, at *10 (C.D. Cal. 2022) (collecting cases that were dismissed based on causation-related standing issues)). Indeed, Appellants themselves lost a motion to dismiss in this action and had to replead. 2-SER-256-60. Meanwhile, other actions cannot surmount the hurdle of class certification. *See, e.g., In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21 (D. Me. 2013). Even if the plaintiffs were successful in certifying the class, they could face an interlocutory appeal of that order. Many resources would surely be consumed during the continued litigation of this action. *In re Target Corp. Customer Data Sec. Breach Litig.*, MDL No. 14-2522 (PAM/JJK), 2015 WL 7253765, at *2 (D. Minn. Nov. 17, 2015).

Plaintiffs here also would have been required to prove their damages, which could have been an uphill battle. *Southern Independent Bank v. Fred's, Inc.*, No. 2:15-CV-799-WKW, 2019 WL 1179396, at *8 (M.D. Ala. Mar. 13, 2019) (ruling under *Daubert* that causation not satisfied for class certification purposes).

Furthermore, time was not on the class members' side. While the parties were fighting through the foregoing issues, potentially for years to come, the class members would be exposed to the ongoing risk of identity theft without the

protection of credit monitoring offered by the instant settlement. Thus, reaching a reasonable settlement was more practical than facing the risks of no recovery at all after years of litigation. *Gordon v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01415-CMA-SKC, 2019 WL 6972701, at *1 (D. Colo. Dec. 16, 2019) ("Data breach cases … are particularly risky, expensive and complex").

Considering the risks and uncertainties presented by data breach litigation, the value of the settlement strongly favored approval. The settlement *immediately* made significant relief available to Settlement Class members. Each Settlement Class member was eligible to make a claim for up to $1,000 in reimbursements for expenses and lost time, and up to $5,000 in reimbursements for extraordinary expenses for identity theft related to the Data Incident, and California Settlement Subclass members were entitled to $100 as a statutory damages award. All Settlement Class members were eligible to enroll in two-years (24 months) of three-bureau credit monitoring. Courts have ruled credit monitoring services "have an intrinsic, tangible value." *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 323 (N.D. Cal. 2018); *Browning*, 2007 WL 4105971, at *5. By enrolling in the credit monitoring program, Settlement Class members are assured they will be promptly notified of any future data breaches. *Id.*

This settlement is a strong result for the Settlement Class and is in line with or exceeds other settlements in cases involving data breaches. *See, e.g., Kolar v. CSI*

*Financial Services, LLC dba Clear Balance*, No. 37-2021-00030426-CU-NP-CTL (San Diego Super. Ct., final approval granted January 2023) (claims-made settlement providing reimbursement of up to $1,100 in out-of-pocket expenses, up to $5,000 in extraordinary losses, lost time up to three hours at $22.50 per hour, two years of 3 bureau credit monitoring, and $100 to California subclass members, subject to proration due to a $2.650M cap on settlement payments); *Cochran, et al. v. The Kroger Co., et al.*, No. 5:21-cv-01887 (N.D. Cal.), ECF No. 108 at 9:3-4, 108-1 at ¶ 5(e) (Mar. 4, 2022) (2 years of 3 bureau credit monitoring <u>or</u> a cash payment <u>or</u> a documented loss payment; payments to California class members were $72 each, and $36 each for non-California class members); *Carrera Aguallo, et al. v. Kemper Corp., et al.*, No. 1:21-cv-01883 (N.D. Ill.), ECF No. 35-3, ¶¶ 2.1-2.3 (Oct. 14, 2021) (18 months of 3 bureau credit monitoring; reimbursement up to $10,000 for out-of-pocket losses and up to three hours of lost time at $18 per hour, and $50 payments to California subclass members). Because the settlement amount here is like other settlements approved in similar cases, this factor reflected that the settlement is fair. *See Calderon v. Wolf Firm*, 2018 WL 6843723, at *7-8 (C.D. Cal. Mar. 13, 2018) (comparing class settlement with settlements in similar cases). Considering the difficulties and expenses Settlement Class members would face pursuing individual claims, and the likelihood that they might be unaware of their claims, the settlement benefits offered here are appropriate. *See id.*

The settlement value per class member here also exceeds that in other exemplary data breach settlements. Here, there is no aggregate cap on the amount Settlement Class members can claim, so each Settlement Class member could claim the full amounts listed above (including the $100 cash benefit for the California Settlement Subclass members). Comparison of a simple amount recovered per class member in other data breach settlements demonstrates this settlement provides an excellent recovery:

| Case Title | Settlement Amount | No. of Class Members | $ Per Class Member |
|---|---|---|---|
| *In re Target Corp. Customer Data Breach Security Litigation*, MDL No. 2522 (D. Minn.) | $10M | 97.5M | $0.10 |
| *Adlouni v. UCLA Health Systems Auxiliary, et al.*, No. BC 589243 (Los Angeles Super. Ct.) | $2M | 4.5M | $0.44 |
| *In re Yahoo! Inc. Customer Data Breach Litig.*, No. 5:16-MD-02752-LHK (N.D. Cal.) | $117.5M | 194M | $0.61 |
| *Fehlen v. Accellion, Inc.,* Case No. 21-cv-01353 (N.D. Cal.) | $8.1M | 9.2M | $0.90 |
| *Atkinson, et al. v. Minted, Inc.*, No. 3:20-cv-03869-VC (C.D. Cal.) | $5M | 4.1M | $1.22 |
| *Cochran, et al. v. The Kroger Co., et al.,* No. 5:21-cv-01887 (N.D. Cal.) | $5M | 3.82M | $1.31 |
| *In re Capital One Consumer Data Security Breach Litig.*, No. 1:19-md-02915-AJT-JFA (E.D. Va.) | $190M | 98M | $1.93 |

| Case Title | Settlement Amount | No. of Class Members | $ Per Class Member |
|---|---|---|---|
| *In re Equifax Inc. Data Security Breach Litig.*, No. 1:17-md-02800-TWT (N.D. Ga.) | $380.5M | >147M | $2.59 |
| *In re Premera Blue Cross Customer Data Security Breach Litig.*, No. 3:15-md-2633-SI (D. Or.) | $32M | 8.86M | $3.61 |
| *Winstead v. ComplyRight, Inc.*, No. 1:18-CV-4990 (N.D. Ill.) | $3.025M | 665,689 | $4.54 |

PSER-015, ¶ 32 These comparisons underscore the strength of the resolution secured here.

Appellants once again attack the settlement claiming it "guaranteed nothing to the class" and contend it constitutes a "less than nuisance" value from this case's purported maximum value of more than $77 million. These exact arguments were heard and rejected by the district court for good reason. The settlement does indeed "offer guaranteed amounts" to every claimant: at least two years of credit monitoring from three credit bureaus, worth $360 per person, and it provides $100 to any of the more than 30,000 California Subclass members who were eligible to file a claim.

Also, Appellants' $77 million figure was predicated upon an argument that is nothing more than a hypothetical. The sum of Appellants' argument is that if "the CCPA applies to companies headquartered in California, regardless of where their victims reside (an unsettled issue), then that liability could be $77 million." 3-ER-310. Appellants' own argument betrays that this is nothing more than an untested

hypothetical valuation of this case, supported by no case law. Even worse, Appellants cite no certified class action case—and not even any individual action— that achieved the maximum statutory damages (either by settlement or trial) for a CCPA claim. The maximum value is never recovered. The $77 million figure is merely offered for shock value and is nothing more than a theoretical math exercise unsupported by any results in the real world. Indeed, when the Court pressed Ms. Wolfson at the hearing on the motion for preliminary approval as to what her opening demand would be at a mediation in this case, she stated it would be $10,000,000. 4-ER-539:15-25.

Moreover, Appellants' lofty valuations of the potential value of this case are belied by their counsel's settlements in other cases. In *Cochran*, Attorney Wolfson settled the claims of 3.82 million class members for $5 million, or approximately $1.31 per class member, including California subclass members, before deducting the costs of settlement administration or attorneys' fees. *Cochran*, No. 5:21-cv-01887-EJD, ECF No. 32 at 2, 12 (June 30, 2021). Because the claims rate was only 2.1%, the California subclass members in that case received $72 each—still below the $100 California Settlement Subclass members could claim here.

Similarly, in *Fehlen v. Accellion, Inc.*, Case No. 21-cv-01353 (N.D. Cal.), where class members' Social Security Numbers were compromised, Attorney Wolfson reached a proposed settlement of $8.1 million for 9.2 million class members

that averaged to $0.90 per class member. And in *Coleman, et al. v. Boys Town National Research Hospital*, District Court of Douglas County, Nebraska, Case No. D01CI18008162, a data breach class action case that was settled on a capped, claims-made basis with identity-theft protection, monetary relief for identity, tax, financial, or medical fraud, and lost time, Appellants' counsel Andrew C. White requested and received a $925,000 attorneys' fee. Accordingly, the settlements of Appellants' own counsel demonstrate the fairness, reasonableness, and adequacy of the settlement here, as the district court rightly found.

Comparisons to other settlements demonstrate the class relief negotiated here is fair, reasonable, and adequate independent of the attorneys' fees and expenses award. As the Settlement Agreement notes, "[t]he Court-approved Class Counsel Payment will not affect any benefits provided to Class Members or Plaintiffs." 3-ER-374. Class relief was negotiated prior to any discussions about attorneys' fees (PSER-035, ¶ 24; 1-SER-122, ¶ 8), and there is nothing in the record to suggest that CPK would have offered more compensation to the Settlement Class than it did. Instead, the fact that an impasse was reached over class relief at the first mediation session shows that CPK and its counsel vigorously contested Plaintiffs' claims and did not want to offer the class the relief that it ultimately did. Accordingly, the settlement is fair, reasonable, and adequate as to class relief, and there was no abuse

of discretion in the district court granting final approval to this settlement, regardless of how this Court views the attorneys' fee award.

### 2. Attorneys' Fees Were Sought and Awarded on a Lodestar Basis

Appellants' argument that an inflated value of this claims-made settlement was used to justify an excessive attorneys' fee suffers from a fatal defect. The attorneys' fees awarded by the district court here were awarded based upon a lodestar submission by Class Counsel. *See* 2-ER-126-39. This was done because Class Counsel recognized, and the district court agreed, that "where a settlement 'will be paid on a claims-made basis with no cap to the relief available[,]'" as is the case here, "[i]t is more appropriate to employ a lodestar method rather than a percentage method…." *Castellon v. Penn-Ridge Transp., Inc.*, No. ED CV18-02136 JAK (KKx), 2020 WL7786659, at *9 (C.D. Cal. Nov. 3, 2020); 2-ER-128. Indeed, Appellants acknowledge that a lodestar approach was the appropriate one. App. Br. at 34.

It is not the case that an "inflated figure was used to justify the fee award." App. Br. at 27. While there was a brief "percentage of the gross value cross check" in the fee motion, it was merely that – a cross check to ensure the reasonableness of the lodestar fee application. "In instances where the court uses the percentage-of-the-fund approach as a cross-check on its lodestar analysis, the court need not be exact in its estimate of the total value of the fund." *Grays Harbor Adventist*

*Christian Sch. v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, at *5 (W.D. Wash. April 24, 2008) (citing *Wing v. Asarco Inc.*, 114 F.3d 986, 990 (9th Cir. 1997) (affirming award of fees where the court conducted a percentage of the estimated fund cross check and acknowledged that the actual value of the fund was not guaranteed and depended on the outcome of other litigations)).

Appellants' own citations are all to the preliminary approval hearing, when the claims rate for this settlement was unknown and the value of the settlement articulated by Class Counsel was a good faith estimate based upon Class Counsel's knowledge and experience. 1-SER-125, ¶ 19; 4-ER-497:17-25. At preliminary approval, the district court raised concerns with a percentage of the benefit approach, and Class Counsel did not pursue that approach for their fee motion. The reason that the district court did not at final approval undertake a proportionality analysis as part of a percentage of the benefit approach, or otherwise address some allegedly "disproportionate amounts negotiated" as the basis for the fee award, is because that was not the issue before the district court. Instead, the issue was whether the lodestar justified the fees requested, and it did.

Appellants' reliance upon *Lowery v. Rhapsody Int'l, Inc*., 75 F.4th 985 (9th Cir. 2023) is misplaced. First, there is no dispute that the actual monetary recovery to the Settlement Class far outstrips the $50,000 in class relief in *Lowery*. Second, the value of the monetary and credit monitoring benefits claimed here is $1,161,149,

more than the attorneys' fees awarded. 2-ER-027, ¶ 2; 1-SER-125, ¶ 19. This calculation does not include the value of the notice and claims administration ($172,570.00 (2-ER-033)), nor does it include the attorneys' fees and costs ($800,000) nor any amount assigned to the business practice improvements included in the settlement, all of which were substantial benefits to the Settlement Class. Third, the fees awarded necessarily included only a modest lodestar multiplier of 1.12, demonstrating that the district court considered and applied the factors articulated in *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1050 n.5 (9th Cir. 2002).

Here, the attorneys' fees awarded demonstrate that the district court thoughtfully applied its discretion and made the award based upon the submitted lodestar with a modest multiplier. Just as with the terms of the settlement itself, there was no lack of scrutiny by the district court.

### 3. The District Court Considered the Attorneys' Fees Provision in the Settlement Agreement

Appellants repeatedly rely upon the provision of the Settlement Agreement that states that CPK agreed not to object to Plaintiffs' request for combined attorneys' fees and costs up to $800,000. 3-ER-373, ¶ 5(a). Appellants defeat their own argument here, noting that they gave the district court "repeated cautioning" about this provision. App. Br. at 30. Contrary to the assertion that the district court "never scrutinized the clear sailing agreement" (*id*.), the opposite is true. The district court necessarily considered this provision and rejected it as evidence of collusion.

As Appellants rightly note, provisions of this type are not prohibited. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 949 (9th Cir. 2011). There is no evidence in this case that the Class would have received meaningfully more if CPK had been allowed to contest the fee motion. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1127 (9th Cir. 2020) (finding no abuse of discretion where district court discounted clear-sailing provision). This is particularly true here, where attorneys' fees were negotiated only after all material terms of class relief were agreed upon, confirmed by the mediator's under-oath declaration. PSER-035, ¶ 24; 1-SER-122, ¶ 8; 1-SER-134, ¶ 6; PSER-006-07, ¶ 7. Furthermore, because the settlement did not include an aggregate cap and the fees were paid separate from the benefits to the Settlement Class, if CPK had contested the fee motion, any reduction in the fees awarded would have flown to CPK's benefit. Thus, here, where the district court gave all aspects of this settlement a high degree of scrutiny over multiple in-person hearings and reams of briefing, the district court's rejection of Appellants' argument that this provision is evidence of collusion was not an abuse of discretion.

### 4. The District Court Did Not Abuse Its Discretion in Dismissing Appellants' So Called "Signs of Collusion"

In setting forth what they call "not-so-subtle signs of collusion," Appellants are trying to make an ordinary settlement negotiation look underhanded. A court's consideration of accusations of collusion in these circumstances, without any evidence of "underhanded activity," "'would lead to the conclusion that no

settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases could settle without being accused by another of participating in a collusive reverse auction.'" *Negrete v. Allianz Life Ins. Co.*, 523 F.3d 1091, 1100 (9th Cir. 2008) (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1189 (10th Cir. 2002)). The record does not support Appellants' allegations because there was nothing underhanded about the negotiations. Instead, the record makes clear that this appeal primarily concerns a group of disgruntled counsel, who filed a case after Plaintiffs and are accusing Plaintiffs of collusion because Appellants wanted the case to themselves.[6] Appellants identified these same "signs" to the district court, and, as discussed above, after substantial written briefing and testimony from the mediator, the district court correctly rejected the idea that these somehow evidenced collusion.

Appellants try to paint a picture that they were shut out of settlement negotiations, but in fact, the opposite is true: *Appellants' counsel excluded themselves from the case*. As of December 8, 2021, two days before the *Kirsten* action was even filed, Class Counsel had already self-organized and agreed to work cooperatively with all other counsel. PSER-005, ¶ 2; PSER-019, ¶ 2. Once they

---

[6] This motivation is made plain by Appellants' specific request that the Court not only reverse approval of the instant settlement, but also instruct the court below "to consider applications for lead counsel under Rule 23(g)." App. Br. at 34. Simply put, sour grapes are not grounds for an appeal.

learned the *Kirsten* action had been filed, Class Counsel internally circulated a draft stipulation for an overall consolidation that included the *Kristen* case and then reached out to Appellants on January 6, 2022 "to see if counsel on all five cases could prosecute the litigation together[.]" PSER-029-30, ¶ 6; PSER-031, ¶ 5. However, Appellants' counsel refused that offer, declaring that they were not interested in prosecuting "all five cases as one[,]" and instead would challenge the first four filed cases for leadership of this matter. *Id.* Despite this rejection, Class Counsel worked with CPK to revise the earlier drafted stipulation of consolidation, which still included the *Kirsten* case, and then sent it to Appellants' counsel. PSER-033-34, ¶¶ 14-15. Appellants responded by demanding edits and insisting on an absurdly short briefing schedule of seven (7) days for a contested leadership motion. *Id.*, ¶ 16. The next day, February 9, 2022, Plaintiffs affirmed that all parties agreed to consolidating all the cases, but that they needed to meet and confer on a reasonable briefing schedule for leadership. *Id.*, ¶ 17. Appellants' counsel did not respond for five days, and on February 14, 2022, Plaintiffs filed a revised stipulation that included only the first four filed cases because they were the only matters that had consented to the stipulation. *Id.*, ¶¶ 18-19. Nevertheless, Plaintiffs still noted in a footnote that they had unsuccessfully made efforts to include the *Kirsten* case and it was not being consolidated. *Id.* ¶ 20; 2-SER-283, n.1.

As this timeline shows, it was Appellants that repeatedly *excluded themselves*.

The *Kirsten* matter did not appear in the consolidation stipulation due to Appellants' counsel's failure to respond to Class Counsel's email. At no time thereafter did Appellants seek to have their action consolidated with the other four actions. Likewise, it is preposterous for Appellants to claim that Plaintiffs improperly sought to delay briefing on leadership. Plaintiffs first offered to work with Appellants cooperatively, and when Appellants rejected that offer Plaintiffs, representing the first four (4) out of the five (5) filed cases, asked to meet and confer to agree on a schedule that provided more than just one week to submit leadership applications. Again, no meet-and-confer ever happened because Appellants ignored that request.

Appellants further assert that Plaintiffs "most likely agreed to a claims-made structure without any information or discovery," and then "secretly" mediated a resolution" (App. Br. at 31), but this is nothing more than rank speculation made by a party that was not involved in those negotiations. In fact, the record shows the exact opposite. From late December through January, Plaintiffs and CPK conducted settlement discussions and a meet-and-confer regarding CPK's planned motion to dismiss, which raised concerns for Plaintiffs regarding their claims. On January 26, 2022, Plaintiffs sent CPK a term sheet, which proposed a claims-made settlement structure, and suggested using Bruce Friedman as a mediator. PSER-033, ¶ 10. That term sheet made clear that any further settlement discussions would hinge on CPK's willingness to provide confirmatory discovery needed to inform an eventual

settlement. *Id.*, ¶ 12. Consistent with this requirement, prior to mediation, Plaintiffs and CPK exchanged informal discovery on a variety of topics, including applicable insurance coverage (which was a wasting policy that was being eroded by litigation costs), the nature of the data breach, and the information that may have been accessed due to the breach. PSER-006, ¶ 6; 1-SER-121, ¶ 7. Thus, Plaintiffs did indeed have sufficient information to effectively negotiate what is a strong settlement.

Furthermore, the very same term sheet Plaintiffs' counsel sent to CPK on January 26, 2022, formed the opening demand at mediation, and was sent to Mr. Friedman as part of Plaintiffs' pre-mediation confidential summary. PSER-034-35, ¶ 21. There were no "secret" negotiations that took place between Plaintiffs and CPK. Instead, Plaintiffs' counsel made a settlement demand, scheduled a mediation, exchanged informal discovery, participated in the mediation as true adversaries to CPK, and negotiated— at arm's length—a fair, reasonable, and adequate settlement. *Rosales v. El Rancho Farms*, No. 1:12-cv-01934, 2015 WL 4460918, at *16 (E.D. Cal. July 21, 2015) ("the Ninth Circuit has determined the 'presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness.'") (quoting *In re Bluetooth*, 654 F.3d at 946). Plaintiffs were under no obligation to share this information with absent Settlement Class members, including Appellants, until they moved for approval of the settlement.

5. **The Settlement Properly Releases the CCPA Claims and Provides Adequate Relief for California Settlement Subclass Members**

Appellants next try to argue that the settlement improperly released the class claims under the CCPA. However, Plaintiffs had standing and a valid basis to assert a claim under the CCPA, those claims were based on the same common nucleus of operative facts as those alleged in the complaints, and the settlement provides a substantial cash payment for the California Settlement Subclass members.

Plaintiff Sydney Rusen, a citizen of California, filed her complaint on November 23, 2021, as part of the *Gilleo* action. Her complaint did not include a CCPA claim because, prior to filing a claim for damages under the CCPA, a plaintiff must first provide Defendant with 30 days' notice of the claim pursuant to Cal. Civ. Code § 1798.150. PSER-019, ¶¶ 3-6. As such, on December 6, 2021, Plaintiff Rusen provided notice to Defendant of its violations of the CCPA, and Defendant responded on January 24, 2022. *Id.*, ¶¶ 7-8.

Appellants' reliance on the fact that, at the time of settlement, the *Gilleo* complaint itself did not explicitly state a claim under the CCPA is a red herring because "it is mainly irrelevant whether or not" the relief sought to be released "was specifically requested in the complaint. The breadth of negotiations is not necessarily strictly confined by the pleadings." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1288 (9th Cir. 1992) (relied on in *Hesse v. Sprint Corp.*, 598 F.3d 581,

590 (9th Cir. 2010), which Appellants quote). If the claims being released "arise from the same common nucleus of operative fact as those set forth" in the complaint, that is sufficient grounds for the settlement to release those claims. *Id.*; *see also Kazi v. PNC Bank, N.A.*, No. 18-cv-04810-JCS, 2021 WL 965372, at *15 (N.D. Cal. 2021) ("Courts have generally interpreted" the identical factual predicate standard "to coincide with the general res judicata test of whether claims share a 'common nucleus of operative fact.'" (quoting *Class Plaintiffs*, 955 F.2d at 1288)). Plaintiff Rusen, as a California Settlement Subclass member, had standing to assert and release claims under the CCPA. Indeed, pursuant to the statute she provided notice to Defendant of its violations of the CCPA.

Likewise, the CCPA claims were based on the same nucleus of facts alleged in the complaints, *i.e.*, the data breach. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) (affirming dismissal of a class action against credit card companies predicated on the same price-fixing predicate and injury as claims settled in an earlier class action, even though the subsequent suit "posit[ed] a different theory of anti-competitive conduct"); *Kazi*, 2021 WL 965372, at *17 (dismissing claims regarding unpaid rest breaks because an earlier complaint that had been settled discussed compensation for hourly work, and compensable rest breaks are treated the same as hours worked).

The settlement specifically provides for a $100 cash payment for any California Settlement Subclass member who submitted a claim, in addition to the other forms of relief. 3-ER-372, ¶ 3(d). Damages under the CCPA are discretionary. Cal. Civ. Code § 1798.150. The district court found the $100 cash payment for California Settlement Subclass members was reasonable, which was the correct holding because that amount compares favorably to other settlements resolving CCPA claims. *See Cochran*, No. 5:21-cv-01887 (N.D. Cal.), ECF No. 108-1, ¶ 5(e) (Mar. 4, 2022) (settlement includes additional payment of $72 for California class members); *Pagan, et al. v. Faneuil Inc*., No. 3:22-cv-00297 (E.D. Va. Feb. 17, 2023) (approving settlement providing additional $50 payment to California claimants); *Carrera Aguallo*, No. 1:21-cv-01883 (N.D. Ill.), ECF No. 35-3, ¶ 2.3 (Oct. 14, 2021), ECF No. 53 (Mar. 18, 2022) (approving settlement providing additional $50 payment to California claimants).

### 6. Allowing the Settlement to Stand Could Not Possibly Encourage Collusion in Future Settlements Because There Was No Collusion Here

Appellants also argue, without satisfactory explanation, that allowing the settlement to stand would somehow encourage collusion in future settlements. Ironically, Appellants' counsel recently received final approval of a pre-litigation and pre-certification settlement in *Cochran.*, No. 5:21-cv-1887 (N.D. Cal.), a case in which they excluded fellow plaintiffs' counsel in related, parallel actions and

settled the claims without briefing any motion to dismiss or taking any formal discovery. *See id.*, ECF No. 115, Final Approval Order, ¶ 17. The *Cochran* settlement designated roughly $2 million of a $5 million common fund amount as class counsel's attorneys' fee (a multiplier of 2 compared to Class Counsel's instant multiplier of 1.12) and costs, plaintiff service awards, and settlement administration expenses – extinguishing almost half of the fund before the *4 million settlement class members* could even attempt to partake. *Id.*

Thus, Appellants choose to engage in peak, straw-grasping hypocrisy, arguing that Plaintiffs' settlement is the result of collusion that rewards Class Counsel "at the expense of class members," despite their counsel having taken a similar settlement posture in *Cochran*, and despite the district court already having overruled such objections. Notably, unlike *Cochran*, there is **no cap** on the settlement benefits that could be claimed by Settlement Class members, and the overall settlement value achieved on behalf of the Settlement Class far exceeded the amount of requested attorneys' fees (which fees are being paid independent of any award to the Settlement Class).[7] In light of Appellants' counsel's bizarre objection

---

[7] The total dollar amount of claims submitted as of November 2, 2022, is $1,161,149.00. 2-ER-027, ¶ 2; 2-ER-032-33, ¶¶ 6-8. Couple this with the $800,000.00 in requested fees and expenses and the notice and administration costs, and the requested fee amounts to a mere 36.3% of the settlement's total monetary value, with the potential maximum value of the Settlement being approximately $40

to these favorable and efficiently obtained results for the Class, one can only come to the conclusion that Appellants' counsel would prefer to inflict even greater a punishment on CPK through needless, protracted litigation, thereby exhausting the insurance resources that would otherwise be available for the Class – a result that would only serve the interests of the lawyers, not injured persons whom they represent.

In sum, the district court's act of approving a settlement that was proven to have been negotiated in good faith and at arm's-length does not have the negative effect Appellants' counsel now wishes to self-servingly project upon it. The district court approved a settlement consisting of terms that were similar to or exceeded terms of data breach settlements that preceded it, and it did so with the best interests of the parties and the Settlement Class in mind. Accordingly, contrary to Appellants' opinion – which is neither based in reason nor in law – the district court's ruling granting final approval of Plaintiffs' settlement will encourage future defendants and their counsel to be responsible stewards of the resources available to remedy harm to individuals victimized by data breaches. It will also encourage class representatives and their counsel to seek to obtain the best results possible for the class within a reasonable timeframe so that they can more quickly and effectively

---

million when credit monitoring services made available to the Class are also considered. *See* 2-ER-024; 1-ER-7, ¶ 12.

protect themselves from the imminent and substantial risk of fraud and identity theft that often results from the compromise of sensitive personal information.

### C. The Court Should Affirm the $800,000 Fee and Expense Award

#### 1. Class Counsel's Lodestar Is Justified

In its Final Approval Order, the district court approved Plaintiffs' request for $800,000 in attorneys' fees and expenses, citing expenses of $26,367.05 and a lodestar of $687,681 based on 1,028.10 total attorney hours at an average hourly rate of $668.88. 1-ER-007. Class Counsel's lodestar is justified because the time they committed to this action and their respective hourly rates are eminently reasonable considering the effort required to negotiate and effect this settlement while addressing Appellants' repetitive arguments trying to undue the settlement.

"The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) (*citing Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). Class Counsel did just that. Each firm detailed the exact number of hours worked by each attorney and their corresponding hourly rate, all of which the district court found to be "fair and reasonable." 2-ER-148; 2-ER-198-199; 2-ER-229; 2-ER-257; 1-ER-007. Each firm also submitted declarations in which they detailed the necessary work completed to reach this settlement, including:

- extensive, independent factual investigations into the Data Incident, the exposure of Plaintiffs' PII, and Plaintiffs' damages, including mitigating the risk of fraud and identity theft;

- drafting and filing Plaintiffs' initial complaints;

- efficiently organizing and coordinating work and staffing for the benefit of the class, and consolidating the various pending lawsuits;

- requesting and reviewing discovery from CPK sufficient to allow Plaintiffs to evaluate the value and strength of their claims, and the viability of potential defenses;

- engaging in extensive arm's-length negotiations during two days of mediation;

- extensive negotiations concerning the terms of the Settlement Agreement and its exhibits, and the notice program and forms;

- overseeing the court-approved notice program and claims process and, eventually, supplementing the notice program to maximize its reach;

- preparing the motion for final approval, along with the supporting declarations, and responding to the various objections and challenges; and

- responding to Settlement Class member inquiries concerning the settlement.

2-ER-146-47; 2-ER-197-98; 2-ER-226-27; 2-ER-246-47.

Given the considerable work required to secure meaningful relief for the Settlement Class, the number of hours Class Counsel devoted to this action are reasonable and justified. So, too, are Class Counsel's hourly rates, which "are within the range for attorneys of similar skill and experience in the Los Angeles legal market," the relevant market for purposes of the Court's analysis. *Strategic Partners, Inc. v. FIGS, Inc.*, No. CV 19-2286 GW (KSx), 2020 WL 3064440, at \*4 (C.D. Cal. Apr. 29, 2020) (approving rates of $695/hour for counsel, and $795/hour for partner); *see also Marshall v. Northrop Grumman Corp.*, No. 16-CV-6794 AB (JCx), 2020 WL 5668963, at \*4 (C.D. Cal. Sep. 18, 2020) (approving rates in class settlement as high as $1,060/hour); *Cochran*, No. 5:21-cv-01887-EJD (N.D. Cal.), ECF No. 105-1 at ¶ 40 (Jan. 14, 2022), ECF No. 115 (Mar. 24, 2022) (approving rates for Ms. Wolfson's firm of $450 for an associate and ranging from $750 to $950 for partners).

Because Plaintiffs and Class Counsel have met their burden, the "burden of rebuttal" shifts to Appellants and "requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates*, 987 F.2d at 1397 (*citing Blum v. Stenson*, 465 U.S. 886, 892 n.5 (1984)). Appellants here made no

effort to present any such evidence. Instead, they recycle the very same arguments they made below, all of which are baseless and self-serving.

For example, while Appellants imply that the time reporting was not "truthful," they fail to cite *any* support for their claim. *See, e.g.,* App. Br. at 35. Appellants similarly suggest Plaintiffs litigated the action "inefficiently" because multiple attorneys billed time and much of their work was undertaken by senior counsel—but this is usually the case in national class actions, especially those involving mediation and settlement. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1115 (9th Cir. 2008) (holding that the "difficulty and skill level of the work performed, and the results achieved – not whether it would have been cheaper to delegate the work to other attorneys – must drive the district court's decision."); *Moore v. Verizon Comms. Inc.*, No. C 09-1823 SBA, 2014 WL 588035, at *5 (N.D. Cal. Feb. 14, 2014) (refusing to reduce fee award because it "was reasonable for multiple senior attorneys to be present and participate in the important aspects of litigation including mediation and settlement."). Indeed, Appellants fail to cite even a single decision supporting their argument.

Nor do Appellants' highly selective (and misleading) quotations from the record below support their claims of inefficiencies and excessive rates. The district court inquired into the number of attorneys involved and Class Counsel explained that the number of lawyers was the result of four separate actions having been filed.

4-ER-493:23-494-23. Class Counsel effectively addressed the district court's concerns regarding staffing. *Id.* Indeed, the district court's many inquiries the Appellants quote concerning the fee request further demonstrate that the court carefully reviewed and considered Plaintiffs' fee petition. App. Br. at 35-36. The district court held five hearings reviewing the settlement, Plaintiffs' fee request, and Appellants' accusations of collusion and reverse auction. The district court considered extensive briefing and declarations on the fee motion, including supplemental submissions. 4-ER-500-01; 2-ER-019-34. And although it did not issue a formal opinion detailing its ruling, Appellants cannot credibly claim the district court failed to do all that was required to "to assure itself—and [this Court]— that the amount awarded was not unreasonably excessive in light of the results achieved." *In re Bluetooth*, 654 F.3d at 943.

### 2. The Results Obtained More than Justify the Modest Multiplier

In this Circuit, a court may adjust a lodestar figure up or down using a positive or negative multiplier reflecting several factors, namely, "the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Hanlon*, 150 F.3d at 1029. Each of these factors supports the district court's decision to apply a modest 1.12 multiplier to Class Counsel's collective lodestar totaling approximately $773,632.

Class Counsel provided high quality representation. Each of the firms are nationally recognized and extremely experienced in the highly specialized field of class action litigation, well-credentialed, and more than able to effectively handle the difficult and novel legal issues in this case. 2-ER-152-195; 2-ER-201-219; 2-ER-232-243; 2-ER-251-257. Each firm leveraged their extensive experience for the benefit of the Settlement Class, as evidenced by the considerable, high-quality work undertaken to successfully resolve this action.

Additionally, nearly all class actions involve a high level of risk, expense, and complexity – undergirding the strong judicial policy favoring settlements. *Limney*, 151 F.3d at 1238. That is particularly true of data breach litigation, in which "[t]he law … remains uncertain and the applicable legal principles have continued to evolve …" *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *32. *See also In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-md-2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019) ("This unsettled area of law often presents novel questions for courts."). The risks inherent in trying a data breach class action magnify the difficult and evolving legal questions typically presented. *See e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, *11 (N.D. Cal. Aug. 17, 2018).

This case is no exception. The action involves a complicated and technical set of facts and a motivated defendant. As discussed above, data breach damage

methodologies remain untested and unproven. Indeed, establishing causation and damages on a class-wide basis is an unexplored legal frontier rife with uncertainty. Additionally, each of the firms representing Plaintiffs chose to represent them on contingency, facing a substantial risk that the litigation would yield no or very little recovery.

In sum, a multiplier was justified and the modest multiplier of 1.12 is extremely reasonable. *See, e.g.*, *Munoz v. Pentair Water Pool & Spa, Inc.*, No. 2:19-cv-02310 JAK (SKx), 2021 U.S. Dist. LEXIS 220386, at *17 (C.D. Cal. Nov. 12, 2021) ("'[m]ultiples ranging from one to four are frequently awarded'" (quoting *Vizcaino*, 290 F.3d at 1050 n.5)); *Abdullah v. United States Sec. Assoc.*, No. CV 09-9554 PSG (Ex), 2017 WL 11630767, at *10-*11 (C.D. Cal. Dec. 4, 2017) (lodestar multiplier of 2.4). The 1.12 multiplier likewise is reasonable when compared to those awarded in other data breach cases in which early settlements were reached. *See, e.g., Atkinson v. Minted, Inc.*, No. 3:20-CV-03869-VC, 2021 WL 6028374, at *4 (N.D. Cal. Dec. 17, 2021) (approving 1.6 multiplier); *Linnins v. HAECO Ams., Inc.*, No. 1:16CV486, 2018 U.S. Dist. LEXIS 183839, at *7-*9 (M.D.N.C. Oct. 26, 2018) (approving 1.16 multiplier); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL 3341200, at *11 (W.D. Ky. Aug. 23, 2010) (approving 1.2 multiplier).

That the multiplier's reasonableness was not explicitly detailed in a written order does not mean the district court failed to carry out its "independent obligation to ensure that the award, like the settlement itself, is reasonable[,]" *In re Bluetooth*, 654 F.3d at 941, as evidenced by the myriad hearings held and briefs submitted. The district court did not "rubber-stamp" Class Counsel's fee award, and the multiplier it awarded is fair and reasonable.

### 3. Even Under Heightened Scrutiny Using the Percentage Method to Cross-Check, the Fee is Justified and Reasonable Compared to the Total Benefit to the Class

"District courts awarding fees must expressly consider the value that the settlement provided to the class … and explain how that justifies the fee award." *Lowery*, 75 F.4th at 992 (*citing In re Bluetooth*, 654 F.3d at 943-45). While Appellants argue that this assessment should be limited to monetary relief (App. Br. at 39), this Court requires district courts to also consider "the value of nonmonetary relief …." *Lowery*, 75 F.4th at 992. Further, in cases where "assigning a precise dollar amount to the class benefit may prove difficult … the district court's assessment of the litigation's success will have to be more contextual than in a case where the fees-to-results ratio is readily calculated." *Id.* at 992 n.1.

Here, as established, there was no cap on the total settlement and overall benefit to the class allowing the settlement value potentially to reach well into the tens of millions of dollars. 3-ER-370-72, 3-ER 375-76. The aggregate monetary

relief made available to the class was considerable, but so too were the non-monetary components—meaningful business practice remediation and two years of three-bureau credit monitoring with a retail value of $360 per Settlement Class member.

Appellants concede that Plaintiffs premised the percentage of recovery cross-check portion of their petition on the amount the Settlement Class actually claimed. *See* App. Br. at 38. They nevertheless oddly contend the district court failed to consider the settlement's actual claimed value in granting the fee petition. *Id.* at 40. This argument is bereft of reason. The district court clearly engaged with every aspect of the approval process, including the eventual fee petition. *See, e.g.,* 1-ER-002-10; 2-ER-012-257; 3-ER-289-385. In granting the fee petition, it also scrutinized the requested fee award relative to the value of the timely submitted claims for the settlement's monetary and non-monetary components as required. *Lowery*, 75 F.4th at 992.

And, importantly, the fee award is commensurate with the value of those timely submitted claims. As of November 14, 2022, Settlement Class members had submitted 1,828 Claim Forms for a total of $706,109.27 in monetary relief (1-ER-033) and 1,264 claims for the credit monitoring benefit, conservatively valued at $15 per month for a total value of $455,040 (1-ER-027), for a total conservative value of $1,161,149.27 in monetary and non-monetary relief. Combined with notice and administration costs and requested attorneys' fees and expenses—and excluding the

value of the Business Practice Changes—the settlement's total value is $2,133,719. When considered in that context, it is clear the fee award amounts to only 36.3% of the total value (again, excluding the value of injunctive relief). 2-ER-024. Appellants' claim that the approved fee constitutes "at least 54% of the total cash benefit" fails to account for the significant non-monetary benefits secured here. App. Br. at 39.[8]

That is a far cry from this Court's recent decision in *Lowery*, where this Court found the $1.7 million awarded in attorneys' fees unreasonable, as it was *more than thirty times larger* than the meager $52,841.05 paid out to class members. *Id*. Nor did the *Lowery* settlement require the defendant to make changes to its business practices. *Id*. at 990. The concerns that drove this Court's decision in *Lowery* simply are not present here.

Nor are Appellants' quibbles with the total value of the settlement even dispositive because in performing a percent-of-recovery crosscheck a court "need not be exact in its estimate of the total value" because it is merely looking to see if

---

[8] Appellants raise for the first time on this appeal the idea that the claims for ordinary expenses could at most total $176,000, which decreases the total value of the benefit used by the Court in evaluating the percentage-of-recovery crosscheck. App. Br. at 16. Even if this argument was material, which it is not for the reasons stated above, it has been waived. *Garity v. APWU Nat'l Labor Org.*, 840 F. App'x 924, 926 n.1 (9th Cir. 2020) ("Generally, arguments not raised before the district court are waived on appeal.").

the fee established through the lodestar method is reasonable. *Grays Harbor Adventist Christian Sch.*, 2008 WL 1901988 at *5-*6 (overruling objection to fees based on differences in the value of non-monetary compensation); *see also Wing*, 114 F.3d at 990 (affirming award of fees where estimated value used for percent-of-recovery cross check depended on the future outcome of other litigations); *Zakskorn v. Am. Honda Motor Co.*, No. 2:11-cv-02610-KJM-KJN, 2015 WL 3622990 , at *15 (E.D. Cal. June 9, 2015) (performing only "a rough cross-check" against the value of the recovery based on certain assumptions). Under any proposed calculation, the instant matter is nothing like the vastly outsized fee awarded in *Lowery*, and as such is still reasonable.

Under either method of analysis, the approved award is reasonable and justified. The $773,633.30 fee a 1.12 multiple of the total lodestar of $687,681.00, and when crosschecked under the percentage of recovery method it is just 36.3% of the total value of the settlement ($2,133,719), even when excluding the obvious value of the agreed-to Business Practice Changes. 1-ER-007, ¶ 12; 2-ER-024. Therefore, Class Counsel's $800,000 fee and expense award is justified and reasonable, and the district court did not abuse its discretion in awarding it.

## VIII. CONCLUSION

For all the reasons stated above, Plaintiffs and Class Counsel request this Court affirm the order of the district court granting final approval to the settlement and awarding attorneys' fees and expenses and service awards.

DATED:     January 30, 2024


___*/s/ Mason Barney*___
MASON BARNEY

SIRI & GLIMSTAD LLP
Mason Barney
200 Park Avenue, 17th Fl.
New York, NY 10166
(212) 532-1091
(646) 417-5967 (fax)
mbarney@sirillp.com

___*/s/ Daniel O. Herrera*___
DANIEL O. HERRERA

CAFFERTY CLOBES
MERIWETHER &
SPRENGEL LLP
Daniel O. Herrera
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
(312) 782-4880
(312) 782-4485 (fax)
dherrera@caffertyclobes.com

___*/s/ Rachele R. Byrd*___
RACHELE R. BYRD

WOLF HALDENSTEIN
ADLER FREEMAN &
HERZ LLP
Rachele R. Byrd
750 B Street, Suite 1820
San Diego, CA 92101
(619) 239-4599
(619) 234-4599 (fax)
byrd@whafh.com


___*/s/ David K. Lietz*___
DAVID K. LIETZ

MILBERG COLEMAN
BRYSON PHILLIPS
GROSSMAN PLLC
David K. Lietz
5335 Wisconsin Ave. NW
Suite 440
Washington, DC 20015
(866) 252-0878
(202) 686-2877 (fax)
dlietz@milberg.com

*Attorneys for Plaintiffs-Appellees*

# DECLARATION REGARDING CONCURRENCE

I, Rachele R. Byrd, am the CM/ECF User whose identification and password are being used to file this Answering Brief of Plaintiffs-Appellees. In compliance with Ninth Circuit Rule 25-5(e), I hereby attest that Mason Barney, Daniel O. Herrera and David K. Lietz have concurred in the content of this filing.

DATED:  January 30, 2024     By:   _/s/ Rachele R. Byrd_
                                           Rachele R. Byrd

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Rachele R. Byrd
750 B Street, Suite 1820
San Diego, CA  92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

*Counsel for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  No. 23-55288

I am the attorney or self-represented party.

**This brief contains** 14,000 **words,** including [          ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Rachele R. Byrd  **Date** 01/30/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                        *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | No. 23-55288

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Answering Brief of Plaintiffs-Appellees

**Signature** | s/ Rachele R. Byrd | **Date** | 01/30/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*